**Nos. 18-17308; 18-17311**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

CITY AND COUNTY OF SAN FRANCISCO,

Plaintiff-Appellee,

v.

WILLIAM P. BARR, et al.

Defendants-Appellants.

———————————

STATE OF CALIFORNIA,

Plaintiff-Appellee,

v.

WILLIAM P. BARR, et al.

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## OPENING BRIEF FOR APPELLANTS

———————————

JOSEPH H. HUNT
   *Assistant Attorney General*
DAVID L. ANDERSON
   *United States Attorney*
HASHIM M. MOOPPAN
   *Deputy Assistant Attorney General*
MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN
BRAD HINSHELWOOD
LAURA E. MYRON
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7228*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-4819*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

STATEMENT OF JURISDICTION ................................................................ 4

STATEMENT OF THE ISSUES ..................................................................... 5

STATEMENT OF THE CASE ........................................................................ 5

    A. The Immigration and Nationality Act ................................................. 5

        1. Detention and Removal of Aliens ................................................. 6

        2. Cooperation with Federal Immigration Enforcement:
           8 U.S.C. § 1373 ............................................................................ 7

    B. The Byrne JAG Program ..................................................................... 8

        1. The § 1373 Certification .............................................................. 10

        2. The Notice and Access Conditions ............................................ 11

    C. Community Oriented Policing Services (COPS) Grants .............................. 12

    D. Prior Proceedings ................................................................................ 12

SUMMARY OF ARGUMENT ........................................................................ 16

STANDARD OF REVIEW ............................................................................... 20

ARGUMENT ...................................................................................................... 20

    I.    The Assistant Attorney General Has Statutory Authority
        to Impose Conditions on Byrne JAG Funding, Including the
        Notice and Access Conditions for FY 2017. ............................................. 20

    II.   The § 1373 Certification Condition for FY 2017 Is Valid and
        § 1373 Raises No Tenth Amendment Concerns ....................................... 28

A.  The § 1373 Certification Condition Is Statutorily Authorized........... 28

B.  Section 1373 Does Not Violate the Tenth Amendment .................... 30

III.    The Conditions Neither Violate the Spending Clause
Nor Are Arbitrary and Capricious.............................................................. 37

IV.    The District Court Erroneously Concluded That California
and San Francisco's State and Local Ordinances Complied
with Section 1373. ..................................................................................... 42

V.    The District Court Improperly Extended the Injunction
to Entities Other than San Francisco and California............................... 46

A.  Article III Standing Requirements Preclude an Injunction
That Extends Beyond What Is Necessary to Redress
Plaintiffs' Injury ...................................................................................... 46

B.  Traditional Equitable Principles Preclude an Injunction That
Extends Beyond What Is Necessary to Redress Plaintiffs'
Injury ........................................................................................................ 50

CONCLUSION ............................................................................................... 56

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                      **Page(s)**

*Adams v. Dole,*
  927 F.2d 771 (4th Cir. 1991) ........................................ 24

*Alvarez v. Smith,*
  558 U.S. 87 (2009) ............................................. 48, 49

*American Sur. Co. of N.Y. v. Marotta,*
  287 U.S. 513 (1933) ................................................ 24

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................. 5, 33

*Avery Dennison Corp. v. Sumpton,*
  189 F.3d 868 (9th Cir. 1999) ...................................... 20

*Bennett v. Kentucky Dep't of Educ.,*
  470 U.S. 656 (1985) ................................................ 38

*Bresgal v. Brock,*
  843 F.2d 1163 (9th Cir. 1987) ..................................... 51

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ....................................... 50, 51, 53, 54

*City and County of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) .................................... 4, 54

*City of Chicago v. Sessions,*
  321 F. Supp. 3d 855 (N.D. Ill. 2018), *appeal docketed,*
  No. 18-2885 (7th Cir. Aug. 28, 2018) ........................... 29, 35

*City of Chicago v. Sessions,*
  888 F.3d 272 (7th Cir. 2018)*, vacated in part,*
  2018 WL 4268817 (7th Cir. June 4, 2018) ........................ 26, 53

*City of Philadelphia v. Attorney Gen.,*
  916 F.3d 276 (3d Cir. 2019) ....................................... 26

*City of Philadelphia v. Sessions,*
  280 F. Supp. 3d 579 (E.D. Pa. 2017) .............................................................. 26

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ................................................................................ 46, 48

*Dalton v. Specter,*
  511 U.S. 462 (1994) ........................................................................................ 37

*Davis v. Monroe Cty. Bd. of Educ.,*
  526 U.S. 629 (1999) ........................................................................................ 38

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
  92 F.3d 1486 (9th Cir. 1996) ........................................................................ 50

*Federal Trade Comm'n v. MTK Mktg., Inc.,*
  149 F.3d 1036 (9th Cir. 1998) ...................................................................... 24

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ............................................................................ 47, 48

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999) ........................................................................................ 51

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
  452 U.S. 264 (1981) ........................................................................................ 34

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018) ...................................................................................... 7

*Kansas v. United States,*
  214 F.3d 1196 (10th Cir. 2000) .................................................................... 39

*Lamar, Archer & Cofrin, LLP v. Appling,*
  138 S. Ct. 1752 (2018) .................................................................................... 43

*Lewis v. Casey,*
  518 U.S. 343 (1996) ................................................................................ 47, 48

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ........................................................................................ 42

iv

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
  638 F.3d 644 (9th Cir. 2011) ...................................................... 50, 51, 53, 54, 55

*Madsen v. Women's Health Center, Inc.,*
  512 U.S. 753 (1994) ................................................................................... 54

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) .................................................................... 47

*Mayweathers v. Newland,*
  314 F.3d 1062 (9th Cir. 2002) ................................................................... 39

*McKenzie v. City of Chicago,*
  118 F.3d 552 (7th Cir. 1997) ..................................................................... 49

*Meinhold v. U.S. Dep't of Def.,*
  34 F.3d 1469 (9th Cir. 1994) ..................................................................... 50

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ................................................................................... 49

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..................................................................................... 42

*Murphy v. National Collegiate Athletic Ass'n,*
  138 S. Ct. 1461 (2018) ............................................................... 19, 31, 33, 34, 35

*National Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ................................................................................... 38

*Nevada v. Skinner,*
  884 F.2d 445 (9th Cir. 1989) ................................................................. 30, 38, 39

*New York v. United States,*
  505 U.S. 144 (1992) ............................................................................. 31, 36, 39

*Norfolk & W. Ry. v. American Train Dispatchers Ass'n,*
  499 U.S. 117 (1991) ................................................................................... 29

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) ....................................................................................... 38

*Printz v. United States,*
  521 U.S. 898 (1997) ..................................................30, 35, 36

*Reno v. Condon,*
  528 U.S. 141 (2000) .......................................................... 36

*Russello v. United States,*
  464 U.S. 16 (1983) ............................................................ 44

*South Dakota v. Dole,*
  483 U.S. 203 (1987) ............................................ 14, 18, 30, 39

*Stone v. INS,*
  514 U.S. 386 (1995) ........................................................... 25

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .......................................................... 48

*Town of Chester v. Laroe Estates, Inc.,*
  137 S. Ct. 1645 (2017) ...................................................... 47

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) ...................................................... 52

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) ............................................................ 24

*United States v. Mendoza,*
  464 U.S. 154 (1980) ..................................................51, 53, 55

*Virginia Soc'y for Human Life v. Federal Election Comm'n,*
  263 F.3d 379 (4th Cir. 2001) .........................................51, 53, 55

*Warth v. Seldin,*
  422 U.S. 490 (1975) ...................................................... 47, 49

*Zepeda v. U.S. Immigration & Naturalization Serv.,*
  753 F.2d 719 (9th Cir. 1983) .........................................47, 49, 53

**Statutes:**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
  Pub. L. No. 104-208, div. C, tit. VI, 110 Stat. 3009 ...................................................... 7

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ................................................. 1
  8 U.S.C. § 1226(a) ...........................................................................................6, 7, 32
  8 U.S.C. § 1226(c) ...................................................................................................... 32
  8 U.S.C. § 1226(c)(1) .................................................................................................... 7
  8 U.S.C. § 1226(c)(2) .................................................................................................... 7
  8 U.S.C. § 1227(a)(1)(C) ............................................................................................ 45
  8 U.S.C. § 1229b(a)(1)-(2) ......................................................................................... 45
  8 U.S.C. § 1229b(b)(1)(A) .......................................................................................... 45
  8 U.S.C. § 1231(a)(1) ................................................................................................... 6
  8 U.S.C. § 1231(a)(1)(A) .................................................................................... 17, 32
  8 U.S.C. § 1231(a)(1)(B)(iii) ..............................................................................6, 17, 32
  8 U.S.C. § 1231(a)(2) ...........................................................................................6, 7, 32
  8 U.S.C. § 1231(a)(4)(A) .....................................................................................6, 17, 32
  8 U.S.C. § 1305 ........................................................................................................... 45
  8 U.S.C. § 1373 ...................................................................................................passim
  8 U.S.C. § 1373(a) ................................................................................. 8, 11, 32, 42
  8 U.S.C. § 1373(b) ................................................................................. 8, 11, 31, 42
  8 U.S.C. § 1373(c) .....................................................................................8, 43, 44

Justice Assistance Act of 1984,
  Pub. L. No. 98-473, 98 Stat. 2077 ............................................................................ 25

Violence Against Women and Department of Justice Reauthorization Act of 2005,
  Pub. L. No. 109-162, 119 Stat. 2960 (2006) ........................................................21, 25

Violent Crime Control and Law Enforcemetn Act of 1994,
  Pub. L. No. 103-322, 108 Stat. 1796 ........................................................................ 12

Water Resources Reform and Development Act of 2014,
  Pub. L. No. 113-121, 128 Stat. 1193 ........................................................................ 29

6 U.S.C. § 251(2) ........................................................................................................... 6

6 U.S.C. § 552(d) ........................................................................................................... 6

28 U.S.C. § 1331 ............................................................................................................ 4

