Nos. 18-17308, 18-17311

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, | No. 18-17308, 18-17311 |
| Plaintiff/Appellee, | U.S. District Court Nos. 3:17-cv-04642-WHO & 3:17-cv-04701-WHO |
| vs. | |
| WILLIAM P. BARR, et al., | |
| Defendants/Appellants, | |
| STATE OF CALIFORNIA ex rel. XAVIER BECERRA, Attorney General, | |
| Plaintiff-Appellee, | |
| WILLIAM P. BARR, et al., | |
| Defendants-Appellants. | |

---

**CITY AND COUNTY OF SAN FRANCISCO'S
ANSWERING BRIEF**

---

On Appeal from the United States District Court
for the Northern District of California

The Honorable William H. Orrick

DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH State Bar #122517
RONALD P. FLYNN, State Bar #184186
YVONNE R. MERÉ, State Bar #173594
AILEEN M. McGRATH, State Bar #280846
Deputy City Attorneys

Office of the San Francisco City
Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:  (415) 554-4691
Facsimile:  (415) 554-4715
Email:  Aileen.McGrath@sfcityatty.org

Attorneys for Plaintiff and Appellee
CITY AND COUNTY OF SAN FRANCISCO

Additional Counsel for Plaintiff and Appellee
CITY AND COUNTY OF SAN FRANCISCO

TARA M. STEELEY, State Bar #231775
SARA J. EISENBERG, State Bar #269303

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION ...........................................................................1

STATEMENT OF THE ISSUES.......................................................2

STATEMENT OF JURISDICTION...................................................3

STATEMENT OF THE CASE...........................................................3

    I.    San Francisco's Sanctuary City Laws And Policies ............................3

    II.    The Byrne JAG Program ......................................................4

    III.    The Department's New JAG Conditions ...............................6

    IV.    Procedural History...............................................................7

    V.    Related Litigation ................................................................9

STANDARD OF REVIEW ............................................................10

SUMMARY OF ARGUMENT ......................................................10

ARGUMENT ................................................................................13

    I.    Congress Has Not Authorized The Department To Impose The Challenged Conditions. ....................................13

        A.    The JAG Statute Does Not Allow The Attorney General To Impose Substantive Conditions. ..........................13

            1.    The JAG Statute Gives The Attorney General A Limited Role. ................................................13

            2.    The Department Incorrectly Argues The JAG Statute Authorizes The Conditions................................15

        B.    Section 10102(a)(6) Of The Statute Establishing The Office Of Justice Programs Does Not Authorize The Challenged Conditions.............................................18

        C.    Section 1373 Is Unconstitutional. ...........................26

            1.    An Unconstitutional Law Cannot Be An Applicable Federal Law................................26

            2.    Section 1373 Violates The Tenth Amendment. .............27

    II.    The Challenged Conditions Violate The Spending Clause................31

        A.    The Challenged Conditions Are Ambiguous...........................32

1. The Notice And Access Conditions Are Ambiguous. ..................................................... 32

2. The Certification Condition Is Ambiguous. .................. 34

B. The Challenged Conditions Are Not Related To The JAG Program's Purpose. .................................................... 34

III. San Francisco Complies With Section 1373. ...................................... 36

IV. The District Court Properly Enjoined The Challenged Conditions Program-Wide. ................................................. 38

A. District Courts Have Discretion To Order Program-Wide Relief. ....................................................................... 38

B. The Department's Request For A New Rule Barring Nationwide Injunctions Is Groundless. ..................................... 41

1. The Department's Article III Argument Lacks Merit. ............................................................ 42

2. Equitable Principles Do Not Foreclose Program-Wide Relief. ................................................ 44

CONCLUSION ................................................................... 47

STATEMENT OF RELATED CASES ............................... 48

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ............... 49

ADDENDUM OF PERTINENT ENACTMENTS ........................ ADD 1

I. San Francisco Administrative Code, Excerpts of Chapter 12H.: Immigration Status ................................................... ADD 1

II. San Francisco Administrative Code, Excerpts of Chapter 12I: Civil Immigration Detainers ............................................ ADD 2

CERTIFICATE OF SERVICE ................................................ 50

# TABLE OF AUTHORITIES

## Federal Cases

*Adams v. Dole*
  927 F.2d 771 (4th Cir. 1991) ............................................................... 21

*Ala. Legislative Black Caucus v. Alabama*
  135 S. Ct. 1257 (2015) ......................................................................43

*Alvarez v. Smith*
  558 U.S. 87 (2009) ............................................................................42

*American Surety Co. of New York v. Marotta*
  287 U.S. 513 (1933) ..........................................................................20

*Arizona v. United States*
  567 U.S. 387 (2012) ..................................................................... 29, 35

*Ariz. State Bd. For Charter Sch. v. U.S. Dep't of Educ.*,
  464 F.3d 1003 (9th Cir. 2006)...................................................... 19, 20

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
  548 U.S. 291 (2006) ..........................................................................32

*Atlas Life Ins. Co. v. W.I. Southern, Inc*.
  306 U.S. 563 (1939) ..........................................................................45

*Beecham v. United States*
  511 U.S. 368 (1994) ..........................................................................16

*Boardman v. Pac. Seafood Grp.*
  822 F.3d 1011 (9th Cir. 2016)...................................................... 19, 20

*Branch v. Smith*
  538 U.S. 254 (2003) ..........................................................................26

*Bresgal v. Brock*
  843 F.2d 1163 (9th Cir. 1987)..................................... 39, 42, 44, 45

*Califano v. Yamasaki*
  442 U.S. 682 (1979) ................................................................... 38, 42

*Charles v. Verhagen*
348 F.3d 601 (7th Cir. 2003) .................................................................35

*Circuit City Stores, Inc. v. Adams*
532 U.S. 105 (2001) .............................................................................15

*Citizens United v. Fed. Election Comm'n*
558 U.S. 310 (2010) .............................................................................39

*City of Chicago v. Sessions*
264 F. Supp. 3d 933 (N.D. Ill. 2017) (*Chicago I*) .......................... 9, 18

*City of Chicago v. Sessions*
321 F. Supp. 3d 855 (N.D. Ill. 2018) (*Chicago III*) ...................... 10, 18

*City of Chicago v. Sessions*
888 F.3d 272 (7th Cir. 2018) (*Chicago II*) ....................... 10, 14, 18, 25

*City of Los Angeles v. McLaughlin*
865 F.2d 1084 (9th Cir. 1989) ...................................................... 5, 13

*City of Los Angeles v. Sessions*
No. 17-7215, 2018 WL 6071072 (C.D. Cal. Sept. 13, 2018) ............................10

*City of Philadelphia v. Attorney General*
916 F.3d 276 (3d Cir. 2019) ....................................... 9, 14, 18, 24, 35

*City & Cty. of San Francisco v. Trump*
897 F.3d 1225, 1243 (9th Cir. 2018) ............................................. 1, 41

*DaimlerChrysler Corp. v. Cuno*
547 U.S. 332 (2006) .............................................................................42

*Davis v. Monroe Cty. Bd. of Educ.*
526 U.S. 629 (1999) .............................................................................33

*Eastman Kodak Co. v. Image Tech. Servs*.
504 U.S. 451 (1992) .............................................................................10

*Evans v. Harnett Cty. Bd. of Educ.*
684 F.2d 304 (4th Cir. 1982) .................................................................40

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*
314 U.S. 95 (1941) .............................................................................20

*Federal Trade Commission v. MTK Marketing, Inc.*
149 F.3d 1036 (9th Cir. 1998)...........................................................21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*
528 U.S. 167 (2000) ...........................................................................43

*Gaffney v. Riverboat Servs. of Ind.*
451 F.3d 424 (7th Cir. 2006)...................................................... 20, 21

*Gill v. Whitford*
138 S. Ct. 1916 (2018) .......................................................................43

*Grupo Mexicano de Desarollo S.A. v. Alliance Bond Fund, Inc.*
527 U.S. 308 (1999) ...........................................................................45

*Harmon v. Thornburgh*
878 F.2d 484 (D.C. Cir. 1989) ...........................................................40

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*
530 U.S. 1 (2000) ...............................................................................32

*Hecht Co. v. Bowles*
321 U.S. 321 (1944) ...........................................................................41

*Hillis v. Heineman*
626 F.3d 1014 (9th Cir. 2010)...........................................................17

*Jama v. Immigration & Customs Enf't,*
543 U.S. 335 (2005) ...........................................................................14

*Kansas v. Nebraska*
135 S. Ct. 1042 (2015) .......................................................................40

*Koslow v. Commonwealth of Pennsylvania*
302 F.3d 161 (3d Cir. 2002)...............................................................35

*Lamar, Archer & Cofrin, LLP v. Appling*
138 S. Ct. 1752 (2018) .......................................................................37

*La. Pub. Serv. Comm'n v. F.C.C.*
   476 U.S. 355, 374 (1986) ..................................................................................13

*Lewis v. Casey*
   518 U.S. 343 (1996) ................................................................................ 39, 43

*Los Angeles Haven Hospice, Inc. v. Sebelius*
   638 F.3d 644 (9th Cir. 2011) ...................................................... 10, 44

*Lujan v. Nat'l Wildlife Fed'n*
   497 U.S. 871 (1990) ...................................................................................39

*McKenzie v. City of Chicago*
   118 F.3d 552 (7th Cir. 1997) ...................................................... 43, 44

*McSherry v. City of Long Beach*
   584 F.3d 1129 (9th Cir. 2009) ..............................................................33

*Melendres v. Arpaio*
   784 F.3d 1254 (9th Cir. 2015) ..............................................................43

*Missouri v. Jenkins*
   515 U.S. 70 (1995) .....................................................................................38

*Monsanto Co. v. Geertsen Seed Farms*
   561 U.S. 87 (2009) .....................................................................................42

*Murphy v. Nat'l Collegiate Athletic Ass'n*
   138 S. Ct. 1461 (2018) .................................................... 27, 28, 29, 30

*Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*
   145 F.3d 1399 (D.C. Cir. 1998) .............................................. 40, 45

*Nevada v. Hicks*
   533 U.S. 353 (2001) ...................................................................................28

*New York v. United States*
   505 U.S. 144 (1992) ...................................................... 27, 29, 30, 34

*P.C. Pfeiffer Co. v. Ford*
   444 U.S. 697 (1979) ...................................................................................20

*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981) ........................................................................... 32, 34

*Porter v. Warner Holding Co.*
328 U.S. 395 (1946) ..............................................................................41

*Printz v. United States*
521 U.S. 898 (1997) ........................................................ 27, 29, 30, 31

*Richmond Tenants Org., Inc. v. Kemp*
956 F.2d 1300 (4th Cir. 1992) ..................................................... 40, 45

*S.E.C. v. Sloan*
436 U.S. 103 (1978) ..............................................................................25

*Scherr v. Marriott International, Inc.*
703 F.3d 1069 (7th Cir. 2013) ..................................................... 43, 44

*South Dakota v. Dole*
483 U.S. 203 (1987) ........................................... 8, 13, 31, 32, 36

*State of New York v. Dep't of Justice*
343 F. Supp. 3d 213 (S.D.N.Y. 2018) ................................................10

*Steinle v. City and Cty. of San Francisco*
919 F.3d 1154 (9th Cir. 2019) ..................................................... 12, 37

*Summers v. Earth Island Inst.*
555 U.S. 488 (2009) ..............................................................................42

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*
402 U.S. 1 (1971) ..................................................................................38

*Texas v. United States*
809 F.3d 134 (5th Cir. 2016) ...............................................................40

*Train v. City of New York*
420 U.S. 35 (1975) ................................................................................16

*United States v. Baucum*
80 F.3d 539 (D.C. Cir. 1996) ..................................................... 26, 27

*United States v. California*
314 F. Supp. 3d at 1102 (N.D. Cal. 2018)...........................................37

*United States v. California*
921 F.3d 865 (9th Cir. 2019) ......................................................12, 37

*United States v. Jicarilla Apache Nation*
564 U.S. 162 (2011) ...................................................................15

*United States v. Mendoza*
464 U.S. 154 (1984) ...................................................................46

*United States v. Oakland Cannabis Buyers' Co-op.*
532 U.S. 483 (2001) ...................................................................41

*Util. Air Regulatory Grp. v. EPA*
573 U.S. 302 (2014) ...................................................................17

*Virginia Society for Human Life, Inc. v. Federal Election Commission*
263 F.3d 379 (4th Cir. 2001)...........................................................44

*Whole Women's Health v. Hellerstedt*
136 S. Ct. 2292 (2016) ..........................................................39, 44

*Yates v. United States*
135 S. Ct. 1074 (2015) ................................................................16

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*
636 F.3d 874 (7th Cir. 2011)...........................................................40

*Zepeda v. U.S. Immigration & Naturalization Service*
753 F.2d 719 (9th Cir. 1983)...........................................................42

## Constitutional Provisions

U.S. Const.
amend. X....................................................................................27

U.S. Const.
art. I, § 8, cl. 1. ......................................................................13

**Federal Statutes**

5 U.S.C.
  § 706(2)(A) ....................................................................................................45

8 U.S.C.
  § 1373 ................................................................................................ *passim*
  § 1373(a).........................................................................................................28
  § 1373(b).........................................................................................................28

20 U.S.C.
  § 10006(b)........................................................................................................13