28 U.S.C. § 1291 ........................................................................................... 5

28 U.S.C. § 1292(a) ...................................................................................... 5

34 U.S.C. §§ 10101-10102 ........................................................................ 27

34 U.S.C. §§ 10101-10111 ........................................................................ 27

34 U.S.C. § 10102(a)(6) .......................................... 2, 9, 13, 16, 17, 21, 23, 24, 25, 26, 27

34 U.S.C. § 10141(b) ................................................................................ 27

34 U.S.C. §§ 10151-10158 ........................................................................ 27

34 U.S.C. § 10152 ...................................................................................... 40

34 U.S.C. § 10152(a)(1) ........................................................ 8, 20, 22, 23, 41

34 U.S.C. § 10152(b) ................................................................................... 9

34 U.S.C. § 10153(A) ................................................................................... 9

34 U.S.C. § 10153(A)(4) .......................................................... 9, 20, 22, 24

34 U.S.C. § 10153(A)(5) ............................................................................ 18

34 U.S.C. § 10153(A)(5)(C) ............................................................ 20, 22, 24

34 U.S.C. § 10153(A)(5)(D) ................................. 2, 5, 9, 18, 20, 28, 29, 41

34 U.S.C. § 10156 ........................................................................................ 9

34 U.S.C. § 10156(c) .................................................................................... 9

34 U.S.C. § 10381(b) ........................................................................... 12, 30

34 U.S.C. § 10444(7) .................................................................................. 25

42 U.S.C. § 3712(a)(6) (2000) ................................................................... 25

42 U.S.C. § 5779(a) ........................................................................ 36

42 U.S.C. § 16154(g)(1) ............................................................ 18, 29

42 U.S.C. § 2000d-4a ................................................................... 11

49 U.S.C. app. § 1305(a)(1) (1988) .............................................. 35

Cal. Gov't Code:

    § 7282 ...................................................................................... 43
    § 7282.5 ................................................................................... 43
    § 7283 *et seq.* ......................................................................... 43
    § 7284 *et seq.* ......................................................................... 43

San Francisco, Cal., Admin. Code:

    Ch. 12H, § 12H.2 .................................................................. 43
    Ch. 12I, § 12I.2 ...................................................................... 43

**Regulations:**

8 C.F.R. § 214.1 ............................................................................ 45

8 C.F.R. § 274a.12 ........................................................................ 45

28 C.F.R. § 66.12(a) (2014) ......................................................... 26

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ............................................................ 5

**Legislative Materials:**

H.R. Rep. No. 104-725 (1996) ............................................ 8, 33, 44

H.R. Rep. No. 109-233 (2005) ..................................................... 25

S. Rep. No. 104-249 (1996) ......................................................... 45

ix

**Other Authorities:**

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
　131 Harv. L. Rev. 417 (2017) .......................................................... 52

Cal. Dep't Of Justice, *Information Bulletin*, (June 25, 2014) ............................................. 46

*The Federalist No. 78*, (Alexander Hamilton) (Clinton Rossiter ed., 1961) .................... 52

OJP, U.S. Dep't of Justice, *About Us,*
　https://ojp.gov/about/about.htm .............................................................. 27

75 Ops. Cal. Atty. Gen. 270 (1992) .................................................................. 46

# INTRODUCTION

This case involves three conditions that the Department of Justice (Department) has placed on the receipt of FY 2017 law-enforcement grants under the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) program in order to discourage frustration of federal law enforcement in the interaction of federal and state regulatory schemes.

The federal government regulates aliens under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* The States regulate the same individuals in various ways, including regulation under their criminal laws. Under the INA, aliens in state custody cannot be removed until they are released, but prompt federal action is often required when aliens are released. The system should—and often does—work seamlessly. At the end of state confinement, the Department of Homeland Security (DHS), pursuant to administrative warrants, takes custody pending removal. In the absence of cooperation, however, aliens subject to removal may return to the general population at the end of their criminal sentence, creating potential risks for federal agents and the community and requiring a wholly unnecessary expenditure of scarce resources.

The three Byrne JAG conditions at issue in this appeal confirm the importance of sharing information as to these individuals to ensure that the state regulatory scheme does not impair the operation of the federal immigration laws.

The first condition, referred to as the "notice" condition, requires that grant recipients have a policy of informing DHS of the scheduled release date of an alien in criminal custody, after receiving a formal request for notification from DHS. The second condition, referred to as the "access" condition, requires that grant recipients have a policy of allowing federal agents to meet with incarcerated aliens in order to inquire about the aliens' right to remain in the United States. The Acting Assistant Attorney General for the Office of Justice Programs (OJP), who administers the Byrne JAG program, imposed the notice and access conditions pursuant to his statutory powers, which "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).

The third condition, referred to as the "§ 1373 certification" condition, requires Byrne JAG applicants to certify that they comply with 8 U.S.C. § 1373, which prohibits restrictions on the sharing of "information regarding . . . immigration status" with DHS. Congress authorized this requirement when it specified that Byrne JAG applicants must certify "in a form acceptable to the Attorney General" that they "will comply with" the Byrne JAG statute "and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). The Department understands "information regarding . . . immigration status" to include an alien's scheduled release date because under the INA, an alien's release date from state or local confinement information is often critical to determining when DHS may detain and remove an alien.

2

Plaintiffs insist that they should not be required to comply with these modest conditions, which are designed to prevent States and localities from upsetting the cooperative law-enforcement framework set forth in the INA by thwarting the federal government's removal of suspected or convicted criminals from the country. They brought these suits raising statutory and constitutional challenges to the Byrne JAG conditions.

The district court granted plaintiffs' request for a permanent injunction with respect to all three conditions. It held that the notice and access conditions are not authorized by statute and are arbitrary and capricious under the Administrative Procedure Act (APA). The court declared that § 1373 does not cover the date an alien is released from local criminal custody, and also concluded that California and San Francisco substantially comply with the § 1373 condition. Although there was no reason for it do so, given its statutory holdings, the court then proceeded to hold that § 1373 violates the Tenth Amendment.

The district court was wrong in all respects. Its reasoning with respect to the notice and access conditions renders meaningless the statute's specific authorization to impose conditions on law enforcement grants. Its reading of § 1373 similarly robs that provision of meaning. The court's constitutional ruling was misjudged in two principal ways. First, it is settled that Congress can include conditions on the receipt of federal funds that it could not impose as freestanding requirements. Second, even if the court

3

had been addressing § 1373 outside the context of a condition, the provision in no sense commandeers state resources in contravention of the Tenth Amendment.

The court further erred by making its injunction applicable to all grant applicants even though there is no dispute that an injunction limited solely to California and San Francisco's grants would fully remedy the parties' injuries. Both Article III and principles of equity preclude injunctions that are broader than necessary to redress a plaintiff's own injuries. This Court has cautioned that nationwide injunctions are appropriate only in "exceptional cases," *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018), and the district court erred in failing to heed this Court's guidance.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331 to adjudicate their federal law challenge to certain federal grant conditions. *See* No. 3:17-cv-4701, Dkt. No. 11, at 6 (hereinafter "State Dkt."); No. 3:17-cv-4642, Dkt. No. 61, at 7 (hereinafter "City Dkt."). The district court issued its order granting summary judgment, mandamus relief, and a permanent injunction with respect to conditions imposed on the federal grant funding on October 5, 2018. ER8-9. On November 20, 2018, the court issued an order amending the judgment and scope of the injunction issued in the case brought by the State of California. *See* ER1-4, ER72-73. On December 3, 2018, the defendants filed a timely notice of appeal. ER 68-69, ER70-71;

*see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that the FY 2017 notice and access conditions, and the condition requiring compliance with 8 U.S.C. § 1373, exceed the Department's statutory authority.

2. Whether the district court erred in holding that 8 U.S.C. § 1373 is not an "applicable federal law[]" with which Byrne JAG applicants must certify compliance under 34 U.S.C. § 10153(A)(5)(D).

3. Whether the district court erred in holding that imposition of the conditions violates the Spending Clause and was arbitrary and capricious under the Administrative Procedure Act.

4. Whether, assuming that the court's injunction was not based on legal error, it erred in extending the injunction beyond California to preclude the Department from enforcing the conditions against non-plaintiffs.

## STATEMENT OF THE CASE

### A.    The Immigration and Nationality Act

The federal government has "broad, undoubted power over the subject of immigration and the status of aliens," and Congress has "specified which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 567 U.S. 387, 394, 396 (2012). At the same time, States have a profound interest

5

in enforcing their own criminal laws, including ensuring that state sentences are served for the time period the State has deemed appropriate. Thus, while the federal government has broad power to enforce immigration laws, Congress provided that aliens in state criminal custody generally cannot be removed until they are released. Congress designed this system based on the premise that States and localities would not interfere with the federal government's detention and removal of aliens once state custody has ended.

### 1. Detention and Removal of Aliens

In general, when the Secretary of Homeland Security issues a warrant for an alien's arrest, DHS may arrest and detain the alien "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).[1] Once an alien is subject to a final removal order, DHS shall remove the alien within 90 days and shall detain the alien during that removal period. *Id.* § 1231(a)(1), (2).

When an alien is already in local criminal custody, however, the federal government typically cannot take custody of and remove the alien until he is released. For an alien who is already subject to a final order of removal, DHS shall remove the alien within 90 days of his release from local criminal custody, 8 U.S.C. § 1231(a)(1)(B)(iii), and "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," *id.* § 1231(a)(4)(A). In general, DHS

---

[1] Section 1226(a) refers to the Attorney General, but the relevant functions have been transferred to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 251(2), 552(d).

"shall detain the alien" beginning on his release from local custody and throughout the 90-day removal period, and "[u]nder no circumstance" may DHS release an alien during the removal period if he has a qualifying criminal history. *Id.* § 1231(a)(2).

When an alien who is not yet subject to a final order of removal is released from local criminal custody, the Secretary may issue a warrant for the alien's arrest, and DHS may arrest and detain the alien under the Secretary's general authority in § 1226(a). If the alien has a certain criminal history or has engaged in certain terrorist activities, however, DHS "shall" take the alien into custody "when the alien is released" from local criminal custody and may not (with a narrow exception) release the alien for the duration of the removal proceedings. 8 U.S.C. § 1226(c)(1), (2); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 846-47 (2018).