28 U.S.C.
  § 509 ......................................................................................................... 19, 21

Pub. L. No. 109-162, § 1111, 119 Stat. 2960 (2006)
  (codified at 34 U.S.C. § 10151, *et seq*.) ............................................4, 5

34 U.S.C.
  § 10102 .............................................................................................................18
  § 10102(a)........................................................................................................ 18
  § 10102(a)(5)....................................................................................................19
  § 10102(a)(6) ................................................. 7, 11, 18, 19, 21, 24, 25
  § 10102(a)(1)-(4)............................................................................................18
  § 10110.............................................................................................................21
  § 10152(a)(1)(A)-(H)................................................................................ 5, 36
  § 10152(c)........................................................................................................22
  § 10153(a).................................................................................................. 5, 14
  § 10153(a)(4) ...................................................................................... 17, 18, 22
  § 10153(a)(5) ................................................................................................. 18
  § 10153(a)(5)(A)-(C)......................................................................................16
  § 10153(a)(5)(C)..............................................................................................17
  § 10153(a)(5)(D) ........................................... 2, 8, 11, 15, 16, 17, 26, 31
  § 10153(a)(6) ....................................................................................................5
  § 10153(b)(1)....................................................................................................24
  §§ 10153-10156................................................................................................14
  § 10154 ..............................................................................................................5
  § 10156(a)-(d)...................................................................................................5
  § 10156(a)(1)....................................................................................................14
  § 10156(a), (d)..................................................................................................13
  § 10171(b)..........................................................................................................13

§ 10191 ......................................................................................................13
§ 10202(c) .................................................................................................24
§ 10251(a)(6) .............................................................................................18
§ 10381(c) .................................................................................................13
§ 10446(e)(3) .............................................................................................14
§ 20927(a) .................................................................................................16
§ 40701(c)(1) .............................................................................................14
§ 40914(b)-(c) ...........................................................................................17
§ 60105(e)(2) .............................................................................................16

42 U.S.C.
§ 300v-1 ....................................................................................................24

**Regulations**

2 C.F.R.
§ 200.207 ...................................................................................................23
§ 200.210(b) ..............................................................................................24
§ 2800.101 .................................................................................................23

28 C.F.R.
§ 66.12 ......................................................................................................23
§ 66.12(b) ..................................................................................................23

**Local Statutes and Codes**

S.F. Admin. Code
§ 12H.1 ........................................................................................................3
§ 12H.2 ........................................................................................................3
§ 12I.1 ................................................................................................3, 4, 30
§ 12I.3 ..........................................................................................................3
§ 12I.4 ..........................................................................................................3

**Other References**

1 R. Cappalli, Federal Grants & Cooperative Agreements—Law, Policy, and
Practice, § 4.01 (1987)............................................................................13

Bray, Multiple Chancellors: Reforming the National Injunction
131 Harv. L. Rev. 417, 434 (2017) ........................................................45

*City of Los Angeles v. Barr*, (Apr. 10, 2019) (No. 18-56292,)
https://www.ca9.uscourts.gov/media/view.php?pk_id=0000033883 ..................46

Congressional Research Service, Department of Justice Reauthorization:
Provisions to Improve Program Management, Compliance, and Evaluation of
Justice Assistance Grants (updated Jan. 10, 2006),
https://www.everycrsreport.com/files/20060110_RL33111_4a22ddca2c9277e02
6b44b7e7d3f6331dbac03f6.pdf..................................................................... 23, 24

Office of Justice Programs: Edward Byrne Memorial Justice Assistance Grant
Program, https://www.bja.gov/jag.........................................................................5

Opening statement of Rep. Lamar Smith, Chair, Subcommittee on Crime,
Committee on the Judiciary, U.S. House of Representatives, *Hearing:
Office of Justice Programs: Coordination and Duplication* (March 5, 2002),
*available at* https://www.loc.gov/resource/conghear04.00098177474/?sp=11...22

Prepared statement of Laurie E. Ekstrand, Director, Justice Issues,
United States General Accounting Office, for March 7, 2002 hearing of the
Subcommittee on Crime, Committee on the Judiciary, U.S. House of
Representatives, *available at* http://www.gao.gov/new.items/d02507t.pdf. .......23

Violence Against Women and Department of Justice Reauthorization
Act of 2005, P.L. No. 109-162 (signed into law on January 5, 2006) .................22

**Legislative Materials**

H.R. Rep. No. 104-24 (1995)...................................................................................35

H.R. Rep. No. 109-233 (2005)...................................................................... 6, 13, 35

## INTRODUCTION

President Trump, and members of his administration, have made no secret of their plans to target undocumented immigrants living in the United States and to undo policies that state and local governments have determined best protect and strengthen their communities. A central aspect of the administration's efforts is at the heart of this case: carrying out President Trump's threat to cut off federal funding from so-called sanctuary cities and States, which have laws and policies that prevent their employees from being conscripted into enforcing federal immigration law.

At first, the Trump administration attempted to act by fiat. Within days of taking office, President Trump signed an executive order that directed the Attorney General and Secretary of Homeland Security to withdraw *all* federal funding from sanctuary jurisdictions, like the City and County of San Francisco (the "City" or "San Francisco"). San Francisco sued, and a judge in the Northern District of California declared the order unconstitutional. This Court recently affirmed that decision, and held that the executive order improperly attempted "to cripple jurisdictions that do not assist in enforcing federal immigration policy." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018).

Soon after the executive order was struck down, the Department of Justice (the "Department") took a different approach, announcing that it would use a formula grant, the Edward Byrne Memorial Justice Assistance Grant program ("JAG" or "Byrne JAG"), to force States and localities to participate in federal immigration enforcement. Specifically, the Department insisted that localities receiving JAG funds agree to assist Immigration and Customs Enforcement ("ICE") in locating undocumented individuals for removal; permit their employees to provide sensitive information to ICE about city residents; and allow ICE officials to rove about busy jail facilities. In San Francisco's case, the City would

need to either abandon its policies prohibiting its conscription into federal immigration enforcement or forgo $1.5 million in criminal justice funding.

The Department's actions are unlawful for three main reasons: They exceed the Attorney General's authority to impose additional requirements on JAG funding; they link a grant condition to a statute—8 U.S.C. § 1373—that is itself unconstitutional under the Tenth Amendment; and they violate the Spending Clause.  The district court, after extensive briefing, enjoined these actions.  It correctly held that the Executive Branch was, once again, unconstitutionally seizing powers that do not belong to it.  This Court should affirm that these actions are unconstitutional.

And even if the Department had the power to link JAG funding to Section 1373, it could not deny grant funds to San Francisco on that basis.  This Court has repeatedly made clear that Section 1373 does not impose the broad prohibitions the Department claims it does.  San Francisco's laws and policies comply with this Circuit's interpretation of Section 1373, as the district court properly held.  The district court's judgment should be affirmed.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly held that the FY 2017 JAG conditions regarding notice, access, and Section 1373 (collectively, the "Challenged Conditions"), exceed the Department's statutory authority and are thus unconstitutional.

2.      Whether the district court correctly held that Section 1373 is not an "applicable Federal law[]" under 34 U.S.C. § 10153(a)(5)(D) because that phrase only covers laws related to federal grants.

3.      Whether the district court correctly held that Section 1373 is unconstitutional because it violates the Tenth Amendment.

4.     Whether the district court correctly held that the Challenged Conditions violate the Spending Clause.

5.     Whether the district court properly entered a declaratory judgment that San Francisco's sanctuary city laws and policies comply with Section 1373.

6.     Whether the district court properly rejected the Department's argument that federal district courts are categorically barred from enjoining unconstitutional grant conditions program-wide.

## STATEMENT OF JURISDICTION

San Francisco agrees with the Department's statement of jurisdiction.

## STATEMENT OF THE CASE

### I.     San Francisco's Sanctuary City Laws And Policies

San Francisco, a city of immigrants, has an established reputation for its diversity and the social support it provides to all members of its community.  To promote cooperation, trust, and safety for its immigrant residents, San Francisco has enacted local policies limiting entanglement with federal immigration enforcement.  S.F. Admin. Code §§ 12H.1, 12I.1.  San Francisco prohibits its employees from using City funds or resources—including work time—to assist federal officials in enforcing immigration laws, except where required by law.  *Id.* §§ 12H.2, 12I.1.  Except in narrow circumstances, the City specifically prohibits its employees from informing federal officials about when people detained in San Francisco jails will be released.  *Id.* §§ 12H.2, 12I.3.  But San Francisco permits its law enforcement officers to collaborate with federal officials when appropriate to further the public interest.  *Id.* § 12I.4.

San Francisco's law enforcement departments have policies implementing these laws.  SER216-295.[1]  For instance, the San Francisco Sheriff's Department ("SFSD") has policies regarding access to jails for ICE officials enforcing civil immigration laws.  SER220-228.  SFSD employees are not authorized to provide individuals conducting civil immigration enforcement access to inmates in jail, access to SFSD computers, databases and logs, release dates and times for inmates, or home or work contact information.  *Id.*  By contrast, SFSD staff forward requests for assistance with criminal investigations to the Sheriff, who directs any assistance to ICE agents as she deems appropriate.  SER227.

These laws and policies reflect San Francisco's legislative judgment that its immigrant residents are more likely to report crimes, use public services, and participate fully in community life when they do not fear adverse immigration consequences from contact with local government officials.  S.F. Admin. Code § 12I.1.  The laws and policies also conserve scarce local resources by using law enforcement personnel only for local public safety priorities and not to carry out the federal government's job of enforcing the immigration laws.  *Id.* ("The federal government should not shift the financial burden of federal civil immigration enforcement, including personnel time and costs relating to notification and detention, onto local law enforcement . . . .").

## II.    The Byrne JAG Program

The JAG program is the primary source of federal criminal justice funding for state and local governments.  The program has been in place since 2006, when Congress merged two criminal justice assistance grant programs to create the current JAG program.  *See*, § 1111, 119 Stat. 2960, 3094 (2006) (codified at 34

---

[1] ER refers to Appellants' Excerpts of Record.  SER refers to Appellee San Francisco's Supplemental Excerpts of Record.  San Francisco uses the abbreviation "Br." to refer to Appellants' Opening Brief.

U.S.C. § 10151, *et seq*.).  In the Department's own words, the program provides state and local governments with "critical funding necessary to support" a wide range of criminal justice initiatives nationwide.[2]  The JAG program allocates funds to States and localities according to a statutory formula based on population and local crime levels.  34 U.S.C. § 10156(a)-(d).  Award recipients are entitled to their share of the formula allocation as long as their proposed programs satisfy one of eight statutory purpose areas.[3]

By their very nature, formula grants leave administering agencies little discretion; these grants "are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula."  *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).  Consistent with the nature of formula grants, the Attorney General's role in JAG grantmaking is limited.  The Attorney General may specify the "form" of the application, collect and "review" those applications, and require that applicants provide specific "certification[s]" and "assurance[s]" in connection with the application.  34 U.S.C. §§ 10153(a), 10154.

The JAG statute does not give the Attorney General the authority to add any new requirements to JAG applications.  Indeed, the application contains only one substantive component: a description of the plan demonstrating how the applicant will use its funds.  *Id.* § 10153(a)(6).  This is consistent with Congress's goal in enacting the JAG statute, which was to allow state and local governments "to

---

[2] Office of Justice Programs: Edward Byrne Memorial Justice Assistance Grant Program, https://www.bja.gov/jag.

[3] The eight purpose areas are: (1) law enforcement, (2) prosecution and courts, (3) prevention and education, (4) corrections and community corrections, (5) drug treatment, (6) planning, evaluation, and technology improvement, (7) crime victim and witness programs, and (8) mental health programs.  34 U.S.C. § 10152(a)(1)(A)-(H).

spend money for programs that work for them." H.R. Rep. No. 109-233, at 89 (2005).

San Francisco has received JAG funding every year since the program began. The City uses that funding to support some of its most important public safety and criminal justice initiatives. SER145-147. For instance, San Francisco uses JAG funds to fund a path-breaking Young Adult Court that provides support for eligible young adult offenders, with the goal of helping youth avoid lifelong entanglement with the criminal justice system. SER145-146. JAG funds also support various City programs that aim to reduce the drug trade, eliminate recidivism among repeat offenders, and connect individuals with substance and mental health problems with appropriate services. SER146-147.

## III. The Department's New JAG Conditions

In the summer of 2017, the Department announced three new conditions on JAG funds. ER256-257.

First, the "Notice Condition" requires grantees to "provide at least 48 hours' advance notice to [the Department of Homeland Security ("DHS")] regarding the scheduled release date and time of an alien in the jurisdiction's custody, when DHS requests such notice." ER257. Second, the "Access Condition" requires grantees to provide federal immigration officials unfettered physical access to a "local-government correctional facility" to interrogate anyone suspected of being a non-citizen. ER437. Both of these conditions further require grantees to adopt a "local ordinance, -rule, -regulation, -policy, or -practice" implementing the condition's requirements. ER257, 437.

Third, the "Certification Condition" requires grantees to certify that they comply with 8 U.S.C. § 1373, which prohibits state and local governments from restricting employees from sharing immigration-status information with federal immigration officials. ER433-434.