### 2. Cooperation with Federal Immigration Enforcement: 8 U.S.C. § 1373

Congress enacted 8 U.S.C. § 1373 in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *See* Pub. L. No. 104-208, div. C, tit. VI, § 642, 110 Stat. 3009, 3009-707. Section 1373 seeks to ensure that no obstacles will prevent the sharing of information between federal, state, and local governments that is crucial to operation of the immigration laws. A House Conference Report explained that provisions like Section 1373 were intended to enable state and local officials to "communicate with the [Immigration and Naturalization Service (INS)] regarding the

presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996).

Section 1373(a) provides that "State" and "local government entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" with federal immigration authorities. Section 1373(b) provides that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[s]ending" to or "requesting or receiving" from federal immigration authorities "information regarding the immigration status, lawful or unlawful, of any individual," "[m]aintaining" such information, or "[e]xchanging" such information with "any other . . . government entity."

Section 1373(c) provides, in turn, that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

## B. The Byrne JAG Program

The Department of Justice, through OJP, administers the Byrne JAG program, which provides federal funds to States and units of local government for broad criminal-justice purposes. 34 U.S.C. § 10152(a)(1). The grant funds are divided among grantees based on a statutory formula, largely premised on population and crime

8

statistics. *Id.* § 10156. Recipients may further distribute Byrne JAG funds through subgrants to localities and community organizations, and state recipients are required to distribute a portion of their grant funds to localities within the State through a subgrant process. *Id.* §§ 10152(b), 10156(c).

The statute vests various powers in the Assistant Attorney General for OJP which "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). This authority has previously been used to impose conditions on Byrne JAG grant funding, including information technology requirements, ER411 (¶¶ 26-27); protections for human research subjects, *id.* (¶ 29); restrictions on the purchase of certain military-style equipment, ER413-14 (¶¶ 45-50); requirements regarding body armor purchases, ER413 (¶¶ 38-39); and training requirements, ER411 (¶¶ 32-33). Congress has never objected to the practice and no jurisdiction has ever challenged OJP's authority to include them.

States and localities that seek direct grant funding must submit an application "in such form as the Attorney General may require." 34 U.S.C. § 10153(A). Among other requirements, applicants must certify that they "will comply with" the Byrne JAG statute "and all other applicable Federal laws," that "for each fiscal year covered by an application, the[y] shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(A)(4), (5)(C), (D).

9

### 1. The § 1373 Certification

In May 2016, prompted by a congressional inquiry, the Department's Office of the Inspector General issued a report raising concerns about compliance with § 1373 by ten jurisdictions receiving Department grants, including the State of California. *See* ER203. As a result, the Department specifically designated that statute as an "applicable Federal law[]" under the Byrne JAG program. ER185-86. And, for many of the jurisdictions singled out in the report, including California, the Department included a condition in their fiscal year (FY) 2016 Byrne JAG awards requiring them to review their compliance with § 1373 and to submit a letter explaining the jurisdiction's basis for its belief that it complied. *See, e.g.*, ER358-59. California and San Francisco accepted their FY 2016 award subject to that condition, and no jurisdiction challenged the FY 2016 condition. *See* ER335; ER396; *see also, e.g.*, ER355-57.

The Department also published guidance explaining that "all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373." ER199-202. The guidance explained that the application requirement would not affect FY 2016 or prior year Byrne JAG grants, but that OJP expected grant recipients to "examine their policies and procedures to ensure they will be able to submit the required assurances" in their FY 2017 application. *Id.*

In accordance with this guidance, OJP specified in the FY 2017 solicitation for Byrne JAG applications that applicants would be required to certify their compliance with § 1373 in connection with their applications (the "§ 1373 certification" condition).

10

ER228 (local); ER269 (State). The solicitation included a certification form in which an applicant's Chief Legal Officer certifies that any "program or activity" funded in whole or in part by the grant complies with 8 U.S.C. § 1373(a) and (b). ER265 (local); ER308 (State).[2]

### 2. The Notice and Access Conditions

The FY 2017 grant solicitations included two additional conditions. *See* ER257 (local); ER300 (State). The conditions apply to any "program or activity" funded by the grant. The "notice condition" requires that the grantee have a policy designed to ensure that facilities provide notice to DHS "as early as practicable" when DHS provides a formal written request for advance notice of the scheduled release date and time for a particular alien. *See, e.g.*, ER437 (¶ 56.1.B) (Greenville, SC FY 2017 award). The "access condition" requires that the grantee have a policy providing that federal agents will be "given access" to correctional facilities for the purpose of meeting with aliens and to "inquire as to such individuals' right to be or remain in the United States." *Id.* ¶ 56.1.A. The Acting Assistant Attorney General for OJP announced that compliance with these special conditions also "will be an authorized and priority purpose of the award." ER300. Like the § 1373 certification condition, these two conditions are designed to ensure that the activities of federal law-enforcement grant

---

[2] The term "program or activity" has the same meaning as that phrase under 42 U.S.C. § 2000d-4a.

recipients do not impair the federal government's ability to ensure public safety and the rule of law by detaining and removing aliens upon their release from local criminal custody.

### C. Community Oriented Policing Services (COPS) Grants

The Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. I, § 10003(a), 108 Stat. 1796, 1808, provides the Department of Justice with authority to make discretionary grants for a variety of statutory purposes related to public safety and community-oriented policing, including, as relevant here, the COPS Anti-Methamphetamine Program. *See* 34 U.S.C. § 10381(b). The Office of Community Oriented Policing Services (COPS Office), which administers these grant programs, receives applications for more funds than Congress annually appropriates, and the application process is thus competitive. The statute sets forth some parameters for the process, but the Attorney General has significant discretion to direct the grant process. For fiscal year 2017, the Department added a certification condition similar to that required for Byrne JAG applicants, requiring COPS grant applicants to certify they complied with 8 U.S.C. § 1373 as part of the application process. ER444.

### D. Prior Proceedings

In August 2017, California and San Francisco filed law suits challenging the imposition of the notice and access and Section 1373 conditions on the Byrne JAG program funding. California also challenged the Section 1373 certification requirement

in the COPS grant program and separately moved for a preliminary injunction, which the district court denied. ER16-17.

Both suits asserted that the conditions are not authorized by the Byrne JAG statute, violate the separation of powers, and violate the APA, and also asserted that § 1373 violates the Tenth Amendment. *See* State Dkt. No. 11; City Dkt. No. 61. All plaintiffs sought permanent injunctive relief barring the Department from enforcing the conditions, and California sought a writ of mandamus compelling the Department to issue the FY 2017 grants. *See* State Dkt. No. 11; City Dkt. No. 61. Both plaintiffs also sought a declaration that § 1373 is unconstitutional under the Tenth Amendment, or, in the alternative, that the state and local laws comply with § 1373. *See* State Dkt. No. 11; City Dkt. No. 61.

On October 5, 2018, the district court granted the plaintiffs' request for summary judgment and concluded that the parties were entitled a permanent injunction, and California was entitled to the mandamus relief it sought. *See* ER8-9.

The court held that the Department lacked authority to impose the notice and access conditions, concluding that the "Attorney General lacks the power to impose additional conditions on Congress's exercise of the Spending Power independent of Congress," ER28; declaring that the authority conferred by 34 U.S.C. § 10102(a)(6) does not apply to the Byrne JAG program; and stating that, in any event, it interpreted that statute to authorize conditions only on "high-risk grantees." ER28 & n.2.

The district court held that the Department lacked authority to include compliance with 8 U.S.C. § 1373 as a grant condition because that provision is not an "applicable federal law" for purposes of the Byrne JAG statute, reasoning that 34 U.S.C. § 10153(A)(5)(D) refers only to "laws related to grant applications." ER38.

In light of its statutory holding, the court had no reason to address plaintiffs' constitutional arguments, but it nevertheless proceeded to do so, declaring that § 1373 violated the Tenth Amendment. The court stated that the statute "does not regulate private actor activities," ER31; "supplants local control of local officers by prohibiting those jurisdictions from preventing employees from communicating with [DHS]," ER33 (quotation marks and citation omitted); and, thus compels state and local governments to adopt certain policies in a manner that violates the Tenth Amendment, ER34-35.

The district court also held that the imposition of the conditions violates the Spending Clause, reasoning that because the Department lacked the statutory authority to impose the conditions on funding, the attempt to do so was necessarily a constitutional violation. *See* ER41. In addition, the court concluded that all three conditions failed to satisfy the Supreme Court's requirement that conditions on spending must be "reasonably related to the purpose of the federal program." ER43 (quoting *South Dakota v. Dole*, 483 U.S. 203, 213 (1987) (O'Connor, J., dissenting)). The court stated that while "criminal law is integral to federal immigration law, . . . it is not

14

a two-way street; immigration law does not impact local law enforcement's administration and enforcement efforts in the criminal justice system." ER45.

The court further concluded that the conditions should be set aside under the APA, on the ground that their imposition was "arbitrary and capricious." ER48. The court explained that the conditions were final agency action that would have legal consequences for the plaintiffs and that the administrative record "indicates the opposite of DOJ's [conclusion]" and that "California [had] show[n] that imposing the challenged conditions may damage law enforcement efforts." ER52.

Finally, the court determined that plaintiffs were entitled to declaratory relief that various state and local ordinances they challenged were in compliance with 8 U.S.C. § 1373 because the statute can only be read to extend to "information strictly pertaining to immigration status (i.e. what one's immigration status is)." ER57.

Having concluded the City and State were entitled to summary judgment and a permanent injunction, the court extended that injunction to apply to all grant applicants rather than only to the plaintiffs in this suit, stating that "[a] nationwide injunction would not disrupt the administration of the Byrne JAG program, a formula grant program that does not independently give the Attorney General authority to impose additional conditions not conferred by Congress." ER65. The court then stayed the application of the injunction outside California pending this Court's consideration of a possible appeal.