**IV.    Procedural History**

Within days of the Department announcing these new conditions, San Francisco filed suit challenging them.  San Francisco's complaint asserted that the conditions: (1) violate the separation of powers because the Attorney General lacks the authority to impose them; and (2) violate the Spending Clause because they are ambiguous and not related to the stated purposes of the JAG program.  Dkt. No. 61.  Also, San Francisco argued that even if the Department could require San Francisco to certify its compliance with Section 1373, San Francisco's laws and policies satisfy that law's requirements.  The district court related San Francisco's case to a suit the State of California filed shortly after raising a number of similar challenges to the new JAG conditions.  Although the cases were never formally consolidated, the court considered them together.

The Department unsuccessfully moved to dismiss San Francisco's claims, arguing that the City's lawsuit was premature, the City lacked standing, and the City improperly sought declaratory relief regarding Section 1373's scope.  ER17.  The district court rejected these arguments.  *Id.*

The parties later engaged in discovery and exchanged thousands of pages of documents.  The Department produced its Administrative Record, and the City produced evidence related to its sanctuary city laws and policies.  The parties thereafter cross-moved for summary judgment.  ER585-586.

On October 5, 2018, the district court entered an order ruling in San Francisco's favor on all causes of action.  ER8-9.  The court held that the Challenged Conditions violate the constitutional separation of powers because the Attorney General lacks the authority to impose them.  ER24-27.  In doing so, the court rejected the Department's argument that 34 U.S.C. § 10102(a)(6) authorized the conditions.  ER27-29.  It held that the Department's interpretation of Section 10102(a)(6) "contradicts the plain meaning of the statute" and is inconsistent with

the provision's structure.  ER28.  The court further held that the sweeping authority the Attorney General claimed to have was impossible to reconcile with the JAG program's formula grant limitations.  ER26.  And the court noted that the Department "does not offer any argument not already considered on this exact issue" in a multitude of other cases, and the Department "made no attempt to address those unfavorable cases or explain why [the court] should depart from that authority."  *Id.*

The district court also focused on the Certification Condition.  First, the court rejected the Department's argument that 34 U.S.C. § 10153(a)(5)(D)'s requirement that grantees comply with "applicable Federal laws" authorized the Certification Condition.  ER29.  The court held that Section 1373 is not "applicable" because it is unconstitutional.  ER36.  The court analyzed Section 1373 under the Supreme Court's recent Tenth Amendment jurisprudence, concluding that the statute "undermines existing state and local policies and strips local policy makers of the power to decide for themselves whether to communicate with" federal immigration authorities.  ER33.  The court also held that Section 1373 shifts immigration enforcement costs to the States, violating the Tenth Amendment.  ER34.  Second, the Court held that even if Section 1373 were constitutional, the Department could not require JAG recipients to comply with it.  ER38.  The JAG statute's reference to "all other applicable Federal laws" encompasses only federal laws "about the grant-making process."  ER37-38.  Section 1373 is not such a law.  *Id.*

The district court also held that the conditions violate the Spending Clause.  ER38-47.  The court noted the lack of statutory authority for the conditions, and concluded the absence of a statutory directive meant that the conditions were fatally ambiguous.  ER40-42.  Further, the court determined the conditions violated the Supreme Court's instruction in *South Dakota v. Dole*, 483 U.S. 203 (1987), that

grant conditions be reasonably related to the purpose of the federal program. ER43-47. The court concluded the Challenged Conditions "are intended to promote immigration enforcement" and therefore "lack any relationship to (and in fact interfere with) the criminal justice priorities set by the plaintiffs." ER45-46.

Finally, the district court held that San Francisco was entitled to declaratory relief that its laws and policies comply with Section 1373. ER58. The court read Section 1373 as only extending to "information strictly pertaining to immigration status (i.e., what one's immigration status is)" and not to the broader categories of information the Department claimed. ER57 (citation omitted). The court found San Francisco's laws to comply with the federal statute. ER58.

In exercising its remedial discretion, the district court held the case warranted programmatic relief. The court concluded that the case presented a narrow issue of law that "does not vary from one jurisdiction to the next." ER62. Further, the court held that a program-wide injunction would serve the public interest by giving certainty to all JAG grantees. ER65. But it stayed the injunction's scope beyond San Francisco and California until the present appeal is resolved. *Id.*

## V.    Related Litigation

Many other jurisdictions have sued to enjoin enforcement of the Challenged Conditions. The cities of Chicago, Philadelphia, Los Angeles, and New York (joined by seven States—New York, Connecticut, New Jersey, Rhode Island, Washington, Massachusetts, and Virginia) have filed similar lawsuits. In all of these cases, the courts have enjoined enforcement of these conditions and have rejected the arguments that the Department makes in this case. *City of Philadelphia v. Attorney General*, 916 F.3d 276, 290 (3d Cir. 2019) (affirming a permanent injunction); *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 951 (N.D. Ill. 2017) (*Chicago I*) (issuing a preliminary injunction as to Notice and

Access Conditions); *City of Chicago v. Sessions*, 888 F.3d 272, 287 (7th Cir. 2018) (*Chicago II*) (affirming preliminary injunction); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 876 (N.D. Ill. 2018) (*Chicago III*) (entering permanent injunction as to Challenged Conditions); *State of New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 245-246 (S.D.N.Y. 2018) (entering permanent injunction as to Challenged Conditions); *City of Los Angeles v. Sessions*, No. 17-7215, 2018 WL 6071072, *3 (C.D. Cal. Sept. 13, 2018) (entering preliminary injunction as to Notice and Access Conditions), *appeal docketed* No. 18-56292 (argued April 10, 2019).

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 465 n.10 (1992). It reviews the district court's order of injunctive relief for abuse of discretion. *See Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 654 (9th Cir. 2011).

## SUMMARY OF ARGUMENT

The Department's attempt to co-opt the JAG program to coerce state and local governments to enforce federal immigration law offends both the JAG statute and, more importantly, the U.S. Constitution itself. The Challenged Conditions are thus unlawful, as every other court to have considered them has held. And even if the Certification Condition survived, the district court properly concluded that San Francisco complies with that condition. The judgment below is proper in every respect. This Court should affirm.

1. The Challenged Conditions violate the constitutional separation of powers because the Attorney General lacks the authority to impose them. The Department insists that the Attorney General can impose the Certification Condition under the JAG statute's requirement that grantees submit a "certification" that they "will comply with all provisions of this part and *all other*

*applicable Federal laws*." 34 U.S.C. § 10153(a)(5)(D) (emphasis added). But this residual clause does not give the Attorney General sweeping authority to require grantees to comply with any and all laws in the U.S. Code. Rather, this provision allows the Attorney General to condition JAG funds on compliance with laws that, like the "provisions of [the JAG statute]," apply to federal grants themselves.

In support of the Notice and Access Conditions alone, the Department points to a separate statutory provision describing the duties the Assistant Attorney General ("AAG") overseeing the Office of Justice Programs ("OJP") possesses. *Id.* § 10102(a)(6). But this provision does not authorize the Notice and Access Conditions. Section 10102(a)(6) provides no independent grant of authority, and only allows the AAG to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants[.]" *Id.* No other law or authority gives the AAG the power the Department claims. The district court properly rejected this argument, as has every court to consider whether Section 10102(a)(6) authorizes the Notice and Access Conditions.

2.    The Certification Condition fails for an independent reason: Section 1373 violates the Tenth Amendment and is thus unconstitutional. The Tenth Amendment prohibits the federal government from issuing direct commands to state or local governments, or compelling them to administer or enforce a federal regulatory program. Section 1373 violates both of these prohibitions, and is accordingly unconstitutional. Section 1373 is therefore not an "applicable Federal law[]" with which JAG applicants can be required to comply.

3.    The Challenged Conditions also violate the Spending Clause. The Spending Clause requires that federal funding conditions be unambiguous and related to Congress's purpose in authorizing the funds. The district court properly held that the Challenged Conditions contravene both of these requirements. The

Department has repeatedly refused to clarify ambiguities about the Notice and Access Conditions' requirements, and has adopted a burgeoning, expansive definition of the Certification Condition. The Challenged Conditions leave local jurisdictions unable to determine what they must do to comply with them, and are therefore fatally ambiguous. Also, none of the Challenged Conditions relates to the purpose of the JAG statute, which is to give local governments the flexibility to fund local criminal justice initiatives.

4. Even if the Certification Condition is valid, the district court properly determined that San Francisco complies with it. This Circuit has twice recently construed the meaning of Section 1373, and in both instances it rejected the Department's argument that Section 1373 prohibits local governments from restricting their employees from sharing release date, contact information, and other sensitive personal information. *United States v. California*, 921 F.3d 865, 890-892 (9th Cir. 2019); *Steinle v. City and Cty. of San Francisco*, 919 F.3d 1154, 1163-1164 (9th Cir. 2019). Instead, Section 1373 applies only to information showing "what one's immigration status is," as the district court held. The Department does not dispute that San Francisco's laws comply with this rule.

5. The district court properly exercised its discretion in entering a nationwide injunction in this case. The Challenged Conditions apply identically across all jurisdictions, and the record shows that the absence of a nationwide injunction creates unique harm and uncertainty. The Department incorrectly argues that constitutional and equitable principles categorically preclude district courts from entering nationwide injunctions. No such limitations on district courts' discretion exist.

## ARGUMENT

## I. Congress Has Not Authorized The Department To Impose The Challenged Conditions.

The Constitution grants Congress, not the Executive Branch, the power to impose conditions on federal funds. *See* U.S. Const. art. I, § 8, cl. 1. Thus, the Executive "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). Executive actions that lack such congressional authorization offend the separation of powers. *See South Dakota*, 483 U.S. at 206. The Challenged Conditions do just that, and the district court was right to enjoin them.

### A. The JAG Statute Does Not Allow The Attorney General To Impose Substantive Conditions.

#### 1. The JAG Statute Gives The Attorney General A Limited Role.

Congress intended the JAG program to provide local jurisdictions with a reliable funding source to support local public policy priorities. *See* H.R. Rep. No. 109-233, at 89. Consistent with this intent, the program is designed as a formula grant with each jurisdiction receiving a predictable sum of money annually. 34 U.S.C. § 10156(a), (d); *see also City of Los Angeles*, 865 F.2d at 1088 ("In the formula grant program the authorizing Act of Congress determines who the recipients are and how much money each shall receive.") (quoting 1 R. Cappalli, Federal Grants & Cooperative Agreements—Law, Policy, and Practice, § 4.01 (1987)). Congress chose not to use a discretionary model—as it has elsewhere— which would have given the Attorney General the authority to select grantees. *See, e.g.*, 34 U.S.C. § 10171(b) (Attorney General makes "[t]he selection of applicants"); *id.* § 10191 (similar); *id.* § 10381(c) (similar); *see also* 20 U.S.C. § 10006(b) ("The Secretary shall determine which States receive grants . . . and the amount of those grants, on the basis of information provided in State applications . . . and such other criteria as the Secretary determines appropriate.").

Instead, Congress directed in the JAG statute that "the Attorney General *shall . . . allocate*" funds according to the stated formula.  34 U.S.C. § 10156(a)(1) (emphasis added).

Consistent with the formula grant structure, the JAG statute gives the Attorney General a narrow role in administering the program.  The Attorney General may collect and "review" applications and, later, disburse JAG awards. *Id.* §§ 10153-10156.  The Attorney General also may decide the "form" applicants must use and require applicants to provide certain "certification[s]" or "assurance[s]."  *Id.* § 10153(a).  Those certifications are narrow and ministerial. They require applicants to: (1) supply information about how they will use grant funding; (2) demonstrate financial and programmatic integrity; (3) confirm that they followed certain procedural requirements, like providing the opportunity for public comment; and (4) certify that they "will comply with all provisions of this part and all other applicable Federal laws."  *Id.*

The statute notably lacks any language granting the Attorney General authority to impose award conditions of his or her choice.  This absence is particularly stark when compared to other statutory provisions.  Congress has repeatedly given the Attorney General greater authority to administer other Department grants.  *E.g.*, *id.* § 40701(c)(1) (the Attorney General "shall . . . establish appropriate grant conditions" for DNA-index formula grant); *id.* § 10446(e)(3) (Attorney General "may impose reasonable conditions on grant awards" in formula grant to combat violence against women).  Its failure to do so here is telling.  *Jama v. Immigration & Customs Enf't,* 543 U.S. 335, 341 (2005); *see also Chicago II*, 888 F.3d at 284; *Philadelphia*, 916 F.3d at 286.

### 2. The Department Incorrectly Argues The JAG Statute Authorizes The Conditions.

Despite this narrow role for the Attorney General, the Department nevertheless argues that the JAG statute authorizes the Challenged Conditions.

First, the Department argues the Certification Condition is authorized by 34 U.S.C. § 10153(a)(5)(D), which says that JAG recipients shall certify that they "will comply with all provisions of this part and all other applicable Federal laws." According to the Department, "the phrase 'applicable Federal laws' covers laws that apply to Byrne JAG applicants" and so extends to Section 1373. Br. 28.

The Department's interpretation is too expansive. Correctly interpreted, Section 10153(a)(5)(D)'s "all other applicable Federal laws" language refers to federal laws that expressly govern federal grants or grantees. This reading is consistent with the JAG statute's text and structure, as well as with the Department's longstanding interpretation of its conditioning authority under this provision.