15

## SUMMARY OF ARGUMENT

The three provisions at issue are entirely proper conditions on the receipt of federal law-enforcement grants, and the district court's contrary rulings rest on a series of errors regarding the relevant statutory and constitutional provisions.

**1.** The district court erred when it concluded that the Attorney General lacks authority to impose any conditions on Byrne JAG grant funding beyond those specifically provided for by Congress. The Assistant Attorney General for OJP (AAG) has long relied on his authority under 34 U.S.C. § 10102(a)(6) to impose a variety of special conditions not otherwise authorized by statute, such as information-technology requirements, ER428 (¶¶ 28-29); protections for human-research subjects, *id.* (¶ 31); restrictions on the purchase of certain military-style equipment, ER432-33 (¶¶ 45-50); requirements regarding body-armor purchases, ER431 (¶¶ 39-41); and training requirements, ER429 (¶¶ 34-35). The district court's theory cannot account for the AAG's past adoption of these conditions, and the general invocation of the Byrne JAG statute would not be sufficient to provide explanation. And none of these special conditions has ever been questioned by Congress or challenged as *ultra vires* by a grant recipient, including California or San Francisco.

The "notice" and "access" conditions fall within the Department's statutory authority. The notice condition requires that the grantee have a policy of notifying DHS of the scheduled release date of an alien in criminal custody, after receiving a formal request for notification from DHS. The access condition requires that the

grantee have a policy of allowing federal agents to meet with incarcerated aliens in order to inquire about the aliens' rights to remain in the United States.

These modest conditions ensure the basic cooperation that the INA envisions when aliens are subject to simultaneous regulation by two sovereigns. The INA generally contemplates that aliens taken into criminal custody by States or localities will not, until released, be removed by the federal government. *See, e.g.*, 8 U.S.C. § 1231(a)(4)(A). Moreover, the INA often requires prompt action by DHS as soon as release takes place, providing, for example, that within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal, *id.* § 1231(a)(1)(A), (a)(1)(B)(iii). The implicit but necessary premise is that States and localities will not use their priority to frustrate immigration enforcement by refusing to inform the federal government of release dates or denying federal officials access to persons who may be subject to removal.

The AAG imposed these conditions pursuant to his statutory authority to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). In concluding otherwise, the district court rendered this provision meaningless, finding that the Department has no independent authority to impose conditions and misunderstanding the AAG's role in administering the Department's grant programs.

**2.** The Department also acted within its statutory and constitutional authority in requiring that FY 2017 grant applicants certify compliance with 8 U.S.C. § 1373. The

governing statute provides that Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5), (A)(5)(D). Following a congressional inquiry and an Inspector General's report, the Attorney General in the prior Administration, through OJP, concluded that 8 U.S.C. § 1373 is an "applicable Federal law[]," and that conclusion is entirely consistent with the statutory text.

The district court erroneously read "all other applicable Federal laws" to include only laws that govern the grant-making process or specifically apply by their terms to grant recipients. This reading is inconsistent with the broad language of § 10153(A)(5)(D); where Congress has intended to restrict the range of applicable laws in this fashion, it has done so expressly. *See, e.g.*, 42 U.S.C. § 16154(g)(1) ("consistent with the generally applicable Federal laws and regulations governing awards of financial assistance, contracts, or other agreements").

The court plainly erred in declaring that the inclusion of the § 1373 certification condition violates the Tenth Amendment. As a threshold matter, the federal government can condition grants on requirements that could not be imposed in a free-standing statute, without raising Tenth Amendment concerns. *See South Dakota v. Dole*, 483 U.S. 203, 210 (1987).

Even as a freestanding statute, § 1373 raises no Tenth Amendment concerns. The statute does not commandeer plaintiffs to regulate or enforce a federal regulatory

18

scheme. Rather, it is an information-sharing requirement that expressly preempts state and local regulations that obstruct the federal government's enforcement of the immigration laws against individual aliens. The Supreme Court in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), confirmed that express preemption provisions such as this are permissible under the Tenth Amendment, and the district court misread that decision to compel the conclusion that § 1373 is unconstitutional.

**3.** The district court's Spending Clause holding adds nothing to its statutory-authority holding, and the notice and access conditions do not violate the Spending Clause. Contrary to the district court's conclusion, it is sufficient that OJP (rather than Congress) unambiguously imposed the conditions. And the conditions are adequately related to the Byrne JAG program because they ensure that the recipients of federal law-enforcement grants do not impede the federal government's own law-enforcement efforts regarding suspected or convicted criminals. For similar reasons, the court erred in finding that OJP's imposition of the notice and access conditions was arbitrary and capricious.

**4.** Finally, the district court erred when it extended the scope of the injunctive relief to non-parties nationwide, disregarding Article III and equitable principles that limit injunctive remedies to what is necessary to redress the plaintiff's injury. Our judicial system does not and should not allow the first prevailing plaintiff to obtain nationwide relief while forcing the government to win every case in order to implement its policy anywhere.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment and the grant of a permanent injunction de novo. *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 874 (9th Cir. 1999).

## ARGUMENT

## I.     The Assistant Attorney General Has Statutory Authority to Impose Conditions on Byrne JAG Funding, Including the Notice and Access Conditions for FY 2017.

**A.** The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes. 34 U.S.C. § 10152(a)(1). Among other requirements set out specifically in the Byrne JAG statute, applicants must certify that they "will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(A)(5)(D), and agree to undertake various activities to advance law-enforcement goals. For example, applicants must provide an assurance that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(A)(4), (5)(C).

The Byrne JAG Program is also subject to the general authority of the AAG. As particularly relevant here, the statute provides that he may "exercise such other powers and functions as may be vested in [him] pursuant to [Chapter 101 of Title 34, which includes the Byrne JAG Program] or by delegation of the Attorney General, *including*

placing *special conditions* on all grants, and determining *priority purposes* for formula grants." 34 U.S.C. § 10102(a)(6) (emphases added). The phrase conferring this general authority to impose special conditions and priority purposes was added in the Violence Against Women and Department of Justice Reauthorization Act of 2005, the same law that created the current version of the Byrne JAG Program. Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006). Special conditions established by the AAG in past years have included: information technology requirements, ER411 (¶¶ 26-27); protections for human research subjects, *id.* (¶ 29); restrictions on the purchase of certain military-style equipment, ER413-14 (¶¶ 45-50); requirements regarding body armor purchases, ER413 (¶¶ 38-39); and training requirements, ER411 (¶¶ 32-33). None of these special conditions has ever been questioned by Congress or challenged as *ultra vires* by any grant recipient, including plaintiffs here.

The Assistant Attorney General acted within this statutory authority in imposing the FY 2017 notice and access conditions, which are modest requirements designed to ensure information sharing, appropriate law-enforcement coordination to enhance public safety, and detention of aliens in state or local criminal custody in a manner that does not pose an obstacle to the orderly enforcement of the immigration laws.

In accepting the "notice" condition, the applicant agrees that, for any "program or activity" funded by the grant, it will have a policy of informing DHS of the scheduled release date of an alien in criminal custody after receiving a formal written request from DHS. ER436 (¶ 55.1.B). In accepting the "access" condition, an applicant agrees that,

with respect to any "program or activity" funded by the grant, it will have a policy providing that federal agents will be "given access" to correctional facilities for the purpose of meeting with aliens and to "inquire as to such individuals' right to be or remain in the United States." *Id.* (¶ 55.1.A).

In agreeing to these conditions, applicants simply agree that their law-enforcement activities will not impair the federal government's law-enforcement activities against suspected or convicted criminals. As discussed, *see supra* pp. 5-7, the structure of the INA contemplates that States and localities may prosecute and incarcerate for criminal offenses aliens who may be removable and, indeed, aliens as to whom a removal order has already issued, but that federal custody of such aliens will commence upon their release. It is crucial to this cooperative law-enforcement framework that States and localities respond to requests for release-date information and permit federal agents to engage in voluntary interviews before releasing aliens from custody.

The propriety of the notice and access special conditions is underscored by the provisions in the Byrne JAG statute that authorize the Attorney General to reasonably require "programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with "affected" agencies, *id.* § 10153(A)(5)(C). What information is "programmatic" must be assessed in light of the broad definition of "program" in Section 10152(a)(1). Notice of an alien's release from local custody constitutes information about the law-enforcement and corrections

22

programs funded by the grants. *See id.* § 10152(a)(1). And access to an alien in local custody constitutes appropriate coordination with federal immigration authorities affected by those programs' custody over the alien. Under the INA, States and localities may first prosecute state and local crimes, and only when those sentences are served does DHS enforce immigration laws. This cooperative and sequential system only works if state and local authorities honor basic, lawful requests from DHS. Nothing in the statute supports the district court's counterintuitive conclusion that applicants can insist on their entitlement to federal law enforcement grants even as they refuse to provide the most basic cooperation in immigration enforcement, which the Attorney General has identified as a federal priority.

**B.** The district court nevertheless held that the Assistant Attorney General lacks statutory authority to impose any conditions other than those already specifically established by Congress. ER29-30. No other court has adopted this limited view of the Department's authority over the Byrne JAG Program. The district court's holding effectively reads out of the statute Congress's express addition of general authority for the AAG to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants," 34 U.S.C. § 10102(a)(6), and calls into question conditions the Department has imposed on Byrne JAG grant funding for decades without objection from Congress, *see supra* p. 21.

The district court's conclusion effectively negates the Attorney General's statutory authority and gives short shrift to his discretion to "reasonably require"

"programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with affected agencies, *id.* § 10153(A)(5)(C). The court did not explain why Congress would have enacted a new provision in 2006 to accomplish absolutely nothing. *See id.* § 10102(a)(6). There would have been no need for Congress to clarify that the AAG could impose "special conditions" and determine "priority purposes" for grants if the only conditions that could be imposed were those already provided for by Congress itself.