To start, Section 10153(a)(5)(D) refers to compliance "with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). Its use of a specific term ("all provisions of this part") followed by a residual term ("all other applicable Federal laws") is critical. In these circumstances, the residual term gains meaning by reference to the specific term. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001). Here, "all other applicable Federal laws" must be read in harmony with the preceding reference to "provisions of this part," and thus as referring to *other* federal statutes that, like the JAG statute, apply to federal grant recipients. Indeed, reading the statute otherwise—to allow the Attorney General to identify applicable code provisions at his whim— would create superfluity problems. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011). If "all applicable Federal laws" means "all Federal laws,"

then both the word "applicable" and the preceding reference to "all provisions of this part" would be unnecessary.

Other interpretive tools counsel against the Department's interpretation, like the canon that a term is given meaning "by the company it keeps." *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015). The immediately surrounding provisions of the statute all concern federal grant making. Section 10153(a)(5)(D) describes four certifications, including the "all other applicable Federal laws" certification. The first three all relate directly to the grant application: The applicant must certify that the programs to be funded "meet" the statute's requirements; that the information in the application "is" correct; and that the applicant "has" coordinated with affected agencies. 34 U.S.C. § 10153(a)(5)(A)-(C). And so the fourth requirement, like these, must be interpreted as regarding the applicant's conduct with respect to the grant. *See Beecham v. United States*, 511 U.S. 368, 371 (1994).

This interpretation accords with several aspects of the JAG statute's broader structure. First, the JAG program is a formula grant, which creates a predictable source of funding. *See supra* p. 13. Interpreting Section 10153(a)(5)(D) to inject the Attorney General's policy preferences into that process defies reason. Congress could not have possibly "scuttled the entire effort by providing the Executive with the seemingly limitless power to withhold funds from allotment and obligation." *Train v. City of New York*, 420 U.S. 35, 45-46 (1975).

Second, the statute contains explicit provisions allowing the Attorney General to withhold small portions of JAG funds if recipients fail to comply with certain federal laws related to criminal justice. For instance, jurisdictions that fail to implement the federal Sex Offender Registration and Notification Act or the federal Death in Custody Act may be subject to a 10-percent withholding of their award. 34 U.S.C. §§ 20927(a), 60105(e)(2). Up to three percent of a State's award may also be withheld if it fails to implement the National Instant Criminal

Background Check System.  *Id.* § 40914(b)-(c).  Why would Congress include these specific requirements if Section 10153(a)(5)(D) already included authority to cut *all* funding based on non-compliance with these—and all other—"applicable Federal laws"?  The Department's answer, in essence, is that these provisions are meaningless.

Finally, the Department's current interpretation contradicts its earlier views. In the recent past, the Department told Congress that it believed it lacked the authority to condition JAG funding on compliance with Section 1373.  SER97-98. Yet the Department now, without explanation, claims to have discovered a source of this authority, without any change in congressionally adopted law.  The Court should be skeptical of this about-face.  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 323-325 (2014).

This is not the only instance in which the Department has suddenly uncovered new sources of authority.  For the first time on appeal, the Department appears to argue that the JAG statute itself authorizes not only the Certification Condition but also the Notice and Access Conditions.  The Department invokes provisions of the JAG statute requiring applicants to provide an "assurance" that they will maintain and report certain "programmatic and financial" information, 34 U.S.C. § 10153(a)(4), and a "certification" that "there has been appropriate coordination with affected agencies," *id.* § 10153(a)(5)(C).  It suggests that these provisions "underscore[]" the "propriety" of the Notice and Access Conditions. Br. 22.

The Department has waived these arguments, so the Court should not consider them.  *Hillis v. Heineman*, 626 F.3d 1014, 1019 (9th Cir. 2010).  And they are meritless in any case.  The provisions the Department cites merely require applicants to provide information about how they use JAG funds.  Notification about inmates' release dates, or access to San Francisco jails, is hardly the kind of

"programmatic [or] financial" information regarding San Francisco JAG-funded programs that the statute contemplates.  34 U.S.C. § 10153(a)(4).  Nor are federal immigration officials the type of "affected agencies" Section 10153(a)(5) references.  Rather, that provision refers to state and local agencies that are *affected by the grant* or the grant application.  *See id.* § 10251(a)(6) (defining "public agency" as "department, agency, or instrumentality" of any State or local government).  In any event, Section 10153(a)(4) contemplates provision of information to the Attorney General.  The Notice Condition, by contrast, aims to require grantees to provide information *to DHS*, even though DHS has no role in administering JAG awards.

### B. Section 10102(a)(6) Of The Statute Establishing The Office Of Justice Programs Does Not Authorize The Challenged Conditions.

Because the JAG statute does not authorize the Challenged Conditions, the Department looks elsewhere.  The Department claims that the statute establishing OJP and defining the responsibilities of its AAG creates the power to impose these conditions.  *See* 34 U.S.C. § 10102; *see also* Br. 23-26.  But this argument fares no better.  Section 10102(a)'s plain text forecloses the Department's argument, as every court to consider the question has held.  *Philadelphia*, 916 F.3d at 287-288; *Chicago I*, 264 F. Supp. 3d at 941-943; *Chicago II*, 888 F.3d at 284-287; *Chicago III*, 321 F. Supp. 3d at 874; *New York*, 343 F. Supp. 3d at 228-229; *Los Angeles*, 2018 WL 6071072 at *2.

The provision at issue appears in a statutory section describing the powers that the AAG overseeing OJP exercises.  Section 10102(a) provides that the AAG shall have several "[s]pecific, general, and delegated powers."  The AAG is to provide information about the criminal justice system and "maintain liaison" with other government entities on criminal justice-related matters.  34 U.S.C. § 10102(a)(1)-(4).  The AAG also coordinates the work of various OJP offices and

bureaus. *Id.* § 10102(a)(5). And finally, relevant here, Section 10102(a)(6) provides that the AAG will "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter [101 of Title 34] or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6).

This last clause—"including placing special conditions"—does not grant the AAG the independent authority to place conditions on grants. Rather, it directs the AAG to "exercise" two types of "powers and functions" that may be "vested" in him or her: (1) powers given to the AAG in other provisions of Chapter 101; and (2) powers that the Attorney General has delegated to the AAG. That is, Section 10102(a)(6) authorizes the AAG to exercise powers that some other statutory authority has vested, either in the AAG directly or in the Attorney General. Provisions like these, which describe the functions that a federal officer may exercise, are commonplace. *See, e.g.*, 28 U.S.C. § 509 (describing the Attorney General).

The Department nonetheless argues that the plain meaning of Section 10102(a)(6) is that it expands the AAG's authority. The Department describes Section 10102(a)(6) as "vest[ing] the AAG with the power" to confer special conditions. Br. 24. But Section 10102(a)(6) does not "vest" anything—its "including" clause refers back to the preceding clause describing existing powers *elsewhere* conferred.

In another unusual interpretation, the Department argues that "including" as it is used in Section 10102(a)(6) expands, not illustrates, the AAG's authority. The Department makes the argument—one difficult to square with common sense— that "including" means "'and' or 'in addition to.'" Br. 24. But this Court has already rejected this exact argument. *Ariz. State Bd. For Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006*); see also Boardman v. Pac.*

*Seafood Grp.*, 822 F.3d 1011, 1021 (9th Cir. 2016) (holding that "specifically includ[ing]" means that "the claims in the second clause are a smaller subset of the . . . claims in the first clause").

Instead, this Court has held that the "plain and unambiguous" meaning of "including" is that it illustrates, rather than expands, the principle preceding it. *Ariz. State Bd. For Charter Sch*., 464 F.3d at 1007-1008 ("In both legal and common usage, the word 'including' is ordinarily defined as a term of illustrating, signifying that what follows is an example of the preceding principle."). The Supreme Court has reached the same conclusion. *See P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 77 n.7 (1979) (rejecting argument that "the word 'including' means 'and' or 'as well as'"); *see also Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' . . . connotes simply an illustrative application of the general principle."). So have other courts of appeals. *See, e.g.*, *Gaffney v. Riverboat Servs. of Ind.*, 451 F.3d 424, 459 (7th Cir. 2006) (items following "including" are "illustrative" of the preceding term).

The Department misinterprets various cases in arguing its unusual position. Br. 24. In *American Surety Co. of New York v. Marotta*, 287 U.S. 513, 517 (1933), the Supreme Court considered the argument that a clause stating that a "creditor" for bankruptcy purposes "may include his duly authorized agent, attorney, or proxy" limited the meaning of "creditor" to those enumerated categories. The Supreme Court rejected that argument, holding that in context "the verb is used to expand, not to restrict." *Id.* That is, the Court determined that "may include" does not mean "shall include only," because the enumerated terms were illustrative of what forms a "creditor" might take—not a complete list of the types of people who may be a creditor. That is consistent with the district court's interpretation of "including" here—the listed terms illustrate the types of powers that the AAG might exercise.

Likewise, this Court's decision in *Federal Trade Commission v. MTK Marketing, Inc.*, 149 F.3d 1036, 1040 (9th Cir. 1998), supports San Francisco's position, not the Department's. There, this Court analyzed a statutory provision stating that the term "'person' includes an individual, firm, association, corporation . . . or any other business entity." *Id.* The Court rejected the argument that this section limits the definition of "person," and held that "the Act merely provides examples" of who may qualify. *Id.* This is no different from San Francisco's position, which is that the language following "including" gives examples of the types of power the AAG may exercise *when it is elsewhere vested in him.*

The Fourth Circuit's decision in *Adams v. Dole*, 927 F.2d 771, 775-777 (4th Cir. 1991), is also inapposite. The court there simply noted that the word "including" can be definitional in certain instances, when the statutory context makes that clear. *Id.* at 777 ("If we say that 'all licensed drivers, including applicants for driver's licenses, shall take an eye exam,' the word 'including' means 'and' or 'in addition to.' That meaning is derived from the fact that a 'licensed driver,' by definition, excludes an 'applicant. . . .'"). That conclusion is not at odds with the district court's.

The Department defends its statutory rewrite on several additional grounds. First, the Department argues that the district court's reading of Section 10102(a)(6) renders the "including" clause language superfluous. Br. 24. But any such clause is arguably superfluous if it provides an example of a preceding principle. *Gaffney*, 451 F.3d at 459. And there is nothing unusual about a statute that describes the duties of a particular federal officer in ways that are arguably redundant of other statutory provisions. For instance, 34 U.S.C. § 10110 provides that the Attorney General has final authority over "all functions, including any grants" administered by OJP. That more specific provision is arguably unnecessary in light of 28 U.S.C. § 509, which generally provides that "all

functions of other officers of [the Department] and all functions of agencies and employees of [the Department] are vested in the Attorney General." It cannot be that all such specific authorizations are superfluous because the same powers are granted elsewhere. And in any event, it is the Department's interpretation that would render various portions of the JAG statute superfluous. Under the Department's reading, there would be no need for various specific grants of authority in the statute itself, such as the authority to condition grants on the submission of certain "data, records, and information," 34 U.S.C. § 10153(a)(4), or on compliance with a "program assessment component," *id.* § 10152(c), because the Attorney General already possesses these broader powers.

But more importantly, the Department is incorrect to argue that the "including" clause must be read to confer power because the 2006 amendments adding this language "would have been entirely unnecessary if it merely referred to pre-existing authority." Br. 24. That is, the Department argues that this clause must mean *something*—or why would Congress have bothered to include it?

The statutory background provides an answer that is consistent with the district court's interpretation. The 2006 amendments to the OJP statute[4] were inspired in significant part by concerns that OJP was not effectively managing its grant programming. Before passing that authorizing legislation, the House held oversight hearings for OJP to "focus on the overlap and duplication that exists within OJP" and the administrative headaches this duplication caused for grantmaking.[5] For instance, one witness from the federal General Accounting

---

[4] The amendments were part of the Violence Against Women and Department of Justice Reauthorization Act of 2005, P.L. No. 109-162 (signed into law on January 5, 2006).

[5] Opening statement of Rep. Lamar Smith, Chair, Subcommittee on Crime, Committee on the Judiciary, U.S. House of Representatives, *Hearing: Office of Justice Programs: Coordination and Duplication* (March 5, 2002), *available at* https://www.loc.gov/resource/conghear04.00098177474/?sp=11.

Office described OJP's long history of grant mismanagement. She reported that many grant files, including JAG grant files, did not contain required progress and financial reports, and generally were insufficiently monitored to ensure that grantees were using funds appropriately.[6] Other assessments of OJP reported the failure to adequately review grant applications or take "aggressive and timely" corrective action as to problematic grantees.[7] In enacting the 2006 amendments, Congress wanted to remedy the "outstanding issues regarding OJP grant program evaluations and compliance monitoring." *Id.* at CRS-12.

One available tool to remedy these issues was the authority to impose certain conditions on particular grants. At the time Congress enacted the 2006 amendments, a Department regulation authorized the agency to impose "special grant or subgrant conditions" on "high-risk grantees" who were not adequately complying with grant terms. 28 C.F.R. § 66.12 (removed Dec. 25, 2014). For instance, if a grant applicant had a history of poor grant performance, was financially unstable, had violated the terms of a previous grant award, or was "not otherwise responsible," "special conditions" on the grantee might be appropriate. In these circumstances, the agency could impose award conditions—like "additional project monitoring"—that would mitigate the risk that the recipient would fail to successfully use its grant funding. *Id.* § 66.12(b).[8]

---

[6] Prepared statement of Laurie E. Ekstrand, Director, Justice Issues, United States General Accounting Office, for March 7, 2002 hearing of the Subcommittee on Crime, Committee on the Judiciary, U.S. House of Representatives, *available at* http://www.gao.gov/new.items/d02507t.pdf.