The district court mistakenly reasoned that the term "including" means that Congress did not intend to expand the AAG's authority. The term "including" is often "used as a word of extension or enlargement," *American Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933), and can mean "and" or "in addition to," *see, e.g.*, *Federal Trade Comm'n v. MTK Mktg., Inc.*, 149 F.3d 1036, 1040 (9th Cir. 1998); *Adams v. Dole*, 927 F.2d 771, 775-77 (4th Cir. 1991) (same). Moreover, § 10102(a)(6) itself is a provision of Chapter 101 that vests the AAG with the power to impose "special conditions" and determine "priority purposes" for grants.

It is a cardinal principle of statutory interpretation that "no clause, sentence, or word shall be [rendered] superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). That principle has particular force here because Congress expressly added the "special conditions" and "priority purposes" authority in 2006, which would have been entirely unnecessary if it merely referred to pre-existing authority conferred by Congress. Confirming the statute's plain text, a report accompanying the enactment

24

of this language stated that the provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

The statute previously authorized the Assistant Attorney General to "exercise such other powers and functions as may be vested in [him] pursuant to [what is now Chapter 101 of Title 34] or by delegation of the Attorney General." 42 U.S.C. § 3712(a)(6) (2000); *see also* Justice Assistance Act of 1984, Pub. L. No. 98-473, tit. II, ch. VI, div. I, § 603, 98 Stat. 2077, 2077-78. Congress later added the language at issue here, which makes clear that the Assistant Attorney General's authority "includ[es] placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6); *see* Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113. In other instances, Congress has left in place substantially the same, more limited language as previously found in the predecessor to 34 U.S.C. § 10102(a)(6). *Compare* 42 U.S.C. § 3712(a)(6) (2000), *and* 34 U.S.C. § 10102(a)(6), *with* 34 U.S.C. § 10444(7) (providing that the Director of the Violence Against Women Office, a separate grant-making office within the Department of Justice, "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this subchapter or by delegation of the Attorney General"). "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995).

The district court further opined that if Section 10102(a)(6) had any meaning, it would be "that the language 'placing special conditions on all grants' is most likely a term of art for the additional conditions placed on 'high-risk grantees' only." ER28 n.2 (citing *City of Philadelphia v. Session*, 280 F. Supp. 3d 579, 617 (E.D. Pa. 2017); *City of Chicago v. Sessions*, 888 F.3d 272, 285 n.2 (7th Cir.), *vacated in part*, 2018 WL 4268817 (7th Cir. June 4, 2018).[3] This misconception is based on a general Department regulation, 28 C.F.R. § 66.12(a) (2014), that was in effect between 1988 and 2014. Contrary to the court's suggestion, the cited regulation did not purport to define the term "special conditions" to cover the universe of all potential special conditions applicable to all types of grantees. Rather, the regulation merely described one type of special condition that was applicable to one type of grantee. And the court does not explain why the only type of special conditions authorized under Section 10102(a)(6) would be those applicable to high-risk grantees.

The court also mistakenly held that 34 U.S.C. § 10102(a)(6) is inapplicable to the Byrne JAG program, declaring that "Section 10102(a)(6) is in a different subchapter than the Byrne JAG statute and there is no text expressly applying it to the Byrne JAG program." ER28. Section 10102(a)(6) appears in Subchapter I, which (among other

---

[3] Even those courts that have found the notice and access conditions beyond the AAG's statutory authority have not accepted the view of the district court here that the Department has no authority to impose conditions on grant funding. *See City of Philadelphia v. Attorney Gen.*, 916 F.3d 276, 286-88 (3d Cir. 2019); *City of Chicago*, 888 F.3d at 283-87.

things) establishes the Office of Justice Programs, provides that the Assistant Attorney General for OJP heads the office, and sets forth his general powers. *See* 34 U.S.C. §§ 10101-10102. The Byrne JAG program appears in Subchapter V, which sets forth the Bureau of Justice Assistance Grant Programs. *See id.* §§ 10151-10158. The Assistant Attorney General for OJP oversees those grant programs, *see id.* § 10141(b); OJP, *About Us*, https://ojp.gov/about/about.htm (OJP organizational chart), and he is the authorizing official who signs the Byrne JAG award documents imposing the disputed conditions, *see, e.g.*, ER419. The statute that provides his general powers applies to his actions in administering the Byrne JAG program. Thus, a plain reading of the statutory text indicates that the AAG's power includes, at a minimum, the power to "plac[e] special conditions on all grants" administered by OJP. *See* 34 U.S.C. § 10102(a)(6). Indeed, if the court were correct that § 10102(a)(6) does not apply outside of Subchapter I, then the power to "determin[e] priority purposes for formula grants" would have no meaning because Subchapter I does not establish any formula grants. *See* 34 U.S.C. §§ 10101-10111. As noted above, this Court should be particularly wary of interpreting the language to be a nullity because doing so would render invalid other conditions that past Assistant Attorneys General have imposed. *See supra* p. 21.

## II. The § 1373 Certification Condition for FY 2017 Is Valid and § 1373 Raises No Tenth Amendment Concerns

### A. The § 1373 Certification Condition Is Statutorily Authorized

**1.** Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of [the Byrne JAG Program] and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). In accordance with the prior Administration's determination that 8 U.S.C. § 1373 is an "applicable Federal law[]" for purposes of the statutorily required certification, *see* ER195-97 (July 7, 2016 mem.); ER199 (Oct. 6, 2016 guidance), beginning in FY 2017 OJP required that grant applicants explicitly certify compliance with § 1373 as part of their Byrne JAG applications. *See, e.g.*, ER228 (FY 2017 local solicitation); ER265 (FY 2017 certification form).

The § 1373 certification condition is consistent with the statutory text. In the context of the Byrne JAG statute, the phrase "applicable Federal laws" covers laws that apply to Byrne JAG applicants and are constitutionally applied as grant conditions. Section 1373 indisputably applies to plaintiffs—subsection (a) applies to any "State" or "local government entity or official," and subsection (b) applies to any "person or agency." Indeed, California accepted a similar condition in its FY 2016 grant. *See* ER355-57; *see also, e.g.*, ER335; ER396.

The district court erroneously concluded that the phrase "all other applicable Federal laws" is limited to "laws related to grant applications." ER38. But the statute's

28

plain text refers to "*all other* applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D) (emphasis added). If Congress had intended to limit the certification to "all laws applicable to Federal grantees," it could have done so expressly, as it has done elsewhere. *See, e.g.*, 42 U.S.C. § 16154(g)(1) ("consistent with the generally applicable Federal laws and regulations governing awards of financial assistance, contracts, or other agreements"); Water Resources Reform and Development Act of 2014, Pub. L. No. 113-121, § 1043(a)(3)(C)(ii)(II), 128 Stat. 1193, 1246 ("will comply with all applicable Federal laws (including regulations) relating to the use of those funds"). As the Supreme Court has recognized, "[b]y itself, the phrase 'all other law' indicates no limitation." *Norfolk & W. Ry. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991).

**2.** The district court further erred in holding that § 1373 is not an "applicable Federal law[]" within the meaning of 34 U.S.C. § 10153(A)(5)(D) on the theory that it violates the Tenth Amendment. As an initial matter, the court erred in concluding that, if § 1373 would be unconstitutional outside the grant context, it would "automatically drop[] out of the possible pool of 'applicable Federal laws' described in the Byrne JAG statute." ER36 (quoting *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 875 (N.D. Ill. 2018), *appeal docketed*, No. 18-2885 (7th Cir. Aug. 28, 2018)). The statutory question is whether Congress intended to make Byrne JAG applicants certify compliance with § 1373 as an "applicable Federal law[]." The answer to that question is yes. Even if the court were correct that the Tenth Amendment bars § 1373 from being applied directly

29

to States and localities as a stand-alone regulation, that would in no way undermine Congress's choice to include § 1373 as an "applicable Federal law[]" where it is constitutionally applied as a funding condition on Byrne JAG applicants.

The district court correctly recognized that Congress may "condition[] the receipt of funds, by states and others, on compliance with federal directives." ER38 (quoting *State of Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989)). For example, in *South Dakota v. Dole*, 483 U.S. 203 (1987), the Supreme Court rejected a challenge to a condition that required States to raise their minimum age for consuming alcohol or face the loss of five percent of federal highway funds. *Id.* at 211. The Court emphasized that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Id.* at 210; *see Printz v. United States*, 521 U.S. 898, 936 (1997) (O'Connor, J., concurring) (noting that a Tenth Amendment issue could be resolved by turning the same requirements into conditions of receiving federal funds). Even under the district court's reasoning, when § 1373 is applied as a condition on federal funds, it is an "applicable Federal law[]" because that application of the statute is constitutional. This is especially true in the context of the COPS grant program, in which the Department has broad discretion to set the terms of any monetary award. *See* 34 U.S.C. § 10381(b).

Relatedly, even accepting the incorrect premise that § 1373 could implicate the Tenth Amendment in some applications, the district court erred in concluding that the statute is unconstitutional on its face. Section 1373 does not have an independent

enforcement mechanism, and it is entirely constitutional to enforce it as a condition on federal funds. Even accepting the court's Tenth Amendment analysis, § 1373 would not cease to be a "Federal law[]" merely because some of its applications are unconstitutional, and, indeed, it would remain "applicable" in precisely these circumstances.

### B. Section 1373 Does Not Violate the Tenth Amendment

**1.** For the reasons discussed above, there was no need for the district court to decide whether § 1373 is consistent with the Tenth Amendment as a stand-alone statute, both because its restrictive reading of "applicable Federal laws" made this inquiry unnecessary and because the constitutionality of the § 1373 certification condition is governed by the Spending Clause (which it plainly satisfies). *See infra* p. 38.

**2.** In any event, § 1373 is entirely consistent with the Tenth Amendment. As noted, the statute provides that "State" and "local government entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing with federal immigration authorities "information regarding the citizenship or immigration status" of any individual. 8 U.S.C. § 1373(a); *see also id.* § 1373(b) (similar). The statute does not require jurisdictions to regulate in a particular area, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). Nor does it require jurisdictions to enforce a federal regulatory scheme, as in *Printz*. Rather, § 1373 is a permissible information-sharing requirement

that preempts State and local governments from hindering the federal government's enforcement of the immigration laws against individual aliens.