[7] Congressional Research Service, Department of Justice Reauthorization: Provisions to Improve Program Management, Compliance, and Evaluation of Justice Assistance Grants (updated Jan. 10, 2006), https://www.everycrsreport.com/files/20060110_RL33111_4a22ddca2c9277e026b44b7e7d3f6331dbac03f6.pdf.

[8] Although the Office of Management and Budget has amended the regulations governing "special conditions" to now refer to these conditions as "specific conditions," the definition of those conditions remains largely unchanged. *See* 2 C.F.R. §§ 200.207, 2800.101.

With this background in mind, the "including" language in Section 10102(a)(6) makes sense. Congress was concerned that OJP was failing to adequately supervise its grantees. That concern explains why Congress would amend the AAG's job description to emphasize his or her ability to control grantees by, for instance, including "special conditions" as that term was commonly understood. This purpose is consistent with other changes Congress made in the same 2006 reauthorization. For example, Congress created the Office of Audit, Assessment and Management, which was tasked with conducting performance audits, managing OJP grants, and "taking actions to ensure the compliance with the terms of grants carried out by DOJ."[9] This legislative history substantiates the district court's reading of Section 10102(a)(6) as incorporating this existing power, rather than creating a new source of authority.

Second, the Department argues that its reading of Section 10102(a)(6) is consistent with conditions that it has previously imposed on JAG awards. Br. 21. But each of these conditions was authorized by Congress directly, making Section 10102(a)(6) irrelevant. *See, e.g.*, 42 U.S.C. § 300v-1 (providing that agency shall engage in notice and comment rulemaking regarding human research); 34 U.S.C. § 10153(b)(1) (requiring the Attorney General to provide technical assistance for JAG recipients); *id.* § 10202(c) (requiring grantees that use funds to purchase body armor to comply with specific requirements); *see also Philadelphia*, 916 F.3d at 290. They also mirror those conditions historically included in other federal grants, pursuant to federal regulation. *See, e.g.*, 2 C.F.R. § 200.210(b) (requiring "Federal awarding agencies" to incorporate certain "general terms and conditions"

---

[9] *See* Congressional Research Service, Department of Justice Reauthorization: Provisions to Improve Program Management, Compliance, and Evaluation of Justice Assistance Grants (Jan. 10, 2006), https://www.everycrsreport.com/files/20060110_rL33111_4a22ddca2c9277e026b4 4b7e7d3f6331dbac03f6.pdf.

into grants). And even if these conditions were not authorized by statute, that would not legitimize the Challenged Conditions. The Department "may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate." *S.E.C. v. Sloan*, 436 U.S. 103, 119 (1978).

Third, the Department complains that the district court's decision was infected by a misunderstanding of the statutory structure. Br. 26-27. But this argument misses the district court's point. The district court referenced the statutory structure to show why it was implausible to believe Congress intended Section 10102(a)(6)'s "including" language to override JAG's formula purpose. ER28-29. The district court cited the Seventh Circuit's assessment that "[a] clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose any conditions on any grants—a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the [AAG] that was not granted to the Attorney General." ER28 (quoting *Chicago II*, 888 F.3d at 285 (internal quotation marks omitted)). The point is that it would be unusual to find this language in a separate statutory section—not that the section itself can never apply to the JAG program.

Finally, the Department argues that the district court interpreted Section 10102(a)(6) more narrowly than other courts have. Br. 23. It is unclear what the Department means by this. In support, the Department cites pages from the district court's order that do not concern Section 10102(a)(6) at all. Br. 23 (citing ER29-30). In any event, the district court's ruling drew heavily on, and is consistent with, the other rulings on this issue. *See, e.g.*, ER28-29. As those courts concluded, neither the JAG statute nor Section 10102(a)(6) authorizes any of the Challenged Conditions. For this reason alone, the Court should affirm the district court's judgment invalidating the Challenged Conditions.

## C.  Section 1373 Is Unconstitutional.

Even if the Department could require compliance with any federal law of its choice under Section 10153(a)(5)(D), it could not select Section 1373.  Section 1373 is unconstitutional, and therefore could not be an "applicable Federal law[]" for grantmaking purposes.

### 1.  An Unconstitutional Law Cannot Be An Applicable Federal Law.

A law that is unconstitutional cannot be an "applicable Federal law[]."  While this conclusion should be obvious, the Department resists it by arguing that Section 1373 could still be applied to grantees even if it "would be unconstitutional outside the grant context."  Br. 29-30.  That is because, the Department says, the proper inquiry is whether Section 1373 might be "constitutionally applied as a funding condition on Byrne JAG applicants."  Br. 30.

Once again, the Department is attempting to rewrite statutory provisions.  Section 1373 is not a funding condition, and the JAG statute does not contain a funding condition that incorporates Section 1373's terms.  The Department appears to suggest that this Court should imagine that Congress imposed a prohibition on restricting the sharing of immigration-status information in the JAG statute.  But that is simply not what Congress has done.

In any event, the very reason the Department says it can require JAG grantees to comply with Section 1373 is that the statute applies to San Francisco on a standalone basis.  The Department claims Section 1373 is an "other applicable Federal law[]" under the JAG statute.  Br. 28-29.  If not, then the Department has no basis to invoke Section 1373 at all.  And for a provision to be a "Federal law," it must be constitutional.  *See Branch v. Smith*, 538 U.S. 254, 281 (2003) (holding that "law" encompasses only valid, constitutional laws); *United States v. Baucum*,

80 F.3d 539, 540-541 (D.C. Cir. 1996) (per curiam) (Once a law has been declared unconstitutional, "there is no valid 'law of the United States' to enforce.").

### 2. Section 1373 Violates The Tenth Amendment.

The Tenth Amendment states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. As a result of this amendment, Congress may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). Nor may it "issue orders directly to the States" and thus violate their "residuary and inviolable sovereignty." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018) (citation and quotation marks omitted). Section 1373 violates both of these limitations.

Section 1373 is unconstitutional because it violates the Tenth Amendment's anticommandeering rule. As the Supreme Court has long held, the Constitution "confers upon Congress the power to regulate *individuals*, not States." *New York v. United States*, 505 U.S. 144, 166 (1992) (emphasis added). Thus, Congress may not "issue direct orders to the Governments of the States." *Murphy*, 138 S. Ct. at 1476. The anticommandeering rule flatly forbids federal laws where "the whole *object* . . . [is] to direct the functioning of the state executive." *Printz*, 521 U.S. at 932.

The Supreme Court in *Murphy* recently clarified the breadth of the anticommandeering rule, which applies not only to federal directives but also to prohibitions. 138 S. Ct. at 1476-1479. The statute in *Murphy* made it "'unlawful' for a State or any of its subdivisions" to "authorize by law" betting on "competitive sporting events." *Id.* at 1470. The federal government defended the law by arguing that the Tenth Amendment only forbids a direct command to the States, not a prohibition. *Id.* at 1478. The Court disagreed, holding that the challenged

law placed States "under the direct control of Congress," "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.* The Court rejected any distinction between a command and a prohibition, holding that "[t]he basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.*

Section 1373 offends this constitutional rule. By its terms, Section 1373(a) targets only "Federal, State, or local government entit[ies] or official[s]" and forbids any prohibition or restriction on the exchange of immigration-status information with ICE. Section 1373(b) similarly provides that no state or local "agency may prohibit, or in any way restrict" the exchange or maintenance of such information. On their face, these provisions speak directly to state or local governments. Like the federal law at issue in *Murphy*, Section 1373 uses a direct command to forbid jurisdictions from implementing their chosen policies. And the consequent commandeering is especially serious because it targets a basic local government function—the ability to control local government officials and employees. *See Nevada v. Hicks*, 533 U.S. 353, 365 (2001).

The Department does not dispute this framework, but instead defends Section 1373 with an argument it offered for the first time at the hearing on the parties' cross-motions for summary judgment: the claim that Section 1373 is a preemption provision. ER31. The district court properly rejected this argument. As the district court held, preemption provisions are laws that restrict States or localities from imposing conflicting standards on private actors. *Id. Murphy* made this abundantly clear, when it held that preemption doctrine applies only to federal laws "that regulate[] the conduct of private actors, not the States." *Murphy*, 138 S. Ct. at 1481. Section 1373, of course, has nothing to do with private conduct—by its terms it applies to state and local government agencies and officials. "[T]here is

simply no way to understand the provision . . . as anything other than a direct command to the States." *Murphy*, 138 S. Ct. at 1481.

The Department further argues that even if Section 1373 does not itself have preemptive effect, "basic principles of obstacle preemption" would forbid restrictions on the sharing of immigration-status information "[e]ven if Congress had not enacted [Section] 1373." Br. 33. In support, the Department points to the Immigration and Naturalization Act ("INA"). This argument, too, fails. Obstacle-preemption principles require courts to assume that "'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, 567 U.S. 387, 400 (2012). The Department does not come close to showing why the INA has such sweeping preemptive effect. It simply asserts, without citation, that the entire INA is "premised on the assumption that the federal government will be able to learn . . . aliens' release dates and seamlessly take them into federal custody." Br. 33. This supposedly "implicit" "premise[]" (Br. 33), of the INA is nowhere close to the "clear and manifest purpose" that is required to preempt state and local police powers. *Arizona*, 567 U.S. at 400. And even if the INA did rest on such a "premise," that premise would be that state and local actors would have to assist the federal government in executing its federal immigration duties—a premise that would itself be unconstitutional because it would conscript state and local officials into enforcing federal law. *See infra* p. 30.

Section 1373 violates the Tenth Amendment for an independent reason as well: It commandeers States and local governments to "administer a federal regulatory program." *Printz*, 521 U.S. at 926. The Supreme Court has consistently eschewed federal laws that "employ state governments as regulatory agencies." *New York*, 505 U.S. at 163. If Congress wants to create a federal regulatory program, it must supply the resources to administer it. Congress cannot

"circumvent" this rule by commandeering "the States' officers, or those of their political subdivisions" directly. *Printz*, 521 U.S. at 935.

But this is exactly what Section 1373 seeks to do. Section 1373 requires San Francisco to allow its employees to administer federal policies, by forbidding San Francisco from restricting or prohibiting employees from spending their paid work time communicating with federal immigration officials. It thereby "shift[s] the cost of regulation to the States," *Murphy*, 138 S. Ct. at 1477, by co-opting state employees to perform federal duties. The comparison to *Printz*, where the Supreme Court struck down efforts to force States to "enact or administer a federal regulatory program," is telling. 521 U.S. at 904. There, the Brady Act sought to enlist state law enforcement officials to "make 'reasonable efforts'" to verify "Brady Forms" they received from firearms dealers as part of a federal background check system. Both the Brady Act and Section 1373 suffer from the same defect: They deny local officials the ability to "decline to administer [a] federal program." *New York*, 505 U.S. at 176-177.

The commandeering problem is even more apparent in light of the anticommandeering doctrine's policy rationales. Section 1373 entangles state and local government officials in federal immigration enforcement, with the inevitable effect of "blurr[ing]" "responsibility for the benefits and burdens of the regulation." *Murphy*, 138 S. Ct. at 1477. Residents of San Francisco will understandably require local officials to "tak[e] the blame" for Section 1373's "burdensomeness and for its defects." *Printz*, 521 U.S. at 930. This is not an abstract concern. One of the central purposes of San Francisco's sanctuary city laws and policies is to ensure that there is a clear demarcation between federal immigration enforcement and local law enforcement. SER254-255; *see also* S.F. Admin Code § 12I.1. Section 1373 thus vitiates the interest in "political accountability" that the Tenth Amendment protects. *Murphy*, 138 S. Ct. at 1477.

The Department resists these constitutional infirmities by claiming that Section 1373 is a mere "reporting requirement[]" to which the Tenth Amendment does not apply. Br. 36. But this is wrong for two reasons. First, on its face the statute does not impose ministerial reporting requirements. Section 1373 mandates a flat ban on an entire category of local policymaking. It forbids San Francisco from imposing *any* limits on how and when its employees may share immigration-related information with federal authorities. This intrudes on quintessential sovereign functions, *Printz*, 521 U.S. at 931, and is not tantamount to the requirement that local law enforcement agencies "report cases of missing children to" the Department, Br. 36 (quoting *Printz*, 521 U.S. at 936 (O'Connor, J., concurring)).

But even if Section 1373 were such a reporting requirement, that would not save it. While the *Printz* plurality left open the validity of "purely ministerial reporting requirements," 521 U.S. at 936 (O'Connor, J., concurring), it rejected information-sharing statutes that apply to "information that belongs to the State and is available to [local officials] only in their official capacity," *id.* at 932 n.17. This is the very type of information Section 1373 addresses. The plurality further disapproved information-sharing statutes that effectuate "the forced participation of the States' executive in the actual administration of a federal program." *Id.* at 918. Again, Section 1373 is such a provision. *See supra* p. 30. Therefore, Section 1373 violates the Tenth Amendment and cannot be an "applicable Federal law[]" under Section 10153(a)(5)(D).