As applied here, § 1373 pertains to the effects of state and local criminal custody on the INA's regulatory scheme concerning the removal and detention of individual aliens. The INA provides that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(A), (B)(iii). During this removal period, DHS "shall detain" the alien, and, if the alien has a qualifying criminal history, "[u]nder no circumstance[s]" shall DHS release the alien during the removal period. *Id.* § 1231(a)(2). Similarly, when an alien is not yet subject to a final order of removal, DHS may execute a warrant to arrest and detain the alien under § 1226(a) when he is released from local criminal custody and, if the alien has a qualifying criminal history, DHS "shall" take the alien into custody "when the alien is released," *id.* § 1226(c).

In this context, a requirement that localities provide DHS with information regarding immigration status (such as an alien prisoner's release date, which is essential to determining when the alien can be removed)—or § 1373's narrower requirement that localities *may not restrict* their officers from sharing such information with DHS—merely prevents localities from using the criminal-law authority over aliens that Congress has allowed them to retain in a manner that frustrates the operation of the parallel federal

regulatory scheme for potential removal or detention upon aliens' release from local custody. Even if Congress had not enacted § 1373, that would follow from basic principles of obstacle preemption. *See Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress did not create a scheme in which the federal government shall take custody of aliens upon their release from state criminal custody without having any mechanism for ascertaining when the alien would be released. The INA's allowance for state criminal custody to be completed before removal is premised on the assumption that the federal government will be able to learn such aliens' release dates and seamlessly take them into federal custody in a safe and orderly manner.

The legislative history of § 1373 confirms this understanding. Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status" as a response, in part, to laws enacted by "[v]arious localities" that "prevent[ed] local officials from disclosing the immigration status of individuals to INS." H.R. Rep. No. 104-725, at 391 (1996). The House Conference Report explained that the statute was intended to "give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens." *Id.* at 383; *see id.* (the provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS").

*Murphy* expressly did not disturb the bedrock principle that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." 138 S. Ct. at

1479. That principle could not save the statute at issue in *Murphy*, which did not "impose any federal restrictions on private actors," but instead sought to prohibit States from authorizing sports gambling schemes. *Id.* at 1481. By contrast, where, as here, both sovereigns regulate private individuals, the issue is not whether the federal government has commandeered a State, but whether the State's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-90 (1981) (It "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce.").

Congress could have provided for immediate removal of aliens regardless of pending local criminal prosecutions. Allowing local criminal custody to continue while requiring that localities facilitate the effectuation of—or at least not interfere with—an orderly transfer to federal officers at the end of such custody does not in any sense "commandeer" the locality into enforcing federal law, but merely places conditions on the locality's exercise of its own regulatory authority. *See Hodel*, 452 U.S. at 290-91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role."). In sum, so long as Congress is expressly (or implicitly) preempting a locality from interfering with federal regulation of private parties, it is not impermissibly regulating the locality directly.

**3.** The district court misunderstood the relevant analysis when it concluded that § 1373 was unconstitutional because, like the statute at issue in *Murphy*, it "'supplants

34

local control of local officers' by prohibiting those jurisdictions from preventing employees from communicating with the INS," ER33 (quoting *City of Chicago*, 321 F. Supp. 3d at 869) and "does not regulate private actor activities," ER31. As the Supreme Court admonished in *Murphy,* "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States"—even in a targeted way—but in substance merely prevent the States from obstructing federal regulation of private parties. 138 S. Ct. at 1480; *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)). That is exactly what § 1373 does: it preempts States and localities from hindering the INA's regulation of aliens.

Plaintiffs assert that they may use their regulatory authority over persons who are also subject to federal regulatory authority in a way that impedes the operation of federal law. The district court got matters backwards in asserting that § 1373 "shifts a portion of immigration enforcement costs onto the States." ER34. By affirmatively asserting criminal custody over aliens whom the federal government seeks to detain and remove, plaintiffs' scheme impairs the exercise of the parallel federal scheme unless plaintiffs terminate custody in a manner that does not hinder the federal government in assuming custody. It is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause authorizes Congress to prohibit a locality from using its authority to create an obstacle to the functioning of the federal scheme.

The federal government is not requiring plaintiffs to enforce federal law by arresting particular individuals or extending their custody. *See Printz*, 521 U.S. at 926

35

(citing *New York*, 505 U.S. at 188). Instead, it is the federal government that seeks to assume custody, and only of those aliens whom plaintiffs have already decided, for their own reasons, to take into custody pursuant to state criminal law. The federal government bears sole responsibility for the actions it takes with respect to private persons pursuant to its regulatory authority.

**4.** Moreover, even if § 1373 could properly be analyzed apart from the INA's general regulatory scheme, a requirement to not interfere with a federal inquiry about an alien's release date or other information regarding immigration status would in no sense be "commandeering" local officials to execute federal law. In *Printz*, the Supreme Court held that local law-enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law. At the same time, it distinguished statutes that "require only the provision of information to the Federal Government," as they "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918. The Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *see Reno v. Condon*, 528 U.S. 141, 151 (2000) (Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of data bases").

The district court dismissed these passages from *Printz* on the theory that Section 1373 "is not merely . . . a ministerial information-sharing statute." ER35. The court based this observation on the fact that the statute "prohibits state and local jurisdictions, their agencies, and officials from preventing information-sharing." *Id.* This distinction does not alter the nature of the statute. In any event, a statute that precludes a state from preventing information-sharing is, if anything, less intrusive than a statute that mandates disclosures.

## III. The Conditions Neither Violate the Spending Clause Nor Are Arbitrary and Capricious

**A.** The district court erroneously invested its statutory holding with constitutional significance, finding that the notice and access conditions violated the Spending Clause simply because they were not authorized by the statute. *See* ER41-47. Even setting aside that imposition of the conditions did not exceed the Assistant Attorney General's statutory authority, any such error in grant administration would not further constitute a violation of the structural limitations on the relationship between States and the federal government. *See Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution.").

The court also erroneously held that the conditions violate the Spending Clause because Congress did not unambiguously impose the conditions. ER41. The federal

government "may offer funds to the States, and may condition those offers on compliance with specified conditions." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012). Neither the Supreme Court nor this Court has ever suggested that unambiguous conditions are invalid when imposed by an agency acting within the authority delegated by Congress. Congress frequently delegates discretionary authority over distribution of federal funds in Spending Clause legislation, such as Medicaid, to executive branch agencies without raising constitutional concerns. The Supreme Court has explained that there is no Spending Clause claim of "insufficient notice . . . where [the] statute made clear that there were some conditions placed on receipt of federal funds," and that "Congress need not 'specifically identif[y] and proscrib[e]' each condition in the legislation." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (alterations in original); *see Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669, 672 (1985) (stating that "the Federal Government simply could not prospectively resolve every possible ambiguity" in a grant program and advising recipients to seek "clarification" from the administering agency).

The district court also erred in holding that conditioning Byrne JAG funds on certification of compliance with § 1373 violates the Spending Clause. ER42-43. This Court has held that conditions on receipt of federal funds must be "unambiguous" so that States can "'exercise their choice knowingly, cognizant of the consequences of their participation,'" *Skinner*, 884 F.2d at 447 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)), and "reasonably related" to the federal interest in the

38

program, *id.* Here, the Department unambiguously imposed the conditions in the grant award documents that grant applicants receive prior to accepting funds. *See, e.g.*, ER436-37 (¶¶ 55.1-56.1). The § 1373 certification condition satisfies both requirements.

As to the clarity requirement, the court again erred in holding that the Section 1373 condition did not provide recipients with sufficient notice of what is required for compliance. As this Court has recognized, it is not required that Congress or the agency "list every factual instance in which a state will fail to comply with a condition" and requiring "[s]uch specificity would prove too onerous." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002). There can be no question that the Department "ma[d]e the existence of the [Section 1373] condition . . . explicitly obvious," *id.*, and that is sufficient to satisfy the requirements of the Spending Clause, *see* ER228 (FY 2017 local solicitation); ER265 (FY 2017 certification form).

Moreover, the court was wrong to conclude that the challenged conditions do not reasonably relate to the purposes of the Byrne JAG Program. ER43-47. As this Court recognized, the Supreme Court has imposed only a "low-threshold relatedness test." *Mayweathers*, 314 F.3d at 1067; *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000) ("minimum rationality"). The Supreme Court "ha[s] suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are *unrelated* to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207 (emphasis added; quotation marks omitted); *see New York*, 505 U.S. at 167 (1992) (conditions must "bear some relationship" to the purpose of federal spending).

The court did not identify a single case in which this Court or the Supreme Court found that the relatedness requirement was not satisfied, and it was wrong to conclude that these conditions are unrelated to the purposes of the Byrne JAG program.

The purpose of the conditions is not to promote immigration enforcement generally. It is to eliminate particular impediments to immigration enforcement created by the local law enforcement departments funded by the grants. The notice and access conditions are limited to aliens whom the City or State itself has taken into custody based on suspected criminal conduct, and are designed to ensure that the City's or State's criminal law enforcement does not obstruct federal immigration law enforcement or endanger public safety by requiring at-large arrests in the community. Section 1373 is similarly related to local criminal justice because it is also limited to the "program or activity" that receives the Byrne JAG funds.

As the district court recognized, the purpose of the program is to provide grants to States and local governments to support criminal justice programs. *See* ER45; 34 U.S.C. § 10152. That Congress sought to give grantees flexibility in how to spend the funds does not make the conditions unrelated to the criminal justice purposes at the heart of the Byrne JAG program. That Congress had previously included, and later repealed, a prior, specific notice condition, and has considered codifying conditions similar to those at issue here, confirms that, contrary to the court's conclusion, Congress considered a notice condition to be related to the purposes of the Byrne JAG grant program. *See* ER44-45.