## II.     The Challenged Conditions Violate The Spending Clause.

Even if none of the above constitutional violations existed, the Challenged Conditions would still be unlawful because they violate the Spending Clause. The Spending Clause requires that federal funding conditions be, among other things, unambiguous and related to Congress's purpose in authorizing the funds. *South*

*Dakota*, 483 U.S. at 207-208. The Challenged Conditions violate both of these limitations.

### A. The Challenged Conditions Are Ambiguous.

"[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). This is because "legislation enacted pursuant to the spending power is much in the nature of a contract." *Id.* Grant recipients "cannot knowingly accept conditions" in that contract "of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Each of the Challenged Conditions fails this test.

### 1. The Notice And Access Conditions Are Ambiguous.

As an initial matter, the Department takes issue with the district court's connection between the Attorney General's lack of statutory authority and the Spending Clause. Br. 37-38. The Department makes the circular argument that "[n]either the Supreme Court nor this Court has ever suggested that unambiguous conditions are invalid when imposed by an agency acting within the authority delegated by Congress." Br. 38. This assertion begs the question, and should be dismissed for that reason alone. But regardless, the district court was correct to connect these two deficiencies. The court had already determined that the Department was not acting within its delegated authority. ER29. And the district court correctly observed that cases assessing ambiguity for Spending Clause purposes had uniformly focused on the governing statute. ER39 (citing *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296; *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). As the JAG statute contains no reference to these conditions at all, there is no way for the Department to satisfy the ambiguity requirement.

Case: 18-17308, 05/22/2019, ID: 11305675, DktEntry: 18, Page 46 of 77

In any event, this Court can affirm the district court's judgment on any ground supported by the record. *McSherry v. City of Long Beach*, 584 F.3d 1129, 1131 (9th Cir. 2009). The record shows that the Notice and Access Conditions are ambiguous for many reasons. The Access Condition is unclear on its face as to whether jurisdictions are required to provide federal officials access only to consenting inmates, or instead whether jurisdictions are required to compel unwilling inmates to meet with ICE. The Department has refused to answer this question; indeed, it has offered conflicting positions in litigation. In the Philadelphia case, the Department stated that the Access Condition "does require access" to unwilling inmates. ER40. But in the present case, the Department stated that the Access Condition does not "forbid a jurisdiction from informing detainees . . . that they may choose not to meet with immigration authorities." *Id.* It is impossible to reconcile these statements.

The Notice Condition is likewise ambiguous. The Notice Condition demands that jurisdictions provide as much advance notice of an individual's release date and time as is "practicable." But the Notice Condition gives no guidance as to what "practicable" means. Further, the Notice Condition refers to an inmate's scheduled release date and time but fails to account for the fact that inmates may at times be released with little or no notice. ER39.

The Department continues to have no answer to these ambiguities. Instead, the Department restates the text of the provisions and reiterates that "Congress need not specifically identify and proscribe each condition in the legislation." Br. 38 (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (internal quotation marks omitted)). But this does not address the uncertainties that the Department has itself created regarding the meaning of the Challenged Conditions. And it only underscores the primary problem: *Congress* has not authorized these conditions in the relevant legislation.

BRIEF OF APPELLEE CCSF
CASE NO. 18-17308

n:\cxlit\li2019\180160\01362601.docx

##   2.   The Certification Condition Is Ambiguous.

Likewise, the Certification Condition is fatally ambiguous, for reasons that go beyond the Department's lack of authority to impose it.  Over the past several years, the Department has offered a burgeoning and imprecise definition of what information Section 1373 covers.  The Department has persisted in claiming that "information regarding . . . immigration status" under Section 1373 includes wide swaths of information, ranging from a person's custody status or release date, his or her home address, a person's age and residency information, familial status, contact information, date of birth, and so forth.  ER42-43.

The Department has never suggested a limiting principle on the information it believes Section 1373 covers.  To the contrary, the record demonstrates that the Department has refused to commit to a specific interpretation of what Section 1373 covers.  *See, e.g.*, SER84-88; SER131-133.  Indeed, in response to discovery requests, the Department asserted that "[d]epending on the situation, federal immigration authorities may need other categories of information that would also fall within Section 1373."  SER111, 133.  And in the present briefing, the Department asserts an even broader definition of Section 1373, arguing that Section 1373 prohibits all restrictions on information showing "whether a given alien may actually be removed or detained by federal immigration authorities."  Br. 44.  These statements leave San Francisco unable to "ascertain what is expected of it" to comply with the Certification Condition.  *Pennhurst*, 451 U.S. at 17.

##   B.   The Challenged Conditions Are Not Related To The JAG Program's Purpose.

The Challenged Conditions violate the Spending Clause for an independent reason: They violate the rule that conditions on federal grants must be "reasonably related to the purpose of the expenditure."  *New York*, 505 U.S. at 172.  Put another way, the condition and the spending program must "share[] the same goal*,"*

*Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003), and the connection between them must be "discernible," *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002).

All of the Challenged Conditions fail this requirement. Congress's purpose in creating the JAG program was to provide *local governments* with a reliable funding stream to address local public safety threats. Dating back to the JAG program's earliest origins, Congress made clear that it wanted to "provide resources for the counties, cities, and towns of America to develop local solutions to their unique crime problems." H.R. Rep. No. 104-24, at 8 (1995) (discussing predecessor to the JAG program). When Congress enacted the modern-day JAG program, it aimed to give recipients "flexibility to spend money for programs that *work for them* rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (emphasis added). The Department does not deny that JAG's purpose is to support criminal justice initiatives. And it does not dispute the district court's determination that the "JAG programs that are at risk of losing funding . . . do not relate to immigration enforcement." ER45.

The Challenged Conditions serve a different purpose altogether: assisting federal immigration enforcement. The Department concedes that here, when it acknowledges that the conditions aim to "eliminate particular impediments to immigration enforcement." Br. 40. But enforcing the federal immigration laws is not related to criminal justice. *Arizona*, 567 U.S. at 396 ("Removal is a civil, not criminal, matter."). And as the district court held, and the Department does not dispute, criminal law may bear on federal immigration law in some respects, but the opposite is not true: "immigration law does not impact local law enforcement's administration and enforcement efforts in the criminal justice system." ER45 (citing *Philadelphia*, 280 F. Supp. 3d at 642).

Instead, the Department tries to understate the relatedness inquiry, arguing that it imposes a minimal standard. Br. 49. But the Supreme Court made clear in *Dole* that the relatedness standard has teeth. The standard requires a determination that "Congress conditioned the receipt of federal funds in a way reasonably calculated to address [a] particular impediment to a purpose for which the funds are expended." 483 U.S. at 209. The Court also made clear what kind of showing is necessary to demonstrate relatedness. In upholding a grant requirement that States adopt a minimum drinking age to receive federal highway funds, the Court emphasized that "[a] Presidential commission appointed to study alcohol-related accidents and fatalities on the Nation's highway concluded that the lack of uniformity in the States' drinking ages created 'an incentive to drink and drive.'" *Id.* Thus, the Court found the funds "directly related to one of the main purposes for which highway funds are expended—safe interstate travel." *Id.* at 208.

The Challenged Conditions do not come close to satisfying this standard. They are not "reasonably calculated to address" any of Congress's purposes in enacting the JAG program. None of the statute's program areas involve immigration. 34 U.S.C. § 10152(a)(1)(A)-(H). The Department points to no legislative history showing that Congress wished to promote immigration enforcement through JAG. And there is nothing in the record below supporting the requisite connection between the JAG program's criminal justice purpose and the Challenged Conditions' aims.

## III. San Francisco Complies With Section 1373.

Even if the Department could defend the Certification Condition, it could not withhold JAG funding from San Francisco on that basis. As the district court held, San Francisco's sanctuary city laws and policies comply with the only reasonable interpretation of Section 1373. ER58-59. The Department disputes this interpretation of Section 1373, arguing that San Francisco's sanctuary city laws

and policies are unlawful because they prohibit employees from sharing personal contact information and release dates with immigration officials.  Br. 45.

This Court has already resolved this dispute.  In two recent cases, *United States v. California*, 921 F.3d 865 (9th Cir. 2019), and *Steinle v. City and County of San Francisco*, 919 F.3d 1154 (9th Cir. 2019), this Court rejected the Department's overly expansive definition of Section 1373.  State and local governments do not run afoul of Section 1373 when they restrict employees from sharing release dates and contact information.  This is because Section 1373's "text . . . clearly does not include release-date information."  *Steinle*, 919 F.3d at 1164; *see also California*, 921 F.3d at 891-893 (holding that Section 1373 does not include information like release dates and addresses).  Rather, the phrase "information regarding . . . citizenship or immigration status" is simply a reference "to a person's legal classification under federal law."  *California*, 921 F.3d at 891. In reaching this conclusion, this Court rejected the very arguments about Section 1373's scope that the Department makes here.  *Compare id.* at 891-893 (rejecting the Department's reliance on *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) and the June 2014 Department Information Bulletin); *Steinle*, 919 F.3d at 1164 n.11 (holding that Section 1373's legislative history is irrelevant in light of the "plain and unambiguous statutory text") *with* Br. 43-46.  That San Francisco prohibits employees from sharing release date information, as well as home and work contact information, is consistent with Section 1373.

That ends the inquiry.  The district court held that San Francisco's sanctuary city laws and policies "do not prohibit information-sharing of an individual's immigration status" (ER59), that is, "what one's immigration status is" (ER57 (quoting *United States v. California*, 314 F. Supp. 3d at 1102 (N.D. Cal. 2018), *aff'd in relevant part* 921 F.3d 865 (9th Cir. 2019))).  The Department does not, and could not, claim otherwise.  Br. 45-46.  This Court should affirm the district

court's declaratory judgment that San Francisco's sanctuary city laws comply with Section 1373.

## IV. The District Court Properly Enjoined The Challenged Conditions Program-Wide.

San Francisco brought constitutional and statutory challenges to the Challenged Conditions, and argued that they should be set aside in their entirety. Dkt. No. 61. The district court properly did so, determining that nationwide relief was proper in light of the "factual record, including the structure of the Byrne JAG program and the harm to jurisdictions across the country" that the unconstitutional conditions caused. ER65. The Department argues that district courts are categorically prohibited from imposing program-wide relief. Instead, the Department argues, each individual city, county, and State affected by the Challenged Conditions must pursue its own lawsuit. Neither the Constitution nor equitable principles demand this result.

### A. District Courts Have Discretion To Order Program-Wide Relief.

The Department's claim that district courts are categorically prohibited from granting program-wide injunctions is at odds with decades of established precedent. Courts have always had the discretion to fashion programmatic remedies where appropriate. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff."). This discretion stems from the principle that, in an equity case, "the nature of the violation determines the scope of the remedy." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971); *see also Missouri v. Jenkin*s, 515 U.S. 70, 88 (1995) ("[T]he principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself."). Consequently, a "systemwide remedy" may be

appropriate when an unlawful action has "systemwide impact." *Lewis v. Casey*, 518 U.S. 343, 359-360 (1996). The Department does not dispute this aspect of the case: The Challenged Conditions apply identically to all JAG applicants across the country. ER65.

The Department focuses on the "nationwide" aspect of the district court's injunction, and suggests that this remedy departs from "longstanding historical practice." Br. 51. But there is nothing unusual about the district court's remedy in this case. The Supreme Court has long recognized that where government action is "unconstitutional on its face, an injunction prohibiting its enforcement is 'proper.'" *Whole Women's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 333 (2010)); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990) (holding that a suit by a single individual can alter an entire federal program). This Court has agreed, holding that "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit . . . *if such breadth is necessary to give prevailing parties the relief to which they are entitled*." *Bresgal v. Brock*, 843 F.2d 1163, 1170-1171 (9th Cir. 1987).

The Department's position is at odds with this authority. In *Whole Women's Health*, the Supreme Court affirmed a statewide injunction striking down parts of a Texas abortion law. 136 S. Ct. at 2303, 2307. The plaintiffs in the case were several Texas abortion providers—not a class of victims, as the Department suggests should be necessary for program-wide relief. Br. 53. But despite this, the Court held that "facial relief" was necessary and an injunction prohibiting enforcement of the unconstitutional provision in all applications was "proper." *Whole Women's Health*, 136 S. Ct. at 2307. Likewise, in *Bresgal*, this Court approved "nationwide" injunctive relief requiring the Secretary of Agriculture to reform its application of a worker-protection statute. 843 F.3d at 1171. In doing

so, this Court rejected arguments that echo those the Department makes here. *Id.* at 1169-1171.

The weight of substantial precedent supports this approach. *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2016), *aff'd by an equally divided Court*, *United States v. Texas* 136 S. Ct. 2271 (2016) ("[T]he Constitution vests the District Court with the 'judicial Power of the United States.' That power is not limited to the district court wherein the court sits, but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction.") (footnote omitted); *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) (upholding injunction that applied beyond plaintiffs); *Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'") (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *Evans v. Harnett Cty. Bd. of Educ.*, 684 F.2d 304, 306 (4th Cir. 1982) ("An injunction warranted by a finding of unlawful discrimination is not prohibited merely because it confers benefits upon individuals who were not plaintiffs or members of a formally certified class."); *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308-1309 (4th Cir. 1992) (upholding nationwide injunction against federal agency). The Department does not explain why this Court should disregard this authority.