40

**B.** The district court impermissibly substituted its own judgment for the judgment of the Department when it concluded that the Department's imposition of the conditions was arbitrary and capricious. ER48-54. At the outset, the court's holding that imposition of the certification condition was arbitrary and capricious collapses because of the nature of the statutory authorization. Congress specified that Byrne JAG applicants must certify their compliance with "applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). Thus, the only question for the agency was whether § 1373 is an "applicable Federal law[]" for purposes of the Byrne JAG statute. It is, *see supra* pp. 28-31, and that purely legal determination resolves the arbitrary-and-capricious analysis.

In any case, there is no basis for concluding that the Attorney General's imposition of the conditions was unreasonable. The Byrne JAG program provides funds to further "criminal justice" in various programs, including "[l]aw enforcement" and "[c]orrections" programs. *See* 34 U.S.C. § 10152(a)(1). The conditions relate to how grantees exercise an integral aspect of those programs—*i.e.*, their policies concerning access to and release of alien prisoners in criminal custody. Moreover, the conditions ensure that any "program or activity" funded by the federal law-enforcement grants does not thwart the federal government's ability to remove aliens whom the grantee itself arrested for criminal conduct.

It is reasonable for the Department to condition law enforcement grants on an undertaking not to pursue a deliberate policy of refusing to provide basic information necessary to enforcement of the immigration laws. Those judgments do not depend

41

on a factual determination of the sort that the district court appeared to demand.  *See* ER52-54.  They simply require asking whether the Department should blind itself to the degree of cooperation provided by localities to federal law-enforcement efforts when distributing federal grants, as well as to the public-safety threats caused by that lack of cooperation.  Thus, even assuming that the Department's imposition of the conditions is subject to arbitrary-and-capricious review, notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes adopted, *but cf. Lincoln v. Vigil*, 508 U.S. 182, 192-94 (1993), the conditions are "rational" and the district court erred in "substitut[ing] its judgment" for the Department's.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

## IV.   The District Court Erroneously Concluded That California and San Francisco's State and Local Ordinances Complied with Section 1373.

The court further erred in holding that the state and local laws pertinent to compliance with Section 1373 were in fact consistent with the statute.[4]  The applicable provision of 8 U.S.C. § 1373 provides that states "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from" federal immigration authorities "information regarding the . . . immigration status . . . of any individual."  8 U.S.C. § 1373(a); *see id.* § 1373(b) ("[N]o person or agency may prohibit,

---

[4] The question whether the VALUES Act, one of the state laws at issue here, is preempted by federal law, including 8 U.S.C. § 1373, is currently pending before this Court in *United States v. California*, No. 18-16496 (argued March 13, 2019).

or in any way restrict, a . . . local government entity from" sharing "information regarding the immigration status" of individuals with federal immigration authorities.). In contrast, § 1373(c), which deals with the obligations of the federal government, refers only to "immigration status."

The California statutes at issue, the TRUST Act, Cal. Gov't. Code §§ 7282, 7282.5, the TRUTH Act, Cal. Gov't. Code § 7283 *et seq.*, the VALUES Act, Cal. Gov't. Code § 7284 *et seq.*, and six confidentiality statutes, are intended to "establish a statewide standard for responding to ICE holds." ER13. As relevant here, the statutes "impos[e] . . . constraints on law enforcement's ability to share the release dates of individuals [in local custody.]" ER14. Chapters 12H and 12I of the San Francisco Administrative Code prohibit local officials from giving federal immigration authorities the contact information and release status of aliens and from using "any City . . . resources to assist in the enforcement of Federal immigration law." S.F., Cal., Admin. Code, ch. 12H, §12H.2; *see also id.* ch. 12.I, §12I.2. In accordance with these provisions, the City provides no information in response to ICE requests regarding individuals in local custody. ER79 (Madrigal Decl. ¶ 10).

The Supreme Court recently emphasized that words such as "regarding," "relating to," and "respecting" "generally ha[ve] a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759-60 (2018). And the significance of the phrase "information regarding" is underscored by the narrower

language of § 1373(c). *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original).

Of course, "information regarding" immigration status includes information necessary to ascertain an individual's category of presence in the United States, *see* ER57-58, but, contrary to the district court's conclusion, it is not limited to such information. In particular, whether a given alien may actually be removed or detained by federal immigration authorities is, at a minimum, information regarding that alien's immigration status. The legislative history confirms this understanding. When Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status," a House Conference Report explained that such provisions were intended to enable state and local officials to "communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996); *see id.* (explaining that the provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS"). Likewise, the Senate Report accompanying § 1373 explained that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and

objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19-20 (1996).

And under the INA, as discussed above, an alien's release date from local criminal custody is critical to determining when DHS may actually detain and remove the alien. *See supra* pp. 5-7. The district court made no attempt to address these features of the INA when analyzing the scope of 8 U.S.C. § 1373.

An alien's home and work address is also relevant to many immigration status issues, including whether an alien admitted in a particular nonimmigrant status has remained in the United States beyond the authorized period of admission, evidenced an intent not to abandon his or her foreign residence, or otherwise violated the terms and conditions of such admission (*e.g.*, engaged in unauthorized employment), *see* 8 U.S.C. § 1227(a)(1)(C); 8 C.F.R. § 214.1; whether the alien has been granted work authorization as a benefit attached to a particular status or form of relief, *see* 8 C.F.R. § 274a.12; whether the alien has kept DHS informed of any change of address as required under 8 U.S.C. § 1305; and whether an alien has accrued the necessary continuous presence to be eligible for relief from removal, 8 U.S.C. § 1229b(a)(1), (2), (b)(1)(A).

Indeed, California and San Francisco's limited view of the scope of 8 U.S.C. § 1373 contradicts the longstanding views, reiterated recently, of the California Attorney General. In 2014, an Information Bulletin issued by the California Department of Justice reiterated the legal position, previously set out in an Attorney

45

General opinion in 1992, that "[f]ederal law provides that state and local governments may not be prohibited from providing information to or receiving information from [Immigration and Customs Enforcement]." Cal. Dep't of Justice, *Information Bulletin* 3 (June 25, 2014) (citing 75 Ops. Cal. Atty. Gen. 270, 277 (1992)); *see* ER172. The bulletin specified that state and local law enforcement officers could provide "notification of the date that an individual will be released." *Id.* That position was correct, and is fundamentally inconsistent with the information-sharing restrictions in the state and local laws at issue here.

## V. The District Court Improperly Extended the Injunction to Entities Other Than San Francisco and California.

As explained above, the district court's conclusion that injunctive relief was warranted rests on an error of law. Even assuming, however, that this Court were to agree with the district court's reasoning, it would be necessary to vacate the injunction insofar as it extends to entities other than the plaintiffs in this case in light of principles of Article III standing and limitations on a court's equitable authority.

### A. Article III Standing Requirements Preclude an Injunction That Extends Beyond What Is Necessary to Redress Plaintiffs' Injury

**1.** To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). "[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each

46

form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion."). As this Court has recognized, "our legal system does not automatically grant individual plaintiffs standing to act on behalf of all citizens similarly situated." *Zepeda v. U.S. Immigration & Naturalization Serv.*, 753 F.2d 719, 730 n.1 (9th Cir. 1983).

The Supreme Court recently reaffirmed these principles in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), concluding that a set of voters had not demonstrated standing to challenge alleged statewide partisan gerrymandering of Wisconsin legislative districts. The plaintiffs alleged that voters who shared their political views were disadvantaged by the way district lines were drawn statewide, and that they were therefore entitled to challenge the entire state map. *Id.* at 1924-25. But the Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact,'" and that a voter's "harm [from] the dilution of [his] vote[] . . . is district specific" because it "results from the boundaries of the particular district in which he resides." *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Accordingly, the Court held that "the remedy that is proper and sufficient lies in the revision of the boundaries

of the individual's own district," not the broader remedy of "restructuring all of the State's legislative districts." *Id.* at 1930-31. And the Court "caution[ed]" that "'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (quoting *Cuno*, 547 U.S. at 353); *accord id.* at 1933 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

Likewise, in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Supreme Court held that the plaintiffs lacked standing to challenge Forest Service regulations after the parties had resolved the controversy regarding the application of the regulations to the project that had caused the plaintiffs' alleged injury. Noting that the plaintiffs' "injury in fact with regard to that project ha[d] been remedied," *id.* at 494, the Court held that to allow the plaintiffs to challenge the regulations "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Id.*; *see also Lewis*, 518 U.S. at 357 ("The actual-injury requirement would hardly serve [its] purpose . . . if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration.").

These cases make clear that where no class has been certified, no justiciable controversy exists once the injury to the actual plaintiffs has been remedied. Thus, in *Alvarez v. Smith*, 558 U.S. 87 (2009), the plaintiffs lacked standing to seek declaratory and injunctive relief against a State's practice of keeping property in custody without a

prompt post-seizure hearing because the plaintiffs had already received the seized property or forfeited their claims to it. *Id.* at 92. The Supreme Court explained that since class certification had been denied, the "only disputes relevant here are those between these six plaintiffs and the State's Attorney . . . and those disputes are now over." *Id.* at 93; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (the plaintiffs "d[id] not represent a class, so they could not seek to enjoin [an agency] order on the ground that it might cause harm to other parties").

This Court has thus recognized the "elementary principle" that in the absence of class certification, plaintiffs are "not entitled to relief for people whom they do not represent." *Zepeda*, 753 F.2d at 730 n.1. Were it otherwise, any individual plaintiff "could merely file an individual suit as a pseudo-private attorney general and enjoin the government in all cases." *Id.* The Seventh Circuit has likewise squarely held that a district court may not "grant relief to non-parties" where an injunction limited to the party would provide complete relief, stating that a broader injunction "exceed[s] the district judge's powers under Article III of the Constitution." *McKenzie v. City of Chicago*, 118 F.3d 552, 555 & n.* (7th Cir. 1997); *see also Warth*, 422 U.S. at 499 ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.").