Equitable principles also support programmatic relief in cases like this. An important principle of equitable relief is that injunctions must be crafted to protect the public interest. *See, e.g.*, *Kansas v. Nebraska*, 135 S. Ct. 1042, 1053 (2015) ("When federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than

when only a private controversy is at stake.'") (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).  Courts must exercise their "'sound discretion' to consider the 'necessities of the public interest' when fashioning injunctive relief." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329-330 (1944)).

The district court properly concluded that the record required a broad injunction to serve the public interest in bringing "clarity to all parties and to citizens dependent on public services."  ER65 (quoting *San Francisco*, 897 F.3d at 1244).  The record in this case demonstrates that it is one of the "exceptional cases" in which program-wide relief is necessary.  *San Francisco*, 897 F.3d at 1244.  The City introduced evidence showing that the Challenged Conditions have "far-reaching impact . . . on all types [of] grant recipients across the geographical spectrum."  ER63.  Declarations from various jurisdictions showed that a nationwide injunction was necessary to protect many cities and counties— especially smaller localities—from facing a "Hobson Choice."  SER54.  These localities would either have to decline 2017 JAG funding that they use to protect the public safety or agree to abide by the unconstitutional conditions.  SER1-55.  Filing a lawsuit is not a feasible alternative, as litigation expenses are likely to outweigh the amount of JAG funding that many local jurisdictions receive.  SER12.  This record uniquely supports broad relief.

### B. The Department's Request For A New Rule Barring Nationwide Injunctions Is Groundless.

The Department asserts that Article III and equitable principles respectively preclude courts from issuing injunctions that go beyond the plaintiffs in the case.  Both arguments fail.

### 1. The Department's Article III Argument Lacks Merit.

There is no Article III principle that limits a district court to entering relief that benefits only the plaintiffs. This Court has squarely held the contrary: "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal*, 843 F.2d at 1169; *see also id.* at 1170 ("The Supreme Court has held that a federal agency is not necessarily entitled to confine any ruling of a court of appeals to its immediate jurisdiction.") (citing *Califano*, 442 U.S. at 702).[10] To be sure, Article III has certain limiting forces: it requires that a plaintiff have standing for "each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), and "for each type of relief sought," *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). But it does not limit a plaintiff who has standing from obtaining program-wide relief, when appropriate.

The Department's purported jurisdictional argument relies on out-of-context language from cases discussing two very different principles: (1) a plaintiff must allege an ongoing or future injury to have standing to seek prospective relief; and (2) a plaintiff with standing to assert one claim may still lack standing to obtain relief on a *different* claim. In *Alvarez v. Smith*, where the plaintiffs sought only prospective relief to remedy a police agency's seizure practices, but their property had been returned, the Supreme Court held that the plaintiffs lacked standing to obtain any prospective remedy. 558 U.S. 87, 92-93 (2009). In *Monsanto Co. v. Geertsen Seed Farms*, the Court overturned an injunction that did not remedy any injury that the plaintiffs were likely to experience. 561 U.S. 139, 163 (2010). In *Summers v. Earth Island Institute*, the plaintiffs had standing to challenge one

---

[10] The Department relies on this Circuit's decision in *Zepeda v. U.S. Immigration & Naturalization Service*, 753 F.2d 719, 730 n.1 (9th Cir. 1983), which disapproved nationwide relief. But *Bresgal* subsequently distinguished and narrowed *Zepeda* on the ground that *Zepeda* involved an injunction against "an entity that [was] not a party to the suit." 843 F.2d at 1170.

agency action, but could not rely on a since-mooted injury to raise a different claim against a different agency action. 555 U.S. at 494-496. And in *Lewis v. Casey*, plaintiffs had standing to challenge the program that injured them but lacked standing to assert claims against a different policy that did not. 518 U.S. at 357-360.

These cases are simply applications of the general principle that a plaintiff must demonstrate standing for each form of relief sought. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 184 (2000). But a nationwide injunction is not a different *form* of relief than a party-specific injunction. *See, e.g.*, *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (once a constitutional violation is shown, the breadth of an injunctive remedy is entrusted to district court's discretion). Here, San Francisco unquestionably had standing to challenge the Department's new conditions; it thus had standing to obtain the injunction the district court entered.

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) (Br. 47-48), is nothing more than an application of these established principles. In *Gill*, the plaintiffs brought an equal protection challenge to allegedly partisan state redistricting. *Id.* at 1922-1923. Under settled law, claims like this require district-based injury and entitle a plaintiff to district-specific, rather than statewide, relief. *See, e.g.*, *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015); *see also Gill*, 138 S. Ct. at 1931. In derogation of this rule, plaintiffs in *Gill* attempted to bring a claim that required a showing of district-based injury without a plaintiff who lived in the district. 138 S. Ct. at 1930-1931. That is why the Court rejected a statewide remedy in *Gill*—not because of any Article III limitation.

The Department also relies on two Seventh Circuit decisions, *McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997), and *Scherr v. Marriott International, Inc.*, 703 F.3d 1069 (7th Cir. 2013). But both cases, again, applied

standard Article III principles. *McKenzie* involved due process challenges to a demolition ordinance. But both state law and the local ordinance forbade demolition once a property owner filed suit, and thus already "provide[d] plaintiffs with [the relief] they seek." 118 F.3d at 555. This is why the court determined that plaintiffs "lack[ed] standing to seek" relief that would benefit others: Because the plaintiffs were already protected from demolition, an injunction restraining demolition would have "affect[ed] *only* the rights of non-parties." *Id.* Similarly, in *Scherr*, the plaintiff brought fifty-seven distinct claims against fifty-seven separate hotels. 703 F.3d at 1073. Because Scherr had been injured at only one hotel, she could not pursue a claim against the other fifty-six. *Id.*

### 2. Equitable Principles Do Not Foreclose Program-Wide Relief.

The Department's categorical bar against nationwide injunctions finds no support in equitable principles, either.

First, the Department claims that the principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" supports the limitation it seeks. Br. 54. But that principle does not mean relief cannot benefit others who have the same injury as the plaintiff, as is clear from controlling decisions like *Whole Woman's Health* and *Bresgal*. The Department relies on *Los Angeles Haven Hospice, Inc. v. Sebelius*, an administrative law case. 638 F.3d 644 (9th Cir. 2011). But this Court recognized in that case that nationwide injunctions may be appropriate in some circumstances, even though a nationwide injunction in that particular case would cause "uncertainty." *Id.* at 664-665. The Department also cites *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379 (4th Cir. 2001), where the Fourth Circuit vacated the nationwide injunction before it. *Id.* at 393. But, again, the court acknowledged that injunctive relief is appropriate in some

circumstances. *Id.* (citing *Richmond Tenants Org.*, 956 F.2d at 1302). Neither case supports the categorical ban the Department seeks.

Second, the Department claims that nationwide injunctions are categorically improper in light of "longstanding historical practice." Br. 51. The Department cites *Grupo Mexicano de Desarollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999), for the proposition that injunctive relief cannot exceed what "was traditionally accorded by courts of equity." But *Grupo Mexicano* expressly provides that Congress may "expan[d]" on historical practice. 527 U.S. at 329. Here, Congress has authorized courts to issue program-wide injunctions when administrative regulations are invalid. *See* 5 U.S.C. § 706(2)(A); *see also Bresgal*, 843 F.2d at 1171; *Nat'l Mining Ass'n*, 145 F.3d at 1409. And *Grupo Mexicano* is distinguishable for another important reason. The case itself, and the cases it relied upon, involved lawsuits between private parties, not lawsuits against the federal government. *E.g., Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939). But the English Court of Chancery did not issue injunctions against the Crown at all. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 434 (2017). If the Department's historical argument were correct, then all injunctions against the federal government would be prohibited, nationwide or otherwise. Clearly that is not what equity requires.

Third, the Department argues that nationwide injunctions forestall percolation and encourage forum shopping. Br. 52. But the district court took this concern into account when deciding nationwide relief was appropriate. ER64. And in any event, there can be no concerns about percolation here. Nationwide relief has not prevented various district courts, and courts of appeals, from considering these legal issues. *See supra* pp. 9-10. Indeed, counsel for the Department admitted during oral argument in another such case that a nationwide injunction does not prevent such further litigation. Oral Argument at 12:10-12:51,

*City of Los Angeles v. Barr*, (Apr. 10, 2019) (No. 18-56292,),

https://www.ca9.uscourts.gov/media/view.php?pk_id=0000033883. ("Q: I'm just

wondering whether that, whether that that moots this proceeding. If there's a

nationwide injunction, we can't countermand that. A: Well, uh, courts proceed in

the face of nationwide injunctions . . . . The case is still live . . . . This Court is

still free to act."). And there can be no allegation of forum shopping in this case,

as San Francisco sued in its home district—as has every other city, State, or county

to file suit regarding the Challenged Conditions.

Fourth, and similarly, the Department argues that nationwide injunctions are

tantamount to nonmutual offensive collateral estoppel, which the Court prohibited

in *United States v. Mendoza*, 464 U.S. 154 (1984). Br. 51. But again, the

Department is wrong. Collateral estoppel prevents relitigation entirely by making

a decision in one case "conclusive in a subsequent suit." *Mendoza*, 464 U.S. at

158. But an injunction does nothing of the sort, and leaves the Department free to

pursue its losing arguments in other fora.

Finally, the Department claims that injunctions that run against the

government and provide relief to non-parties are unfair, because they allow others

to benefit from the case without being bound by a class certification. Br. 53.

Again, this is a factor that the district court took into account when deciding that

broader relief was appropriate. ER64. And anyway, third parties routinely benefit

from litigation, like this one, that invalidates a facially unconstitutional law or sets

aside an agency regulation or policy. *See supra* pp. 39-40. Accepting the

Department's argument would mean that all such injunctions impair federal class

certification rules. That cannot be the case.

## CONCLUSION

For the reasons offered above, this Court should affirm the judgment of the district court.

Dated:  May 22, 2019                    Respectfully submitted,

DENNIS J. HERRERA
City Attorney
JESSE C. SMITH
RONALD P. FLYNN
YVONNE R. MERÉ
AILEEN M. McGRATH
TARA M. STEELEY
SARA J. EISENBERG

Deputy City Attorneys


By: */s/ Aileen M. McGrath*
AILEEN M. MCGRATH
Deputy City Attorney

Attorneys for Plaintiff/Appellee
CITY AND COUNTY OF
SAN FRANCISCO

## STATEMENT OF RELATED CASES

Some or all of the issues presented here are pending before this Court in *City and County of San Francisco v. Barr*, No. 19-15947; *State of California v. Barr*, No. 19-15950; *Los Angeles v. Barr*, No. 18-55314; and *Los Angeles v. Barr*, No. 18-56292.

DENNIS J. HERRERA
City Attorney
JESSE C. SMITH
RONALD P. FLYNN
YVONNE R. MERÉ
AILEEN M. McGRATH
TARA M. STEELEY
SARA J. EISENBERG

Deputy City Attorneys


By: */s/ Aileen M. McGrath*
AILEEN M. MCGRATH
City Attorney

Attorneys for Plaintiff/Appellee
CITY AND COUNTY OF
SAN FRANCISCO

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____ 18-17308, 18-17311 _____

**I am the attorney or self-represented party.**

**This brief contains 13,922 words, excluding the items exempted by Fed.**

**R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.**

**32(a)(5) and (6).**

**I certify that this brief** *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __s/ Aileen McGrath_____ **Date May 22, 2019_____**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**             49             *Rev. 12/01/18*

# ADDENDUM

## ADDENDUM OF PERTINENT ENACTMENTS

**I.**   **San Francisco Administrative Code, Excerpts of Chapter 12H.: Immigration Status**

**Sec. 12H.1.  City and County of Refuge**.  It is hereby affirmed that the City and County of San Francisco is a City and County of Refuge.

**Sec. 12H.2.  Use of City Funds Prohibited.**  No department, agency, commission, officer, or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding release status of individuals or any other such personal information as defined in Chapter 12I in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation, or court decision. The prohibition set forth in this Chapter 12H shall include, but shall not be limited to:

(a) Assisting or cooperating, in one's official capacity, with any investigation, detention, or arrest procedures, public or clandestine, conducted by the Federal agency charged with enforcement of the Federal immigration law and relating to alleged violations of the civil provisions of the Federal immigration law, except as permitted under Administrative Code Section 12I.3.

(b) Assisting or cooperating, in one's official capacity, with any investigation, surveillance, or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State, or Federal criminal laws.

(c) Requesting information about, or disseminating information, in one's official capacity, regarding the release status of any individual or any other such personal information as defined in Chapter 12I, except as permitted under Administrative Code Section 12I.3, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except

as required by Federal or State statute or regulation, City and County public assistance criteria, or court decision.

(d) Including on any application, questionnaire, or interview form used in relation to benefits, services, or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by Federal or State statute, regulation, or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

….

## II.  San Francisco Administrative Code, Excerpts of Chapter 12I: Civil Immigration Detainers

**Sec. 12I.1.  Findings**.  The City and County of San Francisco (the "City") is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population. The City respects, upholds, and values equal protection and equal treatment for all of our residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.