Under these principles, San Francisco and California do not have standing to seek an injunction broader than necessary to remedy their own asserted injuries. And neither plaintiff can plausibly assert that an injunction that extends to other jurisdictions

is necessary to remedy the plaintiffs' claimed harm, which is entirely based on the withdrawal of money that would go to San Francisco and California. Thus, having granted permanent injunctive relief to plaintiffs, the district court had no authority to extend its injunction to jurisdictions across the country.

## B. Traditional Equitable Principles Preclude an Injunction That Extends Beyond What Is Necessary to Redress Plaintiffs' Injury

**1.** Even apart from Article III's jurisdictional constraints, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity. Several equitable principles cut decisively against such injunctions.

*First*, the "Supreme Court has cautioned that 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the Court." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Thus, "[i]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification." *Id.* (quoting *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996)); *see also Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994) (vacating injunction insofar as it applied to persons other than the plaintiff).

In *Los Angeles Haven Hospice*, this Court agreed with the district court that a Department of Health and Human Services regulation was facially invalid, but nonetheless vacated an injunction insofar as it barred that agency from enforcing the regulation against entities other than the plaintiff. The Court recognized that relief

benefitting parties not before the Court is authorized only "if such broad relief is necessary to give prevailing parties the relief to which they are entitled." 638 F.3d at 664 (citing *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)).

This Court has also recognized that "nationwide injunctions 'have a detrimental effect by foreclosing adjudication by a number of different courts and judges.'" *Los Angeles Haven Hospice*, 638 F.3d at 664 (quoting *Yamasaki*, 442 U.S. at 702). "[A]llowing only one final adjudication deprives the Supreme Court of the benefit it receives from permitting multiple courts of appeals to explore a difficult question before it grants certiorari." *Id.* (citing *United States v. Mendoza*, 464 U.S. 154, 160 (1984)); *see also Virginia Soc'y for Human Life v. Federal Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) (permitting nationwide injunction "would 'substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.'" (quoting *Mendoza*, 464 U.S. at 160)).

*Second*, longstanding historical practice confirms that injunctions are limited to what is necessary to remedy the plaintiff's injury. It is well established that the scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'"

*Trump v. Hawaii*, 138 S. Ct. 2392, 2427-28 (2018) (Thomas, J., concurring) (quoting *The Federalist No. 78*, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id.* at 2428. It is thus unsurprising that injunctions like the one here "are a recent development, emerging for the first time in the 1960s and dramatically increasing in popularity only very recently." *Id.* at 2426.

The absence of nationwide injunctions was certainly not for lack of opportunities to seek such relief against federal enactments or policies that were facially invalid. To give a particularly stark counter-example, in the 1930s, courts issued roughly 1600 injunctions against enforcement of a single federal statutory provision. Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 434 (2017). While in some cases before traditional courts of equity, small groups of plaintiffs could join together to bring a "bill of peace" on behalf of an affiliated group, this "kind of proto-class action" was not extended to equitable relief against federal action on behalf of entirely absent, unrepresented parties. *See id.* at 426-27.

*Third*, nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring); *see also* ER64 (explaining that the court "share[s] th[e] concern" articulated by Justice Thomas in *Hawaii*). In "'foreclosing adjudication by a number of different courts and judges,'"

52

nationwide injunctions "deprive[] the Supreme Court of the benefit it receives from permitting multiple courts of appeals to explore a difficult question before it grants certiorari." *Los Angeles Haven Hospice*, 638 F.3d at 664 (quoting *Yamasaki*, 442 U.S. at 702); *see also Virginia Soc'y for Human Life*, 263 F.3d at 393.

*Fourth*, issuing injunctions that provide relief to non-parties subverts the class-action mechanism provided under the Federal Rules of Civil Procedure. *See Zepeda*, 753 F.2d at 727-28. The availability of nationwide injunctions without class certification creates a fundamentally inequitable asymmetry, whereby non-parties can claim the benefit of a single favorable ruling, but are not bound by a loss. As the district court acknowledged, the availability of nationwide injunctions is "a 'one-way-ratchet' that allows plaintiffs to have relief on behalf of all others, while the government cannot preclude all plaintiffs' claims." ER64 (quoting *Chicago*, 888 F.3d at 298 (Mannion, J., dissenting in part)). In other words, if plaintiffs prevails, the court issues the relief that might have been appropriate had it certified a class of all grant applicants; but if the federal government prevail, it gains none of the benefits of prevailing in a class action.

*Finally*, and relatedly, an injunction that extends beyond a plaintiff's injury to cover potential plaintiffs nationwide undermines *Mendoza*'s holding "that nonmutual offensive collateral estoppel simply does not apply against the government." 464 U.S. at 162. That bar on non-parties' invocation of issue preclusion against the federal government is largely meaningless if the first party to obtain a favorable ruling against

the government can obtain an injunction that extends to all non-parties who would otherwise be forced to relitigate the issue under *Mendoza*.

**2.** Here, the district court failed to provide any persuasive justification for its disregard of these equitable principles. It reasoned that a nationwide injunction was appropriate to "bring 'clarity to all parties and to citizens dependent on public services.'" ER65 (quoting *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)). The court explained that such an injunction "would not disrupt the administration of the Byrne JAG program," because the statute "does not independently give the Attorney General authority to impose additional conditions not conferred by Congress." *Id.*

This reasoning conflates the scope of San Francisco and California's legal argument on the merits with the scope of relief necessary to remedy their alleged injury from the violation, and it is inconsistent with each of the equitable principles outlined above as well as with this Court's binding precedent. Nothing in the basic equitable rule that injunctions should "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) (quoting *Yamasaki*, 442 U.S. at 702), suggests that the rule is limited only to cases that turn on their facts rather than resolving purely legal questions. As other courts have recognized, that a challenge is facial does not change the operation of the basic principle. Thus, in *Los Angeles Haven Hospice*, this Court agreed with the plaintiff that an agency regulation was arbitrary and capricious, 638 F.3d at 661, but

reversed the district court's determination that "the facial invalidity of the . . . regulation" permitted a nationwide injunction, *id.* at 665.

The Fourth Circuit took the same approach in *Virginia Society for Human Life*, narrowing a nationwide injunction issued against an agency regulation it found unconstitutional where preventing enforcement of the regulation "against other parties in other circuits does not provide any additional relief" to the plaintiff. 263 F.3d at 393. The lack of historical support for the injunction issued here further underscores the point—courts have long ruled on pure issues of law without suggesting that such a ruling permits nationwide relief. Likewise, *Mendoza* emphasizes that the government is likely to be involved in multiple suits which "involve the same legal issues," and it highlights the negative effects on judicial decisionmaking of a ruling that "freez[es] the first final decision rendered on a particular legal issue." 464 U.S. at 160.

In sum, as neither San Francisco nor California can plausibly argue that they have a cognizable legal interest in federal grants awarded to other jurisdictions across the country, the settled equitable limits on the statutory authority to issue injunctive relief—which complement Article III's constitutional limits in awarding any relief—apply with full force here and require vacatur of the permanent injunction's extension to non-plaintiffs.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

DAVID L. ANDERSON
*United States Attorney*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN
BRAD HINSHELWOOD
*/s/ Laura E. Myron*

LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4819*

March 2019

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that *City of Los Angeles v. Barr*, No. 18-56292 (oral argument to be held April 10, 2019) is a related case pending before this Court.

*s/ Laura E. Myron*
LAURA E. MYRON

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,964 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.


*s/ Laura E. Myron*
LAURA E. MYRON

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Laura E. Myron*
LAURA E. MYRON

**ADDENDUM**

## TABLE OF CONTENTS

8 U.S.C. § 1373....................................................................................................... A1

34 U.S.C. § 10102 ................................................................................................. A2

34 U.S.C. § 10153(A)............................................................................................. A3

**8 U.S.C. § 1373**

## § 1373. Communication between government agencies and the Immigration and Naturalization Service

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

A1

**34 U.S.C. § 10102**

**§ 10102. Duties and functions of Assistant Attorney General**

**(a) Specific, general and delegated powers**

The Assistant Attorney General shall—

**(1)** publish and disseminate information on the conditions and progress of the criminal justice systems;

**(2)** maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

**(3)** provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

**(4)** maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

**(5)** coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and

**(6)** exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

**(b) Annual report to President and Congress**

The Assistant Attorney General shall submit an annual report to the President and to the Congress not later than March 31 of each year.

A2

**34 U.S.C. § 10153(A)**

**§ 10153. Applications**

**(A) In general**

To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General within 120 days after the date on which funds to carry out this part are appropriated for a fiscal year, in such form as the Attorney General may require. Such application shall include the following:

> **(1)** A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities.

> **(2)** An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body).

> **(3)** An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General—

>> **(A)** the application (or amendment) was made public; and

>> **(B)** an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure makes such an opportunity available.

> **(4)** An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require.

> **(5)** A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that—

>> **(A)** the programs to be funded by the grant meet all the requirements of this part;

>> **(B)** all the information contained in the application is correct;

>> **(C)** there has been appropriate coordination with affected agencies; and

**(D)** the applicant will comply with all provisions of this part and all other applicable Federal laws.

**(6)** A comprehensive Statewide plan detailing how grants received under this section will be used to improve the administration of the criminal justice system, which shall—

**(A)** be designed in consultation with local governments, and representatives of all segments of the criminal justice system, including judges, prosecutors, law enforcement personnel, corrections personnel, and providers of indigent defense services, victim services, juvenile justice delinquency prevention programs, community corrections, and reentry services;

**(B)** include a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

**(C)** describe the process used by the State for gathering evidence-based data and developing and using evidence-based and evidence-gathering approaches in support of funding decisions;

**(D)** describe the barriers at the State and local level for accessing data and implementing evidence-based approaches to preventing and reducing crime and recidivism; and

**(E)** be updated every 5 years, with annual progress reports that—

**(i)** address changing circumstances in the State, if any;

**(ii)** describe how the State plans to adjust funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

**(iii)** provide an ongoing assessment of need;

**(iv)** discuss the accomplishment of goals identified in any plan previously prepared under this paragraph; and

**(v)** reflect how the plan influenced funding decisions in the previous year.