The United States Immigration and Customs Enforcement ("ICE") is responsible for enforcing the civil immigration laws. ICE's programs, including

Secure Communities and its replacement, the Priority Enforcement Program
("PEP"), seek to enlist local law enforcement's voluntary cooperation and
assistance in its enforcement efforts. In its description of PEP, ICE explains that all
requests under PEP are for voluntary action and that any request is not an
authorization to detain persons at the expense of the federal government. The
federal government should not shift the financial burden of federal civil
immigration enforcement, including personnel time and costs relating to
notification and detention, onto local law enforcement by requesting that local law
enforcement agencies continue detaining persons based on non-mandatory civil
immigration detainers or cooperating and assisting with requests to notify ICE that
a person will be released from local custody. It is not a wise and effective use of
valuable City resources at a time when vital services are being cut.

  ICE's Secure Communities program (also known as "S-Comm") shifted the
burden of federal civil immigration enforcement onto local law enforcement. S-
Comm came into operation after the state sent fingerprints that state and local law
enforcement agencies had transmitted to the California Department of Justice ("Cal
DOJ") to positively identify the arrestees and to check their criminal history. The
FBI would forward the fingerprints to the Department of Homeland Security
("DHS") to be checked against immigration and other databases. To give itself
time to take a detainee into immigration custody, ICE would send an Immigration
Detainer – Notice of Action (DHS Form I-247) to the local law enforcement
official requesting that the local law enforcement official hold the individual for up
to 48 hours after that individual would otherwise be released ("civil immigration
detainers"). Civil Immigration detainers may be issued without evidentiary support
or probable cause by border patrol agents, aircraft pilots, special agents,
deportation officers, immigration inspectors, and immigration adjudication
officers.

Given that civil immigration detainers are issued by immigration officers without judicial oversight, and the regulation authorizing civil immigration detainers provides no minimum standard of proof for their issuance, there are serious questions as to their constitutionality. Unlike criminal warrants, which must be supported by probable cause and issued by a neutral magistrate, there are no such requirements for the issuance of a civil immigration detainer. Several federal courts have ruled that because civil immigration detainers and other ICE "Notice of Action" documents are issued without probable cause of criminal conduct, they do not meet the Fourth Amendment requirements for state or local law enforcement officials to arrest and hold an individual in custody. (*Miranda-Olivares v. Clackamas Co*., No. 3:12-cv-02317-ST *17 (D.Or. April 11, 2014) (finding that detention pursuant to an immigration detainer is a seizure that must comport with the Fourth Amendment). *See also Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I 2014); *Villars v. Kubiatowski*, No. 12-cv-4586 *10-12 (N.D. Ill. filed May 5, 2014).)

On December 4, 2012, the Attorney General of California, Kamala Harris, clarified the responsibilities of local law enforcement agencies under S-Comm. The Attorney General clarified that S-Comm did not require state or local law enforcement officials to determine an individual's immigration status or to enforce federal immigration laws. The Attorney General also clarified that civil immigration detainers are voluntary requests to local law enforcement agencies that do not mandate compliance. California local law enforcement agencies may determine on their own whether to comply with non-mandatory civil immigration detainers. In a June 25, 2014, bulletin, the Attorney General warned that a federal court outside of California had held a county liable for damages where it voluntarily complied with an ICE request to detain an individual, and the individual was otherwise eligible for release and that local law enforcement

agencies may also be held liable for such conduct. Over 350 jurisdictions, including Washington, D.C., Cook County, Illinois, and many of California's 58 counties, have already acknowledged the discretionary nature of civil immigration detainers and are declining to hold people in their jails for the additional 48 hours as requested by ICE. Local law enforcement agencies' responsibilities, duties, and powers are regulated by state law. However, complying with non-mandatory civil immigration detainers frequently raises due process concerns.

According to Section 287.7 of Title 8 of the Code of Federal Regulations, the City is not reimbursed by the federal government for the costs associated with civil immigration detainers alone. The full cost of responding to a civil immigration detainer can include, but is not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer. Compliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City.

The City seeks to protect public safety, which is founded on trust and cooperation of community residents and local law enforcement. However, civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies. A 2013 study by the University of Illinois, entitled "Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," found that at least 40% of Latinos surveyed are less likely to provide information to police because they fear exposing themselves, family, or friends to a risk of deportation. Indeed, civil immigration detainers have resulted in the transfer of victims of crime, including domestic violence victims, to ICE.

The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.

In 2014, DHS ended the Secure Communities program and replaced it with PEP. PEP and S-Comm share many similarities. Just as with S-Comm, PEP uses state and federal databases to check an individual's fingerprints against immigration and other databases. PEP employs a number of tactics to facilitate transfers of individuals from local jails to immigration custody.

First, PEP uses a new form (known as DHS Form I-247N), which requests notification from local jails about an individual's release date prior to his or her release from local custody. As with civil immigration detainers, these notification requests are issued by immigration officers without judicial oversight, thus raising questions about local law enforcement's liability for constitutional violations if any person is overdetained when immigration agents are unable to be present at the time of the person's release from local custody.

Second, under PEP, ICE will continue to issue civil immigration detainer requests where local law enforcement officials are willing to respond to the requests, and in instances of "special circumstances," a term that has yet to be defined by DHS. Despite federal courts finding civil immigration detainers do not meet Fourth Amendment requirements, local jurisdictions are often unable to confirm whether or not a detention request is supported by probable cause or has been reviewed by a neutral magistrate.

The increase in information-sharing between local law enforcement and immigration officials raises serious concerns about privacy rights. Across the country, including in the California Central Valley, there has been an increase of ICE agents stationed in jails, who often have unrestricted access to jail databases,

booking logs, and other documents that contain personal information of all jail inmates.

The City has an interest in ensuring that confidential information collected in the course of carrying out its municipal functions, including but not limited to public health programs and criminal investigations, is not used for unintended purposes that could hamper collection of information vital to those functions. To carry out public health programs, the City must be able to reliably collect confidential information from all residents. To solve crimes and protect the public, local law enforcement depends on the cooperation of all City residents. Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody.

In late 2015, Pedro Figueroa, an immigrant father of an 8-year-old U.S. citizen, sought the San Francisco Police Department's help in locating his stolen vehicle. When Mr. Figueroa went to the police station to retrieve his car, which police had located, he was detained for some time by police officers before being released, and an ICE agent was waiting to take him into immigration custody immediately as he left the police station. It was later reported that both the Police Department and the San Francisco Sheriff's Department had contact with ICE officials while Mr. Figueroa was at the police station. He spent over two months in an immigration detention facility and remains in deportation proceedings. Mr. Figueroa's case has raised major concerns about local law enforcement's relationship with immigration authorities, and has weakened the immigrant community's confidence in policing practices. Community cooperation with local law enforcement is critical to investigating and prosecuting crimes. Without the cooperation of crime victims – like Mr. Figueroa – and witnesses, local law enforcement's ability to investigate and prosecute crime, particularly in communities with large immigrant populations, will be seriously compromised.

**Sec. 12I.2. Definitions**.

"Administrative warrant" means a document issued by the federal agency charged with the enforcement of the Federal immigration law that is used as a non-criminal, civil warrant for immigration purposes.

"Eligible for release from custody" means that the individual may be released from custody because one of the following conditions has occurred:

(a) All criminal charges against the individual have been dropped or dismissed.

(b) The individual has been acquitted of all criminal charges filed against him or her.

(c) The individual has served all the time required for his or her sentence.

(d) The individual has posted a bond, or has been released on his or her own recognizance.

(e) The individual has been referred to pre-trial diversion services.

(f) The individual is otherwise eligible for release under state or local law.

"Civil immigration detainer" means a non-mandatory request issued by an authorized federal immigration officer under Section 287.7 of Title 8 of the Code of Federal Regulations, to a local law enforcement official to maintain custody of an individual for a period not to exceed 48 hours and advise the authorized federal immigration officer prior to the release of that individual.

"Convicted" means the state of having been proved guilty in a judicial proceeding, unless the convictions have been expunged or vacated pursuant to applicable law. The date that an individual is Convicted starts from the date of release.

"Firearm" means a device, designed to be used as a weapon, from which expelled through a barrel, a projectile by the force of an explosion or other form of combustion as defined in Penal Code Section 16520.

"Law enforcement official" means any City Department or officer or employee of a City Department, authorized to enforce criminal statutes, regulations, or local ordinances; operate jails or maintain custody of individuals in jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

"Notification request" means a non-mandatory request issued by an authorized federal immigration officer to a local law enforcement official asking for notification to the authorized immigration officer of an individual's release from local custody prior to the release of an individual from local custody. Notification requests may also include informal requests for release information by the Federal agency charged with enforcement of the Federal immigration law.

"Personal information" means any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information.

"Serious Felony" means all serious felonies listed under Penal Code Section 1192.7(c) that also are defined as violent felonies under Penal Code Section 667.5(c); rape as defined in Penal Code Sections 261, and 262; exploding a destructive device with intent to injure as defined in Penal Code Section 18740; assault on a person with caustic chemicals or flammable substances as defined in Penal Code Section 244; shooting from a vehicle at a person outside the vehicle or with great bodily injury as defined in Penal Code Sections 26100(c) and (d).

"Violent Felony" means any crime listed in Penal Code Section 667.5(c); human trafficking as defined in Penal Code Section 236.1; felony assault with a deadly weapon as defined in Penal Code Section 245; any crime involving use of a firearm, assault weapon, machine gun, or .50 BMG rifle, while committing or attempting to commit a felony that is charged as a sentencing enhancement as listed in Penal Code Sections 12022.4 and 12022.5.

### Sec. 12I.3.  Restrictions on Law Enforcement Officials.

(a) Except as provided in subsection (b), a law enforcement official shall not detain an individual on the basis of a civil immigration detainer after that individual becomes eligible for release from custody.

(b) Law enforcement officials may continue to detain an individual in response to a civil immigration detainer for up to 48 hours after that individual becomes eligible for release if the continued detention is consistent with state and federal law, and the individual meets both of the following criteria:

(1) The individual has been Convicted of a Violent Felony in the seven years immediately prior to the date of the civil immigration detainer; and

(2) A magistrate has determined that there is probable cause to believe the individual is guilty of a Violent Felony and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to continue to detain an individual based solely on a civil immigration detainer as permitted in this subsection (b), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to: the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

This subsection (b) shall expire by operation of law on October 1, 2016, or upon a resolution passed by the Board of Supervisors that finds for purposes of this Chapter, the federal government has enacted comprehensive immigration reform that diminishes the need for this subsection (b), whichever comes first.

(c) Except as provided in subsection (d), a law enforcement official shall not respond to a federal immigration officer's notification request.

(d) Law Enforcement officials may respond to a federal immigration officer's notification request if the individual meets both of the following criteria:

(1) The individual either:

(A) has been Convicted of a Violent Felony in the seven years immediately prior to the date of the notification request; or

(B) has been Convicted of a Serious Felony in the five years immediately prior to the date of the notification request; or

(C) has been Convicted of three felonies identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, arising out of three separate incidents in the five years immediately prior to the date of the notification request; and

(2) A magistrate has determined that there is probable cause to believe the individual is guilty of a felony identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to respond to a notification request as permitted by this subsection (d), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to, the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

(e) Law enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil

immigration document based solely on alleged violations of the civil provisions of immigration laws.

(f) Law enforcement officials shall make good faith efforts to seek federal reimbursement for all costs incurred in continuing to detain an individual, after that individual becomes eligible for release, in response each civil immigration detainer.

**Sec. 12I.4.  Purpose of This Chapter.**  The intent of this Chapter 12I is to address requests for non-mandatory civil immigration detainers, voluntary notification of release of individuals, transmission of personal information, and civil immigration documents based solely on alleged violations of the civil provisions of immigration laws.  Nothing in this Chapter shall be construed to apply to matters other than those relating to federal civil immigration detainers, notification of release of individuals, transmission of personal information, or civil immigration documents, based solely on alleged violations of the civil provisions of immigration laws. In all other respects, local law enforcement agencies may continue to collaborate with federal authorities to protect public safety. This collaboration includes, but is not limited to, participation in joint criminal investigations that are permitted under local policy or applicable city or state law.

**Sec. 12I.5.  Semiannual Report**.  By no later than July 1, 2014, the Sheriff and Juvenile Probation Officer shall each provide to the Board of Supervisors and the Mayor a written report stating the number of detentions that were solely based on civil immigration detainers during the first six months following the effective date of this Chapter, and detailing the rationale behind each of those civil immigration detainers.  Thereafter, the Sheriff and Juvenile Probation Officer shall each submit a written report to the Board of Supervisors and the Mayor, by January 1st and July 1st of each year, addressing the following issues for the time period covered by the report:

(a)  a description of all communications received from the Federal agency charged with enforcement of the Federal immigration law, including but not limited to the number of civil immigration detainers, notification requests, or other types of communications.

(b)  a description of any communications the Department made to the Federal agency charged with enforcement of the Federal immigration law, including but not limited to any Department's responses to inquiries as described in subsection 12I.5 and the Department's determination of the applicability of subsections 12I.3(b), 12I.3(d) and 12I.3(e).

….

## CERTIFICATE OF SERVICE

I, MARTINA HASSETT, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECFsystem on May 22, 2019.

### CITY AND COUNTY OF SAN FRANCISCO'S
### ANSWERING BRIEF

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed May 22, 2019, at San Francisco, California.



_/s/ Martina Hassett_
MARTINA HASSETT