Nos. 18-17311, 18-17308

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA EX REL. XAVIER BECERRA, ATTORNEY GENERAL,

*Plaintiff and Appellee*,

V.

WILLIAM P. BARR, ET AL.,

*Defendants and Appellants*.

CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiff and Appellee*,

V.

WILLIAM P. BARR, ET AL.,

*Defendants and Appellants*.

**On Appeal from the United States District Court
for the Northern District of California**

Nos. 17-cv-4701 & 17-cv-4642
Hon. William H. Orrick, District Judge

## ANSWERING BRIEF OF PLAINTIFF-APPELLEE
## THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General of California
EDWARD C. DUMONT
Solicitor General
MICHAEL L. NEWMAN
Senior Assistant Attorney General
JOSHUA A. KLEIN (SBN 226480)
Deputy Solicitor General

SARAH E. BELTON
Supervising Deputy Attorney General
LEE SHERMAN
Deputy Attorney General
KRISTIN A. LISKA
Associate Deputy Solicitor General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 510-3919
 Email: joshua.klein@doj.ca.gov

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .....................................................2

STATEMENT OF ISSUES .................................................................3

PERTINENT STATUTES...................................................................3

STATEMENT OF THE CASE ............................................................3

     A.    The JAG and COPS/CAMP Programs.................................4

     B.    New Immigration-Related Conditions .................................7

     C.    California Laws at Issue ......................................................8

     D.    This Litigation ...................................................................14

SUMMARY OF ARGUMENT ..........................................................19

STANDARD OF REVIEW ................................................................20

ARGUMENT .....................................................................................20

I.     The New Funding Conditions Are Unlawful ...........................20

     A.    The Conditions Violate the JAG Statute ...........................21

          1.    The Conditions Are Inconsistent With Congress's Specification of the Conditions for JAG Funding and How Much Each State Must Receive ......................................21

          2.    The Conditions Are Not Authorized by Section 10153(a)(4) or (a)(5)(C).............................................23

          3.    Section 1373 Is Not an "Applicable Federal Law" Under Section 10153(a)(5)(D) .........................................24

     B.    The Conditions Are Not Authorized by the Recitation of the Assistant Attorney General's Powers in 34 U.S.C. § 10102 .............28

     C.    The Conditions Violate the Spending Clause ....................35

     D.    The Conditions Are Arbitrary and Capricious Under the APA .........37

II.    Section 1373 Provides No Basis for Withholding JAG or COPS/CAMP Funds from California.............................................41

     A.    California's Statutes Comply with Section 1373 ................41

i

# TABLE OF CONTENTS
## (continued)

**Page**

    B.     Section 1373 Violates the Tenth Amendment ...................................46

III.    The District Court Did Not Abuse its Discretion in Entering a Nationwide Injunction ....................................................................................52

CONCLUSION ....................................................................................................60

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alvarez v. Smith*
558 U.S. 87 (2009) ................................................................. 59

*Arizona v. United States*
567 U.S. 387 (2012) ............................................................... 36

*Ariz. State Bd. For Charter Sch. v. U.S. Dep't of Educ.*
464 F.3d 1003 (9th Cir. 2006) ............................................. 31

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*
135 S. Ct. 2652 (2015) ........................................................... 47

*Arlington Cent. Sch. Dist. v. Murphy*
548 U.S. 291 (2006) ................................................ 35, 36, 37

*Branch v. Smith*
538 U.S. 254 (2003) ............................................................... 27

*California v. Azar*
911 F.3d 558 (9th Cir. 2018) ............................................... 54

*City & County of San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018) ........................... 20, 26, 53, 54

*City of Chicago v. Sessions*
888 F.3d 272 (7th Cir. 2018) ....................................... *passim*

*City of Los Angeles v. Lyons*
461 U.S. 95 (1983) ................................................................. 56

*City of Los Angeles v. McLaughlin*
865 F.2d 1084 (9th Cir. 1989) ............................................. 21

*City of New York v. United States*
179 F.3d 29 (2d Cir. 1999) ................................................... 48

# TABLE OF AUTHORITIES
## (continued)

Page

*City of Philadelphia v. Attorney General*
   916 F.3d 276 (3d Cir. 2019) ......................................................................*passim*

*Clinton v. City of New York*
   524 U.S. 417 (1998) ....................................................................................20

*DaimlerChrysler Corp. v. Cuno*
   547 U.S. 332 (2006)........................................................................56, 57, 58

*Encino Motorcars, LLC v. Navarro*
   136 S. Ct. 2117 (2016)................................................................................39

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*
   857 F.3d 913 (D.C. Cir. 2017).....................................................................31

*Felder v. Casey*
   487 U.S. 131 (1988)....................................................................................45

*Gill v. Whitford*
   138 S. Ct. 1916 (2018)................................................................................57

*Gonzales v. Oregon*
   546 U.S. 243 (2006)....................................................................................22

*Greenwood v. FAA*
   28 F.3d 971 (9th Cir. 1994) ........................................................................38

*Ileto v. Glock*
   565 F.3d 1126 (9th Cir. 2009) ..............................................................25, 26

*Jessinger v. Nev. Fed. Credit Union*
   24 F.3d 1127 (9th Cir. 1994) ......................................................................20

*Kingdomware Tech., Inc. v. United States*
   136 S. Ct. 1969 (2016)................................................................................43

*Koog v. United States*
   79 F.3d 452 (5th Cir. 1996) ........................................................................47

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lincoln v. Vigil*
    508 U.S. 182 (1993)................................................................38

*Los Angeles Haven Hospice, Inc. v. Sebelius*
    638 F.3d 644 (9th Cir. 2011) ...............................................54

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992)................................................................56

*Lujan v. Nat'l Wildlife Fed'n*
    497 U.S. 871 (1990)................................................................53

*Momot v. Mastro*
    652 F.3d 982 (9th Cir. 2011) ...............................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.
Ins. Co.*
    463 U.S. 29 (1983)................................................17, 39, 41

*Murphy v. Nat'l Collegiate Athletic Ass'n*
    138 S. Ct. 1461 (2018)....................................................*passim*

*Nat'l Fed'n of Indep. Bus. v. Sibelius*
    567 U.S. 519 (2012)................................................................35

*Nat'l. Mining Ass'n v. U.S. Army Corps of Eng'rs*
    145 F.3d 1399, 1409 (D.C. Cir. 1998)................................53

*New York v. Dep't of Justice*
    343 F. Supp. 3d 213 (S.D.N.Y. 2018) ................................48

*New York v. United States*
    505 U.S. 144 (1992)....................................................35, 46, 48

*NLRB v. Express Pub. Co.*
    312 U.S. 426 (1941)................................................................56

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*
    499 U.S. 117 (1991)................................................................25

# TABLE OF AUTHORITIES
## (continued)

Page

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*
  477 F.3d 668 (9th Cir. 2007) ...............................................................40

*Padgett v. Wright*
  587 F.3d 983 (9th Cir. 2009) ...............................................................43

*Pennhurst State Sch. & Hosp. v. Halderman*
  451 U.S. 1 (1981)......................................................................27, 36

*Printz v. United States*
  521 U.S. 898 (1997)..............................................................*passim*

*Regents of the Univ. of Cal. v. DHS*
  908 F.3d 476 (9th Cir. 2018) ...............................................................53

*Reno v. Condon*
  528 U.S. 141 (2000)......................................................................50

*SEC v. Sloan*
  436 U.S. 103 (1978)......................................................................34

*South Dakota v. Dole*
  483 U.S. 203 (1987)......................................................................35

*Steinle v. San Francisco*
  919 F.3d 1154 (9th Cir. 2019) ...............................................................42

*Summers v. Earth Island Institute*
  555 U.S. 488 (2009)..............................................................56, 58, 59

*Trudeau v. FTC*
  456 F.3d 178 (D.C. Cir. 2006)......................................................................38

*United States v. California*
  921 F.3d 865 (9th Cir. 2019) ......................................................42, 44, 49, 50

*United States v. Hsiung*
  778 F.3d 738 (9th Cir. 2015) ...............................................................20

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Mendoza*
  464 U.S. 154 (1980)................................................................55

*Whitman v. Am. Trucking Ass'ns*
  531 U.S. 457 (2001)................................................................32

*Wis. Pub. Intervenor v. Mortier*
  501 U.S. 597 (1991)................................................................47

**FEDERAL STATUTES**

2 U.S.C. § 1602................................................................26

5 U.S.C. § 706................................................................38, 39, 53

8 U.S.C.
  § 1101(a)(27)(J) ................................................................14, 45
  § 1367................................................................46
  § 1373................................................................*passim*
  § 1373(a)................................................................*passim*
  § 1373(b)................................................................7, 36, 49, 50
  § 1644................................................................11

15 U.S.C. § 7903................................................................25

18 U.S.C. § 5038................................................................44

28 U.S.C.
  § 1291................................................................3
  § 1331................................................................2

34 U.S.C.
  § 10102................................................................28
  § 10102(a) ................................................................28, 30, 32, 36
  § 10102(a)(6) ................................................................*passim*
  § 10107................................................................34
  § 10109................................................................29

# TABLE OF AUTHORITIES
## (continued)

Page

34 U.S.C. (cont.)

§ 10152(a)(1) ..............................................................4, 30, 34, 36

§ 10152(a)(2) ...........................................................................34

§ 10152(d) .......................................................................5, 23, 34

§ 10152(f) ................................................................................5

§ 10153 .............................................................................passim

§ 10153(a) ...........................................................................4, 5

§ 10153(a)(1) ..........................................................................23

§ 10153(a)(4) .......................................................................5, 23

§ 10153(a)(5) ........................................................................5, 6

§ 10153(a)(5)(A) ......................................................................34

§ 10153(a)(5)(C) ..................................................................23, 24

§ 10153(a)(5)(D) ...................................................................passim

§ 10153(a)(6) ..........................................................................24

§ 10156 .............................................................................5, 14

§ 10156(a)(1) .....................................................................21, 38

§ 10157 ................................................................................22

§ 10158 ................................................................................23

§ 10202 ................................................................................34

§ 10228 ................................................................................27

§ 10251 ................................................................................36

§ 10381 .................................................................................7

§ 10446 ................................................................................21

§ 20927 ................................................................................22

§ 30307 ................................................................................22

§ 40701 ................................................................................21

§ 40914 ................................................................................22

§ 60105 ................................................................................22

42 U.S.C.

§ 300v-1 (former) (decodified upon expiration of statute)................34

§ 2000d ................................................................................26

§ 3753(a)(11) (2005) ..................................................................6

Pub. L. No. 109-162, 119 Stat. 2960 (2006)...........................4, 6, 28, 29

# TABLE OF AUTHORITIES
## (continued)

Page

**FEDERAL REGULATIONS**

28 C.F.R. pt. 46 ...................................................................................34

28 C.F.R. § 46.103(a)...........................................................................34

28 C.F.R. § 66.12 (2005) ......................................................................30

**CALIFORNIA STATUTES**

California Code of Civil Procedure § 155 ...................................14, 44, 45

California Government Code
   § 7282...........................................................................................8
   § 7282.5.......................................................................9, 11, 12, 44
   § 7283...........................................................................................9
   § 7283.1..................................................................................9, 43
   § 7284...........................................................................................9
   § 7284.2.......................................................................................10
   § 7284.4..................................................................................10, 11
   § 7284.6.................................................................9, 10, 11, 12, 42
   § 7284.10.....................................................................................12

California Penal Code
   § 422.93................................................................................13, 46
   § 679.10................................................................................13, 46
   § 679.11................................................................................13, 46

California Welfare & Institutions Code
   § 827....................................................................................14, 44
   § 831....................................................................................14, 44

Cal. Stat. 2013, ch. 570 .....................................................................8, 9

Cal. Stat. 2016, ch. 768 .........................................................................9

Cal. Stat. 2017, ch. 495 .........................................................................9

# TABLE OF AUTHORITIES
## (continued)

Page

COURT RULES

Cal. R. Ct. 5.552.............................................................................13, 44

Fed. R. App. P. 4(a)(1)(B) ...............................................................3

OTHER AUTHORITIES

Allen, Federal Grant Practice (2018 ed.) ............................................5, 30

Dembling & Mason, Essentials of Grant Law Practice (1991) ................30

Floor Analysis of AB 2792, Sen. Rules Comm., Aug. 22, 2016............51

GAO, Office of Justice Programs: Problems with Grant Monitoring
and Concerns About Evaluation Studies (Mar. 7, 2002)...................28

H.R. 3002, 114th Cong. (2015)........................................................6

H.R. 3009, 114th Cong. (2015)........................................................6

H.R. 5654, 114th Cong. (2016)........................................................6

H.R. Rep. No. 109-233 (2005)...............................................4, 29, 30, 33

Rep. on AB 2792, Assem. Comm. on Pub. Safety, Apr. 11, 2016.........51

Rep. on SB 54, Assem. Comm. on Appropriations, Aug. 21, 2017 ......51

Rep. on SB 54, Assem. Comm. on Pub. Safety, June 12, 2017 ............10

S. 1814, 114th Cong. (2015)...........................................................6

S. 2146, 114th Cong. (2015)...........................................................6

S. 3100, 114th Cong. (2016)...........................................................6

USCIS, Form I-360, available at https://www.uscis.gov/i-360 ..............45

**INTRODUCTION**

Congress established and funded the Edward Byrne Memorial Justice Assistance Grant (JAG) Program to serve a specific purpose under a specific structure. The purpose is to support state and local criminal justice efforts throughout the country. The structure is a formula that entitles each State to a prescribed share of the program's overall funding, based on the State's population and crime rate, and subject to conditions and adjustments defined by Congress itself.

This case involves an attempt by the federal Executive to transform this congressional structure for supporting local justice programs into a mechanism for coercing States and localities into active participation in federal immigration enforcement. For the first time in the program's history, the federal defendants here have sought to condition the availability of JAG funding on state and local agreement to assist federal agencies in the enforcement of civil immigration laws. Defendants assert that they have the authority to add immigration-related funding conditions that Congress did not enact and that relate neither to the programs to be funded nor to Congress's enumeration of the JAG program's areas of emphasis. If an applicant will not certify compliance with those conditions, Defendants claim they can refuse to disburse the entirety of that entity's otherwise allotted funding and instead redistribute it to more tractable jurisdictions.

1

Every court to consider the question has correctly concluded that these new funding conditions cannot be enforced because they are not authorized by Congress. But as the district court here realized, the problems with Defendants' position go well beyond that. The new conditions violate Spending Clause requirements because of their ambiguity and lack of connection to the funded program's purposes. The way the conditions were imposed violated the Administrative Procedure Act. Defendants' attempt to deny funding to California based on 8 U.S.C. § 1373 rests on an incorrect construction of that provision. And section 1373 is unenforceable in any event because it violates the Tenth Amendment.

The district court properly acted to prevent Defendants' violations of law and to secure for California and other jurisdictions the funding to which they are entitled. Its decision should be affirmed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to decide challenges to federal grant conditions under 28 U.S.C. § 1331. That court issued an amended judgment and order on November 20, 2018, resolving all claims in the case. ER 1-6.[1]

---

[1] ER refers to the Excerpts of Records submitted by the federal Defendants-Appellants. CSER refers to California's Supplemental Excerpts of Record. OB refers to the federal Defendants-Appellants' Opening Brief. The California legislative reports cited in this brief may be found at leginfo.legislature.ca.gov/faces/billSearchClient.xhtml.

2

Defendants-Appellants filed a timely notice of appeal on December 3, 2018. ER

68-69; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C.

§ 1291.

## STATEMENT OF ISSUES

1.    Whether Defendants acted contrary to statutory or constitutional

requirements in demanding that applicants for funding under the Edward Byrne

Memorial Justice Assistance Grant Program must comply with three new

conditions relating to support for federal immigration enforcement.

2.    Whether imposition of the new immigration conditions was arbitrary and

capricious under the Administrative Procedure Act.

3.    Whether 8 U.S.C. § 1373 provides any basis for withholding funds from

California.

4.    Whether the district court abused its discretion in enjoining application

of the new conditions nationwide.

## PERTINENT STATUTES

Pertinent federal and state statutes are set forth in an addendum following this

brief.

## STATEMENT OF THE CASE

This case involves grant programs established by Congress to assist state and

local criminal justice initiatives; new funding conditions invented by the federal

Executive to advance its own immigration enforcement agenda; and the federal

defendants' resulting attempts to withhold federal grants in an effort to punish California for maintaining policies that the State has adopted to enhance public safety by promoting trust between immigrant communities and law enforcement.

## A.    The JAG and COPS/CAMP Programs

1.  Congress established the JAG program in 2006.  *See* Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (merging two previous grant programs).  The program is the "'primary provider of federal criminal justice funding to States and units of local government.'"  *City of Philadelphia v. Attorney General*, 916 F.3d 276, 280 (3d Cir. 2019).

The JAG program is designed to "give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution."  H.R. Rep. No. 109-233, at 89 (2005).  Any "State or unit of local government" may submit an application for JAG funding.  34 U.S.C. § 10153(a).  The statute identifies eight kinds of programs for which the grants are intended:  "[l]aw enforcement," "[p]rosecution and court programs," "[p]revention and education," "[c]orrections," "[d]rug treatment and enforcement," "[p]lanning, evaluation, and technology improvement," "[c]rime victim and witness programs," and "[m]ental health … and related law enforcement and corrections."  *Id.* § 10152(a)(1).

4

Congress established the JAG program as a formula grant. Funds are distributed among eligible States according to a statutory formula based on population and violent crime statistics. *See* 34 U.S.C. § 10156(a). The formula is subject to limited adjustments in specific circumstances. *See* p. 22, *infra*. Unlike competitive or discretionary grants, formula grants do not give the administering agency authority to select particular qualifying applications over others according to its own priorities. *See generally City of Chicago v. Sessions*, 888 F.3d 272, 285-286 (7th Cir. 2018) (explaining difference between formula and discretionary grants); Allen, Federal Grant Practice, app'x. A (2018 ed.) ("To receive a formula grant, the entity must meet all the eligibility criteria for the program, which are usually not open to discretionary funding decisions.").

The statute gives the Attorney General limited discretion in administering the program. For instance, in "exigent circumstances" he may allow JAG funds to be used for certain costs that would otherwise be prohibited, 34 U.S.C. § 10152(d)(2); he may extend or renew grants beyond a typical four-year limit, *id.* § 10152(f); and he may "reasonably require" grantees to "maintain and report … data, records, and information (programmatic and financial)," *id.* § 10153(a)(4).

The Attorney General also may specify the "form" of the application, 34 U.S.C. § 10153(a), and the "form" of certain certifications included in the application, *id.* § 10153(a)(5). The substance of those certifications, however, is

set by statute: Applicants must certify that "the programs to be funded by the grant meet all the requirements of this part"; that "the information contained in the application is correct"; that "there has been appropriate coordination with affected agencies"; and that the applicant "will comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5)(A)-(D). Notably, the only immigration-related condition that Congress has ever required in the history of the JAG program and its predecessors was a requirement, under one of JAG's predecessor programs, that recipient States provide to federal immigration authorities "without fee" a notice and certified record of conviction upon an alien's conviction of a crime. 42 U.S.C. § 3753(a)(11) (2005). That requirement was eliminated in 2006, when previous grant programs were combined to form JAG. *See* Pub. L. 109-162, § 1111(a)(i), 119 Stat. at 3094. Although Congress has considered several proposals to tie JAG funding to applicants' cooperation with federal immigration enforcement, none has passed.[2]

    2. The other grant at issue in this case is administered by the U.S. Department of Justice's Office of Community Oriented Policing Services (COPS)

---

[2] *See, e.g.,* Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2 (2015).

under 34 U.S.C. § 10381(k).  Unlike the JAG program, the COPS Anti-Meth

Program (CAMP) is a "competitive grant[]," made to "State law enforcement

agencies … for the purpose of locating or investigating illicit activities."  *Id.*

### B.    New Immigration-Related Conditions

In 2016, Defendants asserted for the first time that 8 U.S.C. § 1373 was an

"applicable Federal law" for purposes of 34 U.S.C. § 10153(a)(5)(D).  ER 200.  As

relevant here, section 1373(a) provides that a "State or local government entity or

official may not prohibit, or in any way restrict, any government entity or official

from sending to, or receiving from, the Immigration and Naturalization Service

information regarding the citizenship or immigration status, lawful or unlawful, of

any individual."  And section 1373(b) provides that state and local government

entities and officials may not "prohibit, or in any way restrict," any state or local

"government entity" from "[m]aintaining" "information regarding the immigration

status, lawful or unlawful, of an individual," or "[e]xchanging such information

with any other Federal, State, or local government entity."

In 2017, Defendants' solicitations for JAG program applications first

included, as requirements for funding, the three conditions at issue here.  ER 7-8.

Under the Certification Condition, applicants must submit certifications, signed by

the jurisdiction's chief legal and executive officers, that the applicant complies

with section 1373.  ER 11-12, 306-308.  Under the Access Condition, applicants

7

must ensure "'that agents of the United States … are given … access'" to any state or local correctional facility "'for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.'" ER 12. And under the Notice Condition, when a state or local correctional institution "'receives from DHS a formal written request [seeking] advance notice of the scheduled release date and time for a particular alien in such facility,'" the facility must "'honor such request and[,] as early as practicable[,] … provide the requested notice to DHS.'" ER 12.

### C.   California Laws at Issue

Defendants' effort to deny funding to California jurisdictions implicates several state laws.

*The TRUST Act (AB 4).*  California enacted the TRUST Act in 2013.  Cal. Stat. 2013, ch. 570, codified at Cal. Gov't Code § 7282 et seq.  The Legislature found that certain then-existing practices, in which state and local law enforcement assisted federal officers with immigration enforcement, "harm[ed] community policing efforts, because immigrant residents who are victims of or witnesses to crime … are less likely to report crime or cooperate with law enforcement when any contact with law enforcement could result in deportation."  Cal. Stat. 2013, ch. 570, § 1(d).  Originally, the TRUST Act limited the circumstances under which

8

local law enforcement officials could detain a person based on an immigration hold when the person was otherwise eligible for release from local custody. *Id.* § 2. After later amendment by SB 54, *see* pp. 9-12, *infra*, the TRUST Act now limits the circumstances in which state and local law enforcement can provide information regarding a person's release date from custody to immigration authorities. Cal. Gov't Code §§ 7282.5(a), 7284.6(a)(1)(C).

***The TRUTH Act (AB 2792).*** California enacted the TRUTH Act in 2016. Cal. Stat. 2016, ch. 768, codified at Cal. Gov't Code § 7283 et seq. The statute's goals were to "promote public safety and preserve limited local resources," and to increase "transparency," "accountability," and "public oversight" regarding local law enforcement's involvement in immigration enforcement efforts. Cal. Stat. 2016, ch. 768, § 2(h), (i). As relevant here, the TRUTH Act requires local officials to deliver a notification of rights to inmates in local law enforcement custody before any interview by immigration authorities regarding civil immigration violations. Cal. Gov't Code § 7283.1(a).

***The California Values Act (SB 54).*** The California Values Act was enacted in 2017. Cal. Stats. 2017, ch. 495, codified at Gov. Code § 7284 et seq. The Legislature stated that "[a] relationship of trust between California's immigrant community and state and local agencies is central to [Californians'] public safety," and that such "trust is threatened when state and local agencies are entangled with

9

federal immigration enforcement." Cal. Gov. Code § 7284.2(b), (c). The Legislature determined that involving local law enforcement with immigration enforcement would cause immigrant community members to "fear approaching police when they are victims of, and witnesses to, crimes," and deter them from "seeking basic health services, or attending school." *Id.* § 7284.2(c); *see* Rep. on SB 54, Assem. Comm. on Pub. Safety, June 12, 2017, at 7 (noting 25% decrease in sexual assault reporting and 10% decrease in domestic violence reporting among Los Angeles's Latino population between early 2016 and early 2017). And the Legislature found that entanglement with immigration enforcement efforts also "diverts already limited resources and blurs the lines of accountability between local, state, and federal governments." Cal. Gov. Code § 7284.2(d).

In order to "ensure effective policing," "protect [Californians'] safety, well-being, and constitutional rights," and "direct the state's limited resources to matters of greatest concern to state and local governments," Cal. Gov't Code § 7284.2(f), SB 54 limits covered law enforcement agencies' ability to use public funds or personnel "to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes," *id.* § 7284.6(a)(1); *see id.* § 7284.4(a) (defining covered law enforcement agencies). It does not, however, prohibit all forms of assistance. For example, the Values Act's restrictions on information sharing (discussed below) do not apply to the California Department of Corrections

10

and Rehabilitation, which operates the state prison system.  *Id.* § 7284.4(a).  SB 54 also permits state and local law enforcement officials to provide immigration authorities with access to criminal history information in the State's law enforcement databases, *id.* § 7284.6(b)(2); *see also* CSER 58-59; and "does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual … or maintaining or exchanging that information with any other federal, state, or local government entity, pursuant to [8 U.S.C. §§] 1373 and 1644," Cal. Gov't Code § 7284.6(e).

Three provisions of SB 54 are especially relevant here.  First, under SB 54's amendments to the TRUST Act, law enforcement agencies may not provide immigration authorities with a person's date of release from custody unless that information is available to the public or concerns a person who (1) has been convicted at any point of any of various federal or state felonies, Cal. Gov't Code § 7282.5(a)(1)-(2), (5); (2) has been convicted within particular time-frames for various other felonies or "wobbler" offenses, *see id.* § 7282.5(a)(3); (3) is registered on the California Sex and Arson Registry, *id.* § 7282.5(a)(4); (4) has been identified by U.S. Immigration and Customs Enforcement as the subject of an outstanding felony arrest warrant, *id.* § 7282.5(a)(5); or (5) has been arrested and

11

held to answer on a finding of probable cause for a serious or violent felony, *id.* § 7282.5(b).

Second, a law enforcement agency generally may not provide personal information about an individual, including the individual's home and work address, to immigration authorities unless the information is publicly available. Cal. Gov't Code § 7284.6(a)(1)(D).

Third, state prisons must provide their inmates with a notification of rights in advance of any interview between an inmate and immigration authorities regarding civil immigration violations. Cal. Gov't Code § 7284.10(a)(1). The notification form explains the purpose of the interview and informs the inmate "that the interview is voluntary, and that he or she may decline to be interviewed or may choose to be interviewed only with his or her attorney present." *Id.*

***State Confidentiality Statutes.*** Defendants' opening brief also refers to six additional "confidentiality statutes." OB 43. Defendants do not cite the statutes or explain their provisions, and misdescribe them as "intended to 'establish a statewide standard for responding to ICE holds.'" *Id.* (quoting description of the TRUST Act). In fact, the laws identified in California's complaint and the district court's opinion protect immigration-related information as part of more general protections for the sensitive personal information of particular categories of vulnerable people.

12

Three of the statutes concern California's policy towards victims and witnesses of crime. California Penal Code sections 679.10 and 679.11 govern California agencies' and officials' duties to certify victims and witnesses for special U and T visas, which federal law makes available to individuals who cooperate with police investigations or are victims of human trafficking. Certifying agencies may not "disclos[e] the immigration status" of any person requesting such a certification "except to comply with federal law or legal process, or if authorized by the victim or person requesting [the certification]." *Id.* §§ 679.10(k), 679.11(k). Penal Code section 422.93 reflects a policy of "encouraging all … victims of or witnesses to crimes … to cooperate with the criminal justice system." *Id.* § 422.93(a). To promote that policy, it prohibits peace officers from "report[ing] or turn[ing] … over to federal immigration authorities" or "detain[ing] … exclusively" for immigration violations a person "who is a victim of or witness to a hate crime … [and] is not charged with or convicted of committing any crime under state law." *Id.* § 422.93(b).

The remaining three statutes reflect California's general policy of protecting the personal information of juveniles and vulnerable youths. *See generally* Cal. R. Ct. 5.552. Juvenile case files contain intensely personal information that would be embarrassing and harmful if released. CSER 81-82. The willingness of juveniles and others to provide the information necessary for accurate judicial

13

determinations depends on ensuring that information in those proceedings will be kept confidential. *Id.* California Welfare and Institutions Code sections 827 and 831 provide privacy for the court records and government information created in connection with juvenile court proceedings, including information about "the immigration status of the juvenile." *Id.* § 831(e).

Finally, California Code of Civil Procedure section 155 provides guidance to California courts as they make factual findings concerning abuse, neglect, or abandonment that would support a child or youth's classification as a "special immigrant" under 8 U.S.C. § 1101(a)(27)(J). Section 155(c) provides that, where a California court is requested to make such findings, information regarding the child's immigration status "shall remain confidential."

### D. This Litigation

California and its localities have participated in the JAG program since its inception. California's Board of State and Community Corrections is the entity that receives the State's share of JAG funds. CSER 19. California jurisdictions have used JAG funding to combat violent crime, gang activity, and illegal drugs, and to support community policing, computer and radio equipment improvement, and substance-abuse recovery. CSER 51-52, 62. Under the formula in 34 U.S.C. § 10156, California's population and crime rates entitled the State and its political subdivisions to receive $28.3 million in JAG funding for FY 2017. CSER 19.

14

For fiscal year 2016, Defendants awarded to California and its local jurisdictions the grant money required under the statutory formula, but informed California that it would have to submit a legal opinion on its compliance with 8 U.S.C. § 1373. ER 182. For fiscal year 2017, Defendants included, in the JAG solicitation for applications, notification that awards would be subject to the Notice and Access Conditions, and a requirement that each applicant submit, as part of accepting any grant, an express certification of compliance with section 1373. ER 300, 306. California submitted an application, but informed Defendants that it was reserving its right to object to the conditions. D.C. Doc. 29-2, at 49. Defendants informed the State that they had preliminarily determined that the Values Act violated section 1373. ER 358-359.

The requirement to comply with Defendants' broad interpretation of section 1373 also affected California's ability to use COPS/CAMP funding. For FY 2017, Defendants, for the first time, required jurisdictions to certify their compliance with section 1373 as part of the CAMP application. ER 444. The California Bureau of Investigation had previously received COPS/CAMP funding each year since the program's inception, using the money to achieve impressive results against drug trafficking organizations. CSER 47-49. For FY 2017, California was awarded $1 million, but was told it could not spend the funds in light of Defendants' concerns about the State's compliance with section 1373. CSER 50.

15

California filed a complaint in August 2017, and an amended complaint in October 2017, asserting that Defendants' attempt to impose the new immigration conditions violated federal law and the Constitution. ER 571-572. It asked the district court to enjoin Defendants from imposing the Certification, Access, and Notice Conditions on JAG funding and to order Defendants to disburse to California jurisdictions their statutory share of JAG funding. *See* ER 16-17. California also sought a declaration that the TRUST, TRUTH, and Values Acts, and the six state confidentiality statutes discussed above, comply with section 1373, or that section 1373 could not be constitutionally enforced. CSER 36-38. The case was decided with another case raising overlapping challenges brought by the City and County of San Francisco. ER 1-67. The district court granted summary judgment to both plaintiffs. ER 67.

The court concluded that the new immigration conditions were not authorized by the JAG statute. ER 24-27. With respect to Defendants' argument that section 1373 is an "applicable Federal law[]" for which a certification of compliance could be required under 34 U.S.C. § 10153(a)(5)(D), the court reasoned that the statute's reference to "applicable Federal law" means laws pertaining to grants, ER 36-38, and that section 1373 was in any event unconstitutional under the Tenth Amendment, ER 29-36. The court also concluded that 34 U.S.C. § 10102(a)(6), describing powers of the Assistant Attorney General for the Office of Justice

Programs, did not confer authority to impose the new conditions.  ER 27-29.  And the court ruled that the conditions violated the Spending Clause, because they were not imposed by Congress and bore no proper relationship to the JAG program's criminal justice purposes.  ER 38-47.

The court also concluded that Defendants' imposition of the new immigration conditions was arbitrary and capricious under the Administrative Procedure Act. The administrative record did not "'articulate a satisfactory explanation'" for Defendants' actions, ER 49 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), and the agency neither "'use[d] relevant data'" nor acted based on a "'rational connection between the facts found and the choice made,'" ER 50.  The agency further "failed to consider important problems with its conditions," including evidence that entangling local law enforcement with routine immigration enforcement would harm the JAG program's crime-fighting purposes.  ER 52-54.

With respect to California's claim regarding its statutes' compliance with section 1373, the court noted that Defendants' briefing had not contested the State's arguments with respect to the TRUST Act, the TRUTH Act, or the confidentiality statutes.  *See* ER 57.  With respect to the Values Act, which permits state and local officials to tell federal authorities about a person's citizenship or immigration status, the court rejected Defendants' assertion that section 1373 also

17

requires officials to provide information on prisoner release dates and addresses. ER 58.  The court further declared that section 1373 was unconstitutional under the Tenth Amendment, because it would "'require[] local policymakers to … allow the federal government to conscript the time and cooperation of local employees.'" ER 29-36.

The court ordered Defendants to disburse to the State and its localities their statutory shares of 2017 JAG and COPS funding.  ER 3-4.  The court prohibited Defendants from withholding JAG or COPS/CAMP funding from California entities based on the nine state statutes at issue in the lawsuit, prohibited Defendants from enforcing section 1373 as an independent obligation against California's state and local governments, and prohibited Defendants from requiring California's state and local governments to comply with section 1373 as a condition for JAG funding.  ER 2-4.  The court also prohibited Defendants from applying the Certification, Access, and Notice Conditions as requirements for JAG funding for "any jurisdiction in the United States."  ER 2.  The court stayed the effect of the last prohibition outside of California pending Defendants' appeal to this court.  ER 3.[3]

---

[3] California and San Francisco later filed cases challenging conditions on JAG funding for FY 2018.  *California v. Sessions,* No. 18-5169 (N.D. Cal.); *San Francisco v. Sessions*, No. 18-5146 (N.D. Cal.).  The district court granted

## SUMMARY OF ARGUMENT

In seeking to impose new immigration-related conditions for JAG funding, Defendants improperly substituted their own determination of who should receive funding for that of Congress. The JAG statute sets forth precise conditions for applicants to receive funding and a detailed formula determining the amount. Neither that statute nor any other authorizes Defendants to withhold funding based on the additional conditions involved here. Indeed, the new conditions are so vague and so unrelated to Congress's local law enforcement purposes for JAG grants that they violate the Spending Clause. Nor did the agency's imposition of the conditions satisfy the requirements of the Administrative Procedure Act, given the conditions' lack of rational connection with the purposes of the JAG program and the agency's failure to address evidence that the conditions would be counterproductive to those purposes.

In addition, funding cannot be withheld based on section 1373, because California's laws comply with the statute and because section 1373 is in any event unconstitutional.

Finally, the district court did not abuse its discretion or exceed constitutional bounds with respect to the scope of injunctive relief.

---

summary judgment to the plaintiffs in those cases, and appeals are pending before this Court in Nos. 19-15950 and 19-15947.

19

## STANDARD OF REVIEW

Interpretations of federal and state statutes are reviewed de novo, *see United States v. Hsiung*, 778 F.3d 738, 761 (9th Cir. 2015), as is a grant of summary judgment, *Jessinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). With respect to an injunction, this Court "review[s] legal conclusions underlying the decision de novo, factual findings for clear error, and the scope of injunctive relief for an abuse of discretion." *Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011).

## ARGUMENT

### I. THE NEW FUNDING CONDITIONS ARE UNLAWFUL

"The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). With respect to federal grants, the Executive Branch therefore "'may not decline to follow a statutory mandate or prohibition simply because of policy objections.'" *Id.* at 1232. That principle was critical to the Constitution's Framers, *see id.*, and safeguards liberty and representative government, *see Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring) (if "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened"). Defendants have violated it here.

20

### A. The Conditions Violate the JAG Statute

As the Third and Seventh Circuits have concluded, the JAG statute does not grant the Attorney General the authority to impose the conditions challenged here. *Philadelphia*, 916 F.3d at 287; *Chicago*, 888 F.3d at 284.

### 1. The Conditions Are Inconsistent With Congress's Specification of the Conditions for JAG Funding and How Much Each State Must Receive

Congress has apportioned JAG funding according to a statutory formula that entitles jurisdictions to a specific share of nationwide funding according to their population and crime rates. *See* 34 U.S.C. §10156(a)(1) (Attorney General "shall … allocate" funding according to formula). JAG is therefore a "[f]ormula" grant—a type "not awarded at the [agency's] discretion." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).

Other grant programs give the Attorney General power to impose "reasonable" or "appropriate" conditions. *E.g.*, 34 U.S.C. § 10446(e)(3) ("may impose reasonable conditions" on grants to combat violence against women); *id.* § 40701(c)(1) ("shall … establish appropriate grant conditions" for DNA program grants). The JAG statute includes no such provision. It prescribes the conditions that an applicant must meet, *see* p. 6, *supra*, and provides no authority for the agency to impose others.

21

"The ability of the Attorney General to depart from the distribution mandated by the [JAG] formula" is likewise "strictly circumscribed," *Chicago*, 888 F.3d at 286, permitting deviations from the formula only in "narrow circumstances," *Philadelphia*, 916 F.3d at 286. Various statutes allow small reductions in a jurisdiction's JAG funding for failure to meet congressionally specified conditions.[4] And the Attorney General may reserve up to "5 percent" of JAG's budget to address "precipitous or extraordinary increases in crime" or to "mitigate significant programmatic harm resulting from operation of the formula." 34 U.S.C. § 10157(b).

These provisions argue against what Defendants claim here—"the power to withhold *all* of a grantee's funds for *any* reason the Attorney General chooses." *Philadelphia*, 916 F.3d at 286; *cf. Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) ("It would be anomalous for Congress to have so painstakingly described the Attorney General's limited authority to deregister a single physician …, but to have given him, just by implication, authority to declare an entire class of activity outside 'the course of professional practice'…."). It argues especially against the

---

[4] *See* 34 U.S.C. § 40914(b)(2) (up to 5% for failure to meet requirements of the National Instant Criminal Background Check System); *id.* § 60105(c)(2) (up to 10% for failure to report deaths in custody); *id.* § 20927(a) (10% for failure to comply with sex offender notification requirements); *id.* § 30307(e)(2) (5% for failure to comply with Prison Rape Elimination Act).

power to withhold funding based on conditions related to immigration enforcement, since Congress itself eliminated the only such condition—a limited requirement relating to supplying certified records of convictions—when it first created the JAG program. *See* p. 6, *supra*. The powers Defendants seek to exercise would require express authorization, and as explained below, none exists.

### 2. The Conditions Are Not Authorized by Section 10153(a)(4) or (a)(5)(C)

Defendants assert that "[t]he propriety of the notice and access … conditions is underscored by" sections 10153(a)(4) and (a)(5)(C) of the JAG statute. OB 22-24. The argument is incorrect.

Section 10153(a)(4) requires applications to include "[a]n assurance that … the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require." As the Third Circuit recognized, "'programmatic and financial'" information, in context, means "information regarding the handling of federal funds and the programs to which those funds are directed." *Philadelphia*, 916 F.3d at 285. The provision ensures that the agency will be able to enforce Congress's requirements that grantees segregate and safeguard grant monies (§ 10158), and avoid prohibited expenditures (§§ 10152(d), 10153(a)(1)). It "does not cover Department priorities unrelated to the grant program," such as the immigration enforcement conditions at issue here. *Philadelphia,* 916 F.3d at 285.

23

Section 10153(a)(5)(C), in turn, requires applicants to certify that "there *has been* appropriate coordination with *affected* agencies" (emphasis added).  As the italicized words indicate, it does not require a promise to provide future access to or information about persons in state or local custody to an agency that is not affected by the grant.  Instead, it concerns coordination that has already occurred "in connection with the grantee's application," *Philadelphia*, 916 F.3d at 285, and with agencies affected by the grant applied for.  *See id.* (reasoning that subparagraph (C) is part of a list of certifications that concern the application itself); 34 U.S.C. § 10153(a)(6) (requiring "Statewide plan," designed "in consultation" with local governments and criminal justice agencies, detailing how JAG grants will "improve the administration of … criminal justice").

### 3.    Section 1373 Is Not an "Applicable Federal Law" Under Section 10153(a)(5)(D)

Defendants argue that the section 1373 Certification Condition is authorized by section 10153(a)(5)(D)'s requirement that applicants certify that they "will comply with all provisions of this part and all other applicable Federal laws." Defendants argue that this provision allows the Attorney General to require jurisdictions to certify their compliance with any federal statute that "applies" to the jurisdictions.  OB 28.

But as the Third Circuit reasoned, an entity cannot violate a law that does not apply to it.  The term "applicable" avoids "being redundant" only if it does "some

24

limiting work beyond delineating the set of all federal laws that would 'appl[y]' to [the grantee]." *Philadelphia*, 916 F.3d at 289. And because section 10153(a)(5)(D) specifies "*applicable* Federal laws" (emphasis added), Defendants gain nothing from their citation (OB 29) to the Supreme Court's statement that "*[b]y itself*, the phrase 'all other law' indicates no limitation." *Norfolk & W. Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991) (emphasis added).

This Court has rejected the argument that Congress, in referring to "applicable" laws, necessarily means every law capable of application to an entity or activity. *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009), considered a provision under which state tort actions against firearms manufacturers and dealers were preserved from federal preemption if the manufacturer or seller "'knowingly violated a State or Federal statute applicable to the sale or marketing of the product.'" *Id.* at 1131 (quoting 15 U.S.C. § 7903(5)(A)(iii) (emphasis omitted)). The plaintiffs argued that the term "applicable" covered any statute "'capable of being applied'" to the sale and marketing of firearms—a requirement that would have been satisfied by the state tort statute under which they sued. *Id.* at 1133-1134. The Court acknowledged a range of potential meanings of the word "applicable." *Id.* at 1135. But it rejected the plaintiffs' broad interpretation, because "'the specific context in which [the term "applicable"] is used[] and the

broader context of the statute as a whole,'" *id.* at 1134, made clear that Congress had used "applicable" to mean only "statutes that regulate manufacturing, importing, selling, marketing, and using firearms," *id.* at 1136.

The JAG statute, too, uses "applicable" in a specific context—in the last of several certifications relating to the grant and "the programs that will be funded under the grant." *Philadelphia*, 916 F.3d at 289. In that context, the word "applicable" denotes laws that apply to the JAG program in particular or to federal grant programs more generally. *E.g.*, 2 U.S.C. § 1602(8)(A)(iii), (14) (regulating lobbying for federal grants); 42 U.S.C. § 2000d (prohibiting racial discrimination in programs or activities "receiving Federal financial assistance").

The "'broader context of the statute as a whole,'" *Ileto*, 565 F.3d at 1134, also contradicts the agency's claim. "Allowing the Attorney General to withhold all funds because a jurisdiction does not certify compliance with any federal law of the Attorney General's choosing" would "destabilize the formula nature of the grant." *Philadelphia*, 916 F.3d at 290. It would allow the Attorney General to impose a condition that Congress itself has repeatedly declined to impose. *See* p. 6, *supra*; *see generally San Francisco*, 897 F.3d at 1234 & n.4 (given repeated congressional rejection of legislation to withdraw grant funding from "sanctuary" cities, Executive Order to same effect was improper attempt to coopt spending and legislative powers). It would contradict "the rule of statutory construction [under

26

which] Congress must express clearly its intent to impose conditions on the grant of federal funds," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24 (1981), and would exceed constitutional limits under the Spending Clause, *see* pp. 35-37, *infra*. And it would undercut Congress's specific direction that "[n]othing in this chapter … shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a); *see Philadelphia*, 916 F.3d at 291.[5]

---

[5] Defendants' contrary interpretation is so radical that it leads them to propose (OB 28-29) that Congress intended the term "applicable Federal laws" to include even statutes that are unconstitutional in the form Congress enacted them, but which could hypothetically have been constitutional if Congress had written the same requirements as grant conditions rather than unconditional commands. That would arguably require (or at least enable) Defendants to withhold JAG funding from any jurisdiction that does not comply with the firearms and gambling statutes that the Supreme Court held unconstitutional in *Printz v. United States*, 521 U.S. 898 (1997), and *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). *See* pp. 46-52, *infra* (discussing *Printz* and *Murphy*). Defendants have not required JAG applicants to certify compliance with those statutes, and for good reason. The question is not what Congress *could perhaps* have conditioned funding on, but what it *did* condition funding on, and there is no indication that Congress meant the term "law" to encompass unconstitutional enactments. *See generally Branch v. Smith*, 538 U.S. 254, 281 (2003) (plurality opinion) (describing such a view as "highly unusual"); pp. 46-52, *infra* (describing constitutional problems with section 1373).

### B. The Conditions Are Not Authorized by the Recitation of the Assistant Attorney General's Powers in 34 U.S.C. § 10102

Defendants also claim authorization for the new conditions based on authority outside of the JAG statute. Section 10102(a) of Title 34 sets out the general duties and powers of the Assistant Attorney General (AAG) for the Office of Justice Programs (OJP). Its final provision recognizes that the AAG may:

> (6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

Defendants contend that the phrase "including placing special conditions on all grants" confers authority to impose the challenged conditions, as well as any other condition that the Assistant Attorney General might deem proper. OB 23-27. That is incorrect, as every court to have considered the issue has concluded. *E.g., Philadelphia*, 916 F.3d at 287-288; *Chicago*, 888 F.3d at 284-287.

1. The "including … special conditions" language was added to section 10102(a)(6) in 2006. *See* Pub. L. No. 109-162 § 1152, 119 Stat. at 3113. Congress had become aware of significant deficiencies in how the Department of Justice and OJP were monitoring the grants they administered. *See, e.g.*, GAO, Office of Justice Programs: Problems with Grant Monitoring and Concerns About Evaluation Studies 5 (Mar. 7, 2002) (discussing the "high risk for fraud, given the amount of money involved and the tens-of-thousands of grantees"). The 2006

28

amendment thus established an Office of Audit, Assessment, and Management (OAAM), to address "problems that came to light during … oversight hearings," including "the lack of monitoring and outcome-based evaluations of OJP programs" and "failures to adequately review grant applications and undertake more aggressive and timely corrective action on audit findings."  H.R. Rep. No. 109-233, at 90; *see* 34 U.S.C. § 10109 (describing duties of OAAM).  Congress required OAAM to examine grantees' compliance with "special conditions," and specified that OAAM's director could be supervised only by the Attorney General or the AAG for OJP.  34 U.S.C. § 10109(a)(1), (2).

The language about "special conditions" in section 10102(a)(6)'s description of the AAG's duties and powers was added simultaneously.  That addition, under the heading "coordination duties of [the] Assistant Attorney General," Pub. L. 109-162, § 1152(b), 119 Stat. at 3113 (capitalization altered), emphasized the AAG's responsibility for implementing appropriate measures, as part of particular grants, to ensure that federal funding is not misspent or wasted.  *See* H.R. Rep. No. 109-233, at 90 ("A strategic objective … for [OJP] is to ensure meaningful outcomes, appropriate fiscal management, and accountability.").  Befitting that focus, the term "special conditions" matched the term used in Department of Justice regulations at the time to describe conditions placed on "'high-risk'" grantees— that is, those who had "a history of unsatisfactory performance," or inadequate

29

"management system[s]," had violated "terms and conditions of previous awards," were "not financially stable," or were "otherwise not responsible." 28 C.F.R. § 66.12(a) (2005); *see id.* (requiring "special conditions" to "correspond to the high risk condition"); *id.* § 66.12(b) (specifying special conditions such as requiring "more detailed financial reports," "project monitoring," and "technical or management assistance").[6] The amendment to section 10102(a)(6) thus reflected Congress's desire that the accountable official in charge of OJP would impose "special conditions" to prevent fraud and waste. It did not confer independent, free-floating authority to impose any sort of condition an AAG might wish on any grant administered by OJP.[7]

2. Defendants' contrary position is unsupported by the statute's text, structure, or purpose. "'[I]ncluding,'" "[i]n both legal and common usage," is ordinarily "a term of illustration, signifying that what follows is an example of the

_____

[6] *See generally* Allen, Federal Grant Practice § 47:6 (listing similar special conditions as typical for high-risk grantees); Dembling & Mason, Essentials of Grant Law Practice § 13.01 (1991) (discussing "special conditions … to deal with the special risks" posed by "potentially trouble-inviting activities, or a grantee [that poses] a particular danger in the administration of the grant").

[7] Section 10102(a)(6)'s reference to determining "priority purposes for formula grants" (OB 11, 21) likewise provides no authority to impose the conditions challenged here. Like the reference to special conditions, the reference to priority purposes reflected Congress's desire that OJP "ensure meaningful outcomes, appropriate fiscal management, and accountability." H.R. Rep. No. 109-233, at 90. And Congress's specification of the purposes of the JAG program, in section 10152(a)(1), does not include routine federal immigration enforcement.

30

preceding principle." *Ariz. State Bd. For Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006). "Whatever follows the word 'including' is a subset of whatever comes before." *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 922 (D.C. Cir. 2017). Here, the "including" phrase comes after "such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General." It therefore "set[s] forth a subcategory of the types of powers and functions that the Assistant Attorney General may exercise when vested in the Assistant Attorney General either by the terms of this chapter or by delegation of the Attorney General." *Chicago*, 888 F.3d at 285.[8]

As demonstrated above, the Attorney General's powers over the JAG program do not include any general power to impose conditions not specified by Congress. *See* pp. 21-22, *supra*. Nor do Defendants point to anything that "vests" any such power directly in the Assistant Attorney General. Defendants' assertion that "§ 10102(a)(6) itself is a provision of Chapter 101 that vests the AAG with the

---

[8] Defendants argue that "including" is "often used as a word of extension or enlargement," and "can mean 'and' or 'in addition to.'" OB 24. But as *Arizona State Board* reasoned, such a usage of "including" is "counterintuitive." 464 F.3d at 1008-1009. It only makes sense when the illustrative interpretation of "including" would be "irrational or absurd," such as if the words in the "including" clause and those preceding it are "mutually exclusive" or "incompatible," *id.*, which is not the case here.

31

power to impose 'special conditions' and determine 'priority purposes' for grants" (OB 24) is circular. "[T]he Special Conditions Clause cannot authorize … on its own" a power that "has not been vested in the Attorney General or the AAG in the Byrne JAG statute or anywhere else in the United States Code." *Philadelphia*, 916 F.3d at 287-288.

Structurally, the reference to special conditions appears in the last of six "subsections delineating the AAG's power" and duties. *Philadelphia*, 916 F.3d at 288. The other five concern providing information to governmental and educational entities and the public, maintaining federal liaison with research institutions and governments, and supporting the activities of other DOJ offices. 34 U.S.C. § 10102(a)(1)-(5). None encompasses or compares to the power to withhold formula grant funding from applicants who meet statutory qualifications but do not meet additional conditions that an AAG has decided to impose. "A clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose *any* conditions on *any* grants—a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the Assistant Attorney General that was not granted to the Attorney General." *Chicago*, 888 F.3d at 285; *see Philadelphia*, 916 F.3d at 288; *cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress … does not alter the fundamental details of a regulatory

scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Finally, Congress added the language about "special conditions" to section 10102(a)(6) in the same bill in which it combined previous programs into the JAG program. As part of that, Congress compressed the long list of certifications and assurances that applicants were previously required to make, and substituted instead the short list in section 10153. *See* H.R. Rep. No. 109-233, at 136-139 (showing required certifications and assurances under previous program). To have simultaneously given the Assistant Attorney General the ability to invent new requirements that are unrelated to the historical understanding of special conditions would have been inconsistent with Congress's underlying goals to "give State and local governments more flexibility to spend money for programs that work for them" and "lessen the administrative burden of applying for the grants." *Id.* at 89.

3. Defendants assert that if section 10102(a)(6) does not broadly empower the AAG to impose conditions of his choosing, then certain conditions imposed on grants in the past would have been invalid. OB 21. The past conditions listed by Defendants addressed only the use of grant funds themselves,[9] and were largely

---

[9] *See* ER 411 (condition regarding "any information technology system funded or supported by OJP funds"); *id.* (training for members "of a law enforcement task force funded with these funds"); ER 413 ("body armor purchased with JAG

authorized by specific provisions of federal law.[10]  They do not support any self-generating authority to impose the conditions here, which are unauthorized by any other statute and unrelated to the use of grant funds or the JAG program's purposes.  Furthermore, Defendants' observation that the prior conditions have never been the subject of a legal challenge, OB 21, simply underscores how little they prove about Defendants' current efforts to expand their authority.  *Cf. SEC v. Sloan*, 436 U.S. 103, 119 (1978) ("'[A]n agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate.'").  It is equally true that there is no precedent in the history of the JAG program for the sort of extraneous conditions that Defendants have sought to impose here.

---

funds"); ER 413-414 ("award funds may not be used for items that are listed on the Controlled Expenditure List").  Although the condition regarding research on human subjects (ER 411) does not mention a limitation to funded programs, it imposes the requirements of 28 C.F.R. pt. 46, which apply only to research "conducted or supported by a federal … agency," 28 C.F.R. § 46.103(a).

[10] *E.g.,* 34 U.S.C. § 10107(b) (authorizing requirements for computer systems purchased with grants); *id.* § 10202(c) (requirements for grants used to purchase body armor); *id.* § 10152(d)(2)(A) (prohibition on using grant money to purchase vehicles); *id.* §§ 10153(a)(5)(A) (requirement that "the programs to be funded by the grant meet all the requirements of this part"—including that they be used for a purpose described in section 10152(a)(1)); former 42 U.S.C. § 300v-1(b) (authorizing federal agencies to safeguard ethical values in human research (decodified upon expiration of statute)); *see generally Philadelphia*, 916 F.3d at 290 n.12 (noting that Philadelphia had set forth statutory authority for each prior condition imposed by DOJ, and DOJ did "not take issue with the City's account").

34

## C.    The Conditions Violate the Spending Clause

The new conditions also violate the Constitution's Spending Clause.

"Congress has broad power to set the terms on which it disburses federal money to the States." *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006).  There are, however, "limits on Congress's power under the Spending Clause to secure state compliance with federal objectives." *Nat'l Fed'n of Indep. Bus. v. Sibelius*, 567 U.S. 519, 576 (2012) (plurality opinion).  These limitations "ensur[e] that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.* at 577.  The conditions here violate two constitutional limits.

First, a spending condition must relate "'to the federal interest'" in the particular national project or program to which it is attached.  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  Otherwise, "the spending power could render academic the Constitution's other grants and limits of federal authority." *New York v. United States*, 505 U.S. 144, 167 (1992).

This requirement was satisfied in *South Dakota*, where Congress conditioned a percentage of highway funding to States on their instituting a legal drinking age of 21.  *South Dakota*, 483 U.S. at 205.  A main purpose of federal highway funding is to promote "safe interstate travel," and the condition was "reasonably calculated" to address a "particular impediment" to that purpose.  *Id.* at 209.

Here, there is no similar relationship between the funding program and the new conditions that Defendants have sought to impose. The JAG program's purpose is to promote state and local "criminal justice" programs, 34 U.S.C. § 10152(a)(1), meaning "activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law," *id.* § 10251(a)(1). The federal immigration system is something else entirely. "Removal is a civil, not criminal, matter." *Arizona v. United States*, 567 U.S. 387, 396 (2012). Defendants seek, through the immigration conditions, to induce state and local officials to transmit information regarding people who have never been convicted or even suspected of a crime—including victims and witnesses—to facilitate the deportations of thousands of non-criminals. And the Certification Condition attempts to regulate not only the information that state and local entities and officials exchange with *federal* authorities, but also that which they maintain internally or exchange with other state and local entities—including entities with no law enforcement role. *See* 8 U.S.C. § 1373(b).

Second, Congress's imposition of conditions on federal funds must be "unambiguous[]." *Pennhurst*, 451 U.S. at 17. That is because Spending Clause legislation is "'in the nature of a contract,'" *Arlington*, 548 U.S. at 296, and "[t]here can … be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it," *Pennhurst*, 451 U.S. at 17. Every

court that has considered the statutes at issue has interpreted them as barring the new conditions—undermining any contention that the statutes unambiguously permit them.

Defendants' ambiguous statements about what their conditions require compound the problem for States seeking to make a knowing decision about whether to participate in the JAG program. As the district court noted, Defendants' interpretation of what is required to comply with the section 1373 certification requirement has shifted substantially throughout the course of this case. *See* ER 42-43. If the federal agency itself does not know the scope of a condition, it cannot be said to have presented a "contract" allowing its state counterparts to engage in a "'voluntar[y] and knowing[]'" choice, as the Constitution demands. *Arlington*, 548 U.S. at 296.

### D. The Conditions Are Arbitrary and Capricious Under the APA

The district court further concluded that the administrative record demonstrated a lack of rational connection between the agency's stated goals and the conditions it imposed, as well as a wholesale failure to address important concerns. ER 48-54. Because the APA does not allow agencies to act in an

arbitrary and capricious manner, the court correctly held that the agency's adoption of the challenged conditions violated 5 U.S.C. § 706(2)(A).[11]

Defendants' perfunctory challenge to this conclusion rests mainly on the contention that section 1373 is an "applicable law" for purposes of 34 U.S.C. § 10153(A)(5)(D). OB 41. But even if section 1373 were an applicable law (and it is not, *see* pp. 24-27, *supra*), that would not allow a certification requirement that is arbitrary and capricious. Defendants do not claim that any statute requires them to impose the new immigration-related conditions. And a choice that is merely statutorily permissible—such as the choice of which applicable laws to require certification for—must be set aside if the agency did not "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational

---

[11] Defendants do not argue that the district court erred in determining that there was reviewable "final agency action" under the APA. *See* D.C. Doc. 89, at 19-20. The issue is thus waived. *See Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006) (APA's final agency action requirement is non-jurisdictional); *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief."). To the extent that Defendants suggest, without arguing, that their actions are unreviewable under the APA because they are committed to agency discretion (OB 42), that suggestion likewise fails. *Lincoln v. Vigil,* 508 U.S. 182 (1993), which Defendants cite, explained that an agency's allocation of funds will frequently be unreviewable where "'Congress merely appropriate[d] lump-sum amounts without statutorily restricting what can be done with those funds.'" *Id.* at 192. That principle has no application to the JAG program, whose statute commands that the Attorney General "shall" allocate funding according to a specific formula. 34 U.S.C. §10156(a)(1).

connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983);

*compare* 5 U.S.C. § 706(2)(A) (court shall set aside agency action that is arbitrary

or capricious), *with id.* § 706(2)(C) (court shall set aside agency action that is in

excess of statutory authority).

Although Defendants assert that "there is no basis for concluding that the

Attorney General's imposition of the conditions was unreasonable," OB 41, they

cite nothing in the administrative record as support for their decision, OB 41-42.

The Department of Justice administered the JAG program for years without the

conditions at issue here—and previously explained that it lacked the authority to

impose such conditions on formula grants. CSER 40-41. Nothing in the record

explains why the earlier policy and legal conclusion were wrong, or why later

events justified a change. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117,

2126 (2016) ("'[u]nexplained inconsistency'… is 'a reason for holding [the

agency's] interpretation to be an arbitrary and capricious change from [prior]

agency practice'").

Nor did anything that Defendants pointed to in the district court support the

new conditions. Defendants claimed that a 2007 Inspector General's report

showed the need for release-date information. ER 50. But as the district court

observed, that report proved nothing about the effect of prior notification, because

39

it simply noted crimes committed by noncitizens released from custody without examining whether immigration authorities had been notified before the release. *Id.* Defendants also relied on a 2016 Inspector General's memorandum that made no connection between the certifications and the purposes of the JAG program, *id.*, and was in any event issued after the agency had decided to make compliance with section 1373 a condition for JAG grants, *id.*; *cf. Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 688-689 (9th Cir. 2007) (presentation that did not precede agency decision did not support reliance on rational decision-making process). And although Defendants relied on a letter stating that OJP (in a reversal of its prior position) had determined that section 1373 was an "applicable Federal law" for purposes of the JAG program, the letter did "not explain how or why the OJP reached its determination." ER 51. A 2017 "Backgrounder on Grant Requirements" that Defendants pointed to did not include "a clear link … between localities keeping release dates or contact information confidential and more dangerous or less safe communities." ER 51. And a 2017 press release by the then-Attorney General stated only conclusions—that sanctuary city policies "'encourage illegal immigration and even human trafficking'"—without providing "any demonstrable linkage between allowing local government to maintain immigration confidentiality and less safe communities." ER 51-52.

40

Defendants likewise ignore the district court's conclusion that the agency "failed to consider an important aspect of the problem" before it, *State Farm*, 463 U.S. at 43—namely, evidence that imposing the challenged conditions would hamper law enforcement by discouraging victims and witnesses from reporting crime and cooperating with police. *See* ER 52-54. In 2015, moreover, the agency acknowledged that "[w]itholding … funding would have a significant, and unintended impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy." CSER 41. The agency never explained why it was imposing the conditions and using them to deny funding despite the harms that it had previously described.

## II. SECTION 1373 PROVIDES NO BASIS FOR WITHHOLDING JAG OR COPS/CAMP FUNDS FROM CALIFORNIA

As the district court correctly ruled, there are two reasons—independent of the arguments above—why JAG and COPS/CAMP funds cannot be withheld from California and its local governments based on section 1373. First, California's statutes comply with section 1373 as properly interpreted. Second, section 1373—especially as Defendants would construe it—cannot be reconciled with the Tenth Amendment.

### A. California's Statutes Comply with Section 1373

The district court correctly granted a declaration that California's Values Act, TRUST Act, and TRUTH Act, and the six confidentiality statutes described above,

comply with section 1373. Defendants' arguments to the contrary should be rejected.

1. Defendants' argument concerning the Values Act (OB 42-46) is foreclosed by this Court's decision in *United States v. California*, 921 F.3d 865 (9th Cir. 2019). There, this Court examined section 1373 and the Values Act in detail, and concluded that the two are consistent because section 1373's reference to "'information regarding the citizenship or immigration status, lawful or unlawful, of any individual'" refers only to "a person's legal classification under federal law," which the Values Act permits officials to share. *Id.* at 891; *see also Steinle v. San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019) (section 1373(a) "do[es] not prohibit" a municipality from forbidding its employees to provide "release-date information" to immigration authorities); Cal. Gov't Code § 7284.6(e) (providing that the Values Act "does not prohibit or restrict" California governmental entities and officials from "sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual … pursuant to [8 U.S.C. §] 1373").

2. Defendants have forfeited any argument as to the other statutes covered by the district court's order—"the TRUST Act, … the TRUTH Act, … and six confidentiality statutes." OB 43. The district court concluded that Defendants had "conced[ed]" any objection to California receiving declaratory relief regarding

42

those statutes because, in the cross-motions for summary judgment, Defendants argued only that the Values Act conflicted with section 1373. ER 57.[12] Defendants' opening brief does not argue that the district court erred in deeming the issues conceded, or that their failure to argue the issues below should be excused. This Court therefore need not consider the merits. *See Kingdomware Tech., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016) ("The Department failed to raise this argument in the courts below, and we normally decline to entertain such forfeited arguments."); *Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (court "'will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief'").

If considered on the merits, Defendants' arguments as to these statutes would fail. The TRUTH Act does not restrict government officials from providing information to federal authorities. It merely requires that certain records on such interactions be maintained and that there be corresponding disclosures to the public and to inmates. *See* Cal. Gov't Code § 7283.1. The TRUST Act, in turn, permits law enforcement officials to "cooperate with immigration authorities … where

---

[12] *See* D.C. Doc. 124, at 26 (arguing that California's declaratory relief claim should be dismissed as nonjusticiable as to all the statutes, but that "assuming the Court reaches the merits of this claim, it should enter judgment for the defendants denying plaintiff's request for a declaratory judgment regarding the Values Act"); *id.* at 32-34 (arguing only that the Values Act violates section 1373).

permitted by the California Values Act." Cal. Gov't Code § 7282.5(a). This Court's holding in *California* regarding the Values Act's compliance with section 1373 therefore means that the TRUST Act complies as well.

The six confidentiality statutes, in contrast, do affect the sharing of immigration-status information. But they do so only with respect to particular categories of vulnerable people, and in ways consistent with federal policies towards the same groups.

Welfare and Institutions Code sections 827 and 831 include immigration status among a variety of information that California keeps confidential with respect to juvenile proceedings. *See generally* Cal. Welf. & Inst. Code § 831(a) ("Confidentiality is integral to … the juvenile justice system in order to avoid stigma and promote rehabilitation for all youth…."); Cal. R. Ct. 5.552; CSER 81-82 (describing contents of juvenile case files and the need for confidentiality). Federal law likewise requires juvenile records to be "safeguarded from disclosure to unauthorized persons" and released only "to the extent necessary to meet [specified] circumstances." 18 U.S.C. § 5038(a). Those circumstances include "the investigation of a crime," but not routine civil immigration enforcement. *Id.* § 5038(a)(3).

Code of Civil Procedure section 155 governs California courts when special findings in state court are requested to support a federal application for "special

immigrant juvenile" status. Congress established the Special Immigrant Juvenile process to allow abused, abandoned, and neglected youth to secure lawful immigration status, and gave state courts (with their expertise in juvenile and dependency matters) an explicit role in making the legal determinations that are prerequisites for such relief. 8 U.S.C. § 1101(a)(27)(J)(i). The application of California's confidentiality rules in that process is inherent in Congress's decision to entrust the process to state courts to begin with: "Federal law takes state courts as it finds them … insofar as those courts employ rules that do not 'impose unnecessary burdens upon rights of recovery authorized by federal laws.'" *Felder v. Casey*, 487 U.S. 131, 150 (1988). Section 155(c) requires that information about such a child's immigration status not be disclosed to anyone but the child, his guardian, the parties, and appropriate counsel. That does not burden any right of the federal program's intended beneficiaries; indeed, it advances federal policy by insulating potential applicants from fears that could otherwise dissuade them from raising meritorious claims. Nor does it burden the federal program for which Congress sought state courts' assistance: If a child actually seeks special immigrant status from federal authorities, she will disclose her immigration status as part of the application.[13]

---

[13] *See* USCIS, Form I-360, at 3, available at https://www.uscis.gov/i-360.

Finally, Penal Code sections 422.93, 679.10, and 679.11 protect the information of applicants for U or T visas and of hate-crime victims and witnesses, so they are not dissuaded from cooperating in the detection and prosecution of serious crimes. That goal is consistent with federal policy, which strictly limits the "use" or "disclosure" of information relating to an alien who has applied for a U or T visa or a visa for victims of domestic violence. 8 U.S.C. § 1367(a)(2). And where individuals apply to federal authorities for special visas, those authorities will obviously have their own direct access to any immigration-related information they may require.

**B.    Section 1373 Violates the Tenth Amendment**

Although California's statutes comply with section 1373, section 1373 does not comply with the Constitution. The district court therefore correctly enjoined Defendants from enforcing it against California.

1. The Constitution "'confers upon Congress the power to regulate individuals, not States.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018) (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). The federal government "may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). In *Printz*, accordingly, the Supreme Court held that it would be "fundamentally incompatible with our constitutional system of dual sovereignty"

46

for Congress to require local sheriffs to perform background checks or related tasks concerning prospective gun purchases as part of a congressional scheme regulating the distribution of firearms. *Id.* at 935.

California has determined that its law enforcement resources should be directed towards issues of local concern, and that state and local participation in immigration enforcement would harm the State's law enforcement goals. *See* pp. 8-10, *supra*. Section 1373 unconstitutionally interferes with that decision by allowing the federal government to "impress into its service—and at no cost to itself"—the State's employees. *Printz*, 521 U.S. at 922.

That outcome does not change merely because section 1373 is phrased as a prohibition-on-a-prohibition, rather than as a direct requirement that state officials act for the federal government. "Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials.…" *Koog v. United States*, 79 F.3d 452, 460 (5th Cir. 1996). Section 1373 removes decisionmaking authority from the State's constitutionally chosen policymakers and purports to grant it to individual state and local employees as they carry out their official duties using public resources—something the federal government has no power to do. *See, e.g., Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015) ("States retain autonomy to establish their own governmental processes"); *Wis. Pub. Intervenor v. Mortier,* 501

47

U.S. 597, 607-608 (1991) ("well settled" that local governments are "'created as convenient agencies for exercising such of the government[al] powers of the State'" as the State grants in its "'absolute discretion'"). And by "dictat[ing] what a state legislature may and may not do," *Murphy*, 138 S. Ct. at 1478, with respect to limiting state and local officials' discretion to assist the federal government, section 1373 violates the principle that Congress may neither compel state legislatures to adopt federally preferred policies, *New York*, 505 U.S. at 161-162, nor preclude them from enacting legislation of their own choosing, *Murphy*, 138 S. Ct. at 1478.[14]

2. Defendants argue that section 1373 merely "'preempt[s]'" "state and local laws that obstruct federal laws [on immigration]." OB 33 (quoting *Murphy*, 138 S. Ct. at 1479). They describe the federal government's overall immigration

---

[14] In *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), the Second Circuit rejected a claim that section 1373 facially violated the Tenth Amendment, reasoning that the statute does not "directly compel states or localities to require or prohibit anything." *Id.* at 35. *Murphy*, however, has since made clear that a putative federal proscription on state legislative action is as offensive to the Constitution as a putative federal compulsion to enact a state law. 138 S. Ct. at 1478 (distinction between the two "is empty"). *See New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 234 (S.D.N.Y. 2018) ("It is clear that *City of New York* cannot survive the Supreme Court's decision in *Murphy*."), appeal docketed, Nos. 19-267 & 19-275 (2d Cir.). Indeed, the fact that federal officials do not direct individual state employees under section 1373 simply raises additional constitutional concerns. *See Printz*, 521 U.S. at 922-923 (raising separation-of-powers concerns where Congress empowers local officials to "implement [a federal] program without meaningful Presidential control").

48

enforcement system and emphasize that federal efforts to remove aliens from this country will be more efficient if state and local agencies provide the information federal authorities want. OB 5-7, 32, 35.

But declining to participate is not the same as obstruction. "Federal schemes are inevitably frustrated when states opt not to participate in federal programs or enforcement efforts." *California,* 921 F.3d at 890. A State nevertheless "has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts," and its "choice … to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal." *Id.* at 890-891.

As *Murphy* explained, preemption is at issue where "Congress enacts a law that imposes restrictions or confers rights on private actors [and] a state law confers rights or imposes restrictions that conflict with the federal law." 138 S. Ct. at 1480. Section 1373, however, does not impose restrictions or confer rights on private actors. It regulates only "Federal, state, [and] local government entit[ies]" and "official[s]." § 1373(a), (b). And although the Immigration and Naturalization Act as a whole does regulate private actors, preemption would operate only where needed to protect the private individuals' "federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 138 S. Ct. at 1480. Section 1373 does not protect private individuals' right to engage in federally-

49

protected conduct. Instead, it attempts to enlist state officers and governments as agents of federal enforcement.

Defendants argue that section 1373 is permissible because it requires only "information-sharing." OB 31, 37. But as *California* explained, any special ability for the federal government to require information sharing from States applies, under *Murphy*, only where the federal law targets "conduct engaged in by both state and private actors." 921 F.3d at 890; *compare Murphy*, 138 S. Ct. at 1478-1479 (explaining that the law upheld in *Reno v. Condon*, 528 U.S. 141 (2000), "applied equally to state and private actors"), *with Printz*, 521 U.S. at 936 (O'Connor, J., concurring) (noting that the law struck down in *Printz* did not involve "purely ministerial reporting requirements imposed … pursuant to [Congress's] Commerce Clause powers"). In any event, section 1373's requirements extend far beyond reporting information to the federal government. The statute also prohibits States from determining whether a "State or local government entity" should "[m]aintain" information for its *own* use or exchange information with other "State[] or local" entities. 8 U.S.C. § 1373(b).

3. By changing the "'balance of power between the States and the Federal Government,'" *Murphy*, 138 S. Ct. at 1477, section 1373 causes the kinds of problems that the anticommandeering doctrine aims to prevent.

First, by disabling States from deciding how much of their officers' or agencies' time should be taken from other priorities to fulfill information requests from the federal government, section 1373 would effectively "shift[] the costs of [federal] regulation to the States." *Murphy,* 138 S. Ct. at 1477.[15]  Second, it undercuts "political accountability" and "blur[s]" responsibility for the consequences of the policy choice at issue. *Murphy*, 138 S. Ct. at 1477.  As the district court recognized, persuasive evidence shows that entangling state and local law enforcement with routine immigration enforcement leads to decreased cooperation with law enforcement.  ER 33, 52-54.[16]  Community health, safety and

---

[15] *See* CSER 66 (sheriff's department's resource shortfalls make it impossible to undertake immigration-related informational work without sacrificing other duties); Rep. on SB 54, Assem. Comm. on Appropriations, Aug. 21, 2017, at 1 ("This bill prioritizes the use of public resources by law enforcement agencies in California for the enforcement of state laws by limiting the use of those resources for purposes of immigration enforcement."); Floor Analysis of AB 2792, Sen. Rules Comm., Aug. 22, 2016, at 5 (observing that federal requests for notification of release dates "overburden[] local law enforcement's resources").

[16] *See* CSER 114-116 (undocumented Mexican nationals in San Diego County are 60% less likely to report crimes to police as witnesses, and 40% less likely to report as victims, if they believe that local law enforcement officials work together with federal immigration authorities on immigration enforcement efforts); CSER 64 (sheriff's experience that "[w]itnesses and victims are less likely to report crimes to local law enforcement if they fear that the information they provide will be used against them or someone they know for federal immigration enforcement purposes"); CSER 77 (district attorney's explanation that many families and communities contain both documented and undocumented people, and that crimes may go unreported where a victim or witness fears the immigration consequences for a perpetrator); Rep. on AB 2792, Assem. Comm. on Pub. Safety, Apr. 11,

welfare are also affected when fear of immigration consequences causes affected

populations to avoid interaction with state and local authorities.[17]  By disabling the

State from deciding when and how state or local officials get involved with federal

immigration enforcement, section 1373 would obscure for voters which

government is responsible for the bad effects of the entanglement.  And "it will

likely be [state and local officials], not some federal official, who will be blamed"

for the federal policy's "defects."  *Printz*, 521 U.S. at 930.

## III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ENTERING A NATIONWIDE INJUNCTION

Finally, Defendants argue that, under principles of equity and Article III

standing, the district court's injunction should be vacated "insofar as it extends to

entities other than the plaintiffs in this case."  OB 46.   That is also incorrect.

1.  Under the APA, when a court determines that agency action is "contrary to

constitutional right," "in excess of statutory jurisdiction [or] authority," or

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

2016, at 5 (citing significant decline among Latinos—including U.S.-born
Latinos—in willingness to report crime if they think police would use the
interaction as an opportunity to inquire into their immigration status or that of
people they know).

[17] *See* CSER 116-117 (belief that local law enforcement works with immigration
authorities makes immigrants less likely to access healthcare or place children in
after-school or daycare programs); CSER 71-72 (effect on immigrants' willingness
to access county services supporting child health and disaster relief).

law," 5 U.S.C. § 706(2), the "'ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 511 (9th Cir. 2018) (quoting *Nat'l. Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). "Under these circumstances, a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court." *Regents*, 908 F.3d at 511 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting)); *see id.* (stating that Justice Blackmun's *Lujan* opinion "'express[ed] the view of all nine Justices on this question'"). Giving nationwide effect to a ruling on an agency's illegal action is therefore far from unusual. If there is anything unusual, it is the federal government's insistence that although its conditions have been declared unlawful, it can nonetheless apply them to any State or locality that has not specifically challenged them.

The district court did not, however, rely merely on its powers under the APA. As required by this Court's precedent, the district court undertook a "searching inquiry into whether this case justifies the breadth of the injunction imposed." *San Francisco*, 897 F.3d at 1245. The court recognized that the new conditions' legality is "a narrow issue of law that does not vary from one jurisdiction to the next." ER 62. Based on declarations "from municipal jurisdictions across the country," the court concluded that the new conditions, and their effect on

distributions, had a "far-reaching impact … on all types [of] grant recipients." ER 63; *see also* CSER 85-100, 126-138; *cf. California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (narrowing injunction where there was no "showing of nationwide impact or [harm to other jurisdictions of] sufficient similarity to the plaintiff states"). The court considered whether the nationwide injunction would "disrupt the administration of the … JAG program," and concluded that it would not. ER 65.

Defendants do not argue that the district court's determinations were clearly erroneous. Instead, although this Court has rejected the idea that there is "a blanket restriction on all nationwide injunctions," *San Francisco*, 897 F.3d at 1244, Defendants contend that "'[i]njunctive relief generally should be limited to apply only to named plaintiffs'" unless a class has been certified, OB 50 (quoting *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)). But as the word "generally" indicates, that is not an ironclad rule.

Defendants argue that nationwide injunctions prevent legal questions from percolating through the federal courts and encourage forum-shopping. OB 52. The district court "share[d]" these concerns but determined they were not implicated here given the numerous judicial decisions that had already issued. ER 64. Later events confirm that judgment. The Third Circuit has already ruled on the illegality of the new conditions. *See Philadelphia*, *supra.* The Seventh Circuit,

54

after concluding that the conditions were likely illegal in the preliminary injunction context, *see Chicago*, *supra,* recently heard oral argument on the issue in a final injunction context, *City of Chicago v. Barr*, No. 18-2885 (7th Cir.) (argued Apr. 10, 2019). And the Second Circuit will hear argument in June 2019. *See* Doc. 28, *New York v. USDOJ*, Case No. 19-267 (2d Cir.).

Defendants contend that nationwide injunctions undermine the rule that "'nonmutual offensive collateral estoppel … does not apply against the government.'" OB 53 (quoting *United States v. Mendoza*, 464 U.S. 154, 162 (1984)). But injunctions differ from collateral estoppel. Under collateral estoppel, a decision in one case is "conclusive in a subsequent suit." *Mendoza*, 464 U.S. at 158. In contrast, the injunction here neither restricts the federal government in the arguments it can make in other lawsuits, nor prohibits any court from accepting those arguments.[18]

Defendants argue that the injunction "subverts the class-action mechanism provided under the Federal Rules of Civil Procedure" and creates an "inequitable asymmetry, whereby non-parties can claim the benefit of a single favorable ruling, but are not bound by a loss." OB 53. But this unusual case features a more

---

[18] This is not a case in which there is any danger of injunctions that are contradictory in the sense that compliance with one would require disobeying the other.

pressing asymmetry. Despite decision after decision declaring Defendants' new conditions illegal, Defendants insist on applying them nonetheless, forcing each applicant that disagrees to litigate individually, at a cost that could exceed the amount of the grant at issue. Preventing that from happening does not offend principles of equity: Federal courts have "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from defendant's conduct in the past." *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435 (1941).

2. Defendants also argue that the injunction's scope violates the standing requirements of Article III of the Constitution. That is likewise incorrect.

A plaintiff must have standing for "each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), and "each type of relief sought," *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). Those requirements were met here. Each claim concerned an injury that was suffered by California, caused by the challenged conditions, and remedied by preventing the conditions' application. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (requirements for standing). And the "form of relief" that the court awarded was an injunction, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 105

56

(1983) (distinguishing between standing to claim damages and standing for an injunction), from which California benefits.

Defendants seek to invent a new rule that Article III prohibits courts from enjoining a defendant's behavior towards those who are not the named plaintiffs unless that aspect of the injunction directly benefits the plaintiffs. But the cases on which Defendants rely do not support that view. OB 46-50.

In *Gill v. Whitford*, 138 S. Ct. 1916 (2018), plaintiffs who were members of one political party challenged a statewide districting plan, alleging that the plan unfairly favored the other party. The Court reasoned that the alleged injury— "dilution of [the plaintiffs'] votes"—was "district specific," because it depended on the "boundaries" of a plaintiff's particular district and "the composition of its voters." *Id.* at 1930. As a result, plaintiffs who lived in non-gerrymandered districts asserted only a generalized grievance, and claims could be pursued only by plaintiffs whose own districts had been constructed to dilute their votes. *Id.* As Defendants note (OB 48), *Gill* quoted *Cuno*, 547 U.S. at 353, as stating that "standing is not dispensed in gross," and that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934. But that means only that an injury caused by one legal requirement does not give rise to standing to protest another legal requirement. *See Cuno*, 547 U.S. at 353 (stating that even if plaintiffs had established Article III injury "with respect to their

57

*municipal* taxes, that injury does not entitle them to seek a remedy as to [their]

state taxes"); *id.* (stating that "'[t]he actual-injury requirement would hardly serve

[its] purpose … if once a plaintiff demonstrated harm from one particular

inadequacy in government administration, the court were authorized to remedy *all*

inadequacies in that administration'"). Here, the conditions that the district court

enjoined nationwide are the same ones that cause California harm.

Citing *Summers*, Defendants argue that "no justiciable controversy exists

once the injury to the actual plaintiffs has been remedied." OB 48. In *Summers*,

an organizational plaintiff that was challenging a Forest Service rule attempted to

establish standing based on a member's affidavit stating that the member would be

harmed by the regulation's application to a particular area that he frequently

visited. 555 U.S. at 494. While the case was pending, however, the parties settled

their dispute as to that location. *Id.* Although there was "no other application of

the … regulations that threaten[ed] imminent and concrete harm to the interests of

[the organization's] members," *id.* at 495, the district court proceeded to judgment

anyway, invalidating several regulations and enjoining their enforcement

nationwide, *id.* at 492. The Supreme Court held the injunction improper, because

there was "no precedent for the proposition that when a plaintiff has sued to

challenge the lawfulness of certain action or threatened action but has settled that

suit, he retains standing to challenge the basis for that action (here, the regulation

in the abstract), apart from any concrete application that threatens imminent harm to his interests." *Id.* at 1149-1150. *Summers* does not undercut standing here, because nothing before the injunction eliminated the harm to California caused by the Defendants' attempt to impose unlawful grant conditions.[19]

Principles of Article III standing thus provide no basis for narrowing the scope of the injunction entered here.

---

[19] Defendants' reliance (OB 48-49) on *Alvarez v. Smith*, 558 U.S. 87 (2009), is similarly off-point. In that case, the plaintiffs, whose property had been seized without a warrant, sought to enjoin municipal practices with respect to the seizure of property for potential forfeiture. *Id.* at 90. But all plaintiffs' property had already been returned, or their claims otherwise settled, before the lawsuit was decided. *Id.* at 92.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  May 22, 2019

Respectfully submitted,

*s/ Joshua A. Klein*

XAVIER BECERRA
Attorney General of California
EDWARD C. DUMONT
Solicitor General
MICHAEL L. NEWMAN
Senior Assistant Attorney General
JOSHUA A. KLEIN
Deputy Solicitor General
SARAH E. BELTON
Supervising Deputy Attorney General
LEE SHERMAN
Deputy Attorney General
KRISTIN A. LISKA
Associate Deputy Solicitor General
CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 510-3919
Joshua.Klein@doj.ca.gov
*Attorneys for Plaintiff-Appellee*
*the State of California*

## STATEMENT OF RELATED CASES

The following pending cases raise similar legal issues:

*Los Angeles v. Barr*, No. 18-55314

*Los Angeles v. Barr*, No. 18-56292

*San Francisco v. Barr*, No. 19-15947

*California v. Barr*, No. 19-15950

Dated:  May 22, 2019        Respectfully Submitted,

XAVIER BECERRA
Attorney General of California

*s/ Joshua A. Klein*
JOSHUA A. KLEIN
Deputy Solicitor General

61

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 18-17311, 18-17308

I am the attorney or self-represented party.

**This brief contains** | 13,800 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.

- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    - ○ it is a joint brief submitted by separately represented parties;

    - ○ a party or parties are filing a single brief in response to multiple briefs; or

    - ○ a party or parties are filing a single brief in response to a longer joint brief.

- ○ complies with the length limit designated by court order dated [                    ].

- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Joshua A. Klein | **Date** | May 22, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*

**STATUTORY ADDENDUM**

# Table of Contents

**Page**

8 U.S.C. § 1373 Communication between government agencies  and the Immigration and Naturalization Service ......................................................1

34 U.S.C. § 10102 - Duties and functions of  Assistant Attorney General .............2

34 U.S.C. § 10152 - Description.................................................................................2

34 U.S.C. § 10153 - Applications .............................................................................3

34 U.S.C. § 10156 - Formula ....................................................................................5

34 U.S.C. § 10157 - Reserved funds.........................................................................5

34 U.S.C. § 10228 ....................................................................................................6

34 U.S.C. § 10251 ....................................................................................................6

Cal. Gov. Code § 7282 .............................................................................................7

Cal. Gov. Code § 7282.5 ..........................................................................................8

Cal. Gov. Code § 7283 ...........................................................................................10

Cal. Gov. Code § 7283.1 ........................................................................................11

Cal. Gov. Code § 7284.2 ........................................................................................12

Cal.Gov. Code § 7284.4 .........................................................................................13

Cal. Gov. Code § 7284.6 ........................................................................................14

Cal. Gov. Code § 7284.10 ......................................................................................15

Cal. Penal Code § 422.93 .......................................................................................16

Cal. Penal Code § 679.10 .......................................................................................16

Cal. Penal Code § 679.11 .......................................................................................17

Cal. Welf. & Inst. Code § 827 ................................................................................17

Cal. Welf. & Inst. Code § 831 ................................................................................18

Cal. Code of Civil Procedure § 155 .......................................................................18

## 8 U.S.C. § 1373 COMMUNICATION BETWEEN GOVERNMENT AGENCIES AND THE IMMIGRATION AND NATURALIZATION SERVICE

**(a)** In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b)** Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

**(2)** Maintaining such information.

**(3)** Exchanging such information with any other Federal, State, or local government entity.

**(c)** Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

## 34 U.S.C. § 10102 - DUTIES AND FUNCTIONS OF ASSISTANT ATTORNEY GENERAL

**(a)** Specific, general and delegated powers

The Assistant Attorney General shall--

   **(1)** publish and disseminate information on the conditions and progress of the criminal justice systems;

   **(2)** maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

   **(3)** provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

   **(4)** maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

   **(5)** coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and

   **(6)** exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

*     *     *

## 34 U.S.C. § 10152 - DESCRIPTION

**(a)** Grants authorized

   **(1)** In general

   From amounts made available to carry out this part, the Attorney General may, in accordance with the formula established under section 10156 of this title, make grants to States and units of local government, for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following programs:

ADD 2

**(A)** Law enforcement programs.

**(B)** Prosecution and court programs.

**(C)** Prevention and education programs.

**(D)** Corrections and community corrections programs.

**(E)** Drug treatment and enforcement programs.

**(F)** Planning, evaluation, and technology improvement programs.

**(G)** Crime victim and witness programs (other than compensation).

**(H)** Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

\*　　\*　　\*

## 34 U.S.C. § 10153 - APPLICATIONS

**(a)** In general

To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General within 120 days after the date on which funds to carry out this part are appropriated for a fiscal year, in such form as the Attorney General may require. Such application shall include the following:

**(1)** A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities.

**(2)** An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body).

**(3)** An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General--

**(A)** the application (or amendment) was made public; and

**(B)** an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or community-based organizations,

to the extent applicable law or established procedure makes such an opportunity available.

**(4)** An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require.

**(5)** A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that--

   **(A)** the programs to be funded by the grant meet all the requirements of this part;

   **(B)** all the information contained in the application is correct;

   **(C)** there has been appropriate coordination with affected agencies; and

   **(D)** the applicant will comply with all provisions of this part and all other applicable Federal laws.

**(6)** A comprehensive Statewide plan detailing how grants received under this section will be used to improve the administration of the criminal justice system, which shall--

   **(A)** be designed in consultation with local governments, and representatives of all segments of the criminal justice system, including judges, prosecutors, law enforcement personnel, corrections personnel, and providers of indigent defense services, victim services, juvenile justice delinquency prevention programs, community corrections, and reentry services;

   **(B)** include a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

   **(C)** describe the process used by the State for gathering evidence-based data and developing and using evidence-based and evidence-gathering approaches in support of funding decisions;

   **(D)** describe the barriers at the State and local level for accessing data and implementing evidence-based approaches to preventing and reducing crime and recidivism; and

   **(E)** be updated every 5 years, with annual progress reports ….

\*　　\*　　\*

ADD 4

## 34 U.S.C. § 10156 - FORMULA

**(a)** Allocation among States

  **(1)** In general

Of the total amount appropriated for this part, the Attorney General shall, except as provided in paragraph (2), allocate--

  **(A)** 50 percent of such remaining amount to each State in amounts that bear the same ratio of--

  **(i)** the total population of a State to--

  **(ii)** the total population of the United States; and

  **(B)** 50 percent of such remaining amount to each State in amounts that bear the same ratio of--

  **(i)** the average annual number of part 1 violent crimes of the Uniform Crime Reports of the Federal Bureau of Investigation reported by such State for the three most recent years reported by such State to--

  **(ii)** the average annual number of such crimes reported by all States for such years.

  **(2)** Minimum allocation

If carrying out paragraph (1) would result in any State receiving an allocation less than 0.25 percent of the total amount (in this paragraph referred to as a "minimum allocation State"), then paragraph (1), as so carried out, shall not apply, and the Attorney General shall instead--

  **(A)** allocate 0.25 percent of the total amount to each State; and

  **(B)** using the amount remaining after carrying out subparagraph (A), carry out paragraph (1) in a manner that excludes each minimum allocation State, including the population of and the crimes reported by such State.

*     *     *

## 34 U.S.C. § 10157 - RESERVED FUNDS

  **(a)** Of the total amount made available to carry out this part for a fiscal year, the Attorney General shall reserve not more than--

**(1)** $20,000,000, for use by the National Institute of Justice in assisting units of local government to identify, select, develop, modernize, and purchase new technologies for use by law enforcement, of which $1,000,000 shall be for use by the Bureau of Justice Statistics to collect data necessary for carrying out this part; and

**(2)** $20,000,000, to be granted by the Attorney General to States and units of local government to develop and implement antiterrorism training programs.

**(b)** Of the total amount made available to carry out this part for a fiscal year, the Attorney General may reserve not more than 5 percent, to be granted to 1 or more States or units of local government, for 1 or more of the purposes specified in section 10152 of this title, pursuant to his determination that the same is necessary--

**(1)** to combat, address, or otherwise respond to precipitous or extraordinary increases in crime, or in a type or types of crime; or

**(2)** to prevent, compensate for, or mitigate significant programmatic harm resulting from operation of the formula established under section 10156 of this title.

### 34 U.S.C. § 10228

**(a)** General rule

Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.

\*     \*     \*

### 34 U.S.C. § 10251

**(a)** Definitions

As used in this chapter--

**(1)** "criminal justice" means activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law, including, but not

limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, including juveniles, activities of courts having criminal jurisdiction, and related agencies (including but not limited to prosecutorial and defender services, juvenile delinquency agencies and pretrial service or release agencies), activities of corrections, probation, or parole authorities and related agencies assisting in the rehabilitation, supervision, and care of criminal offenders, and programs relating to the prevention, control, or reduction of narcotic addiction and juvenile delinquency.

\*    \*    \*

### CAL. GOV. CODE § 7282

For purposes of this chapter, the following terms have the following meanings:

\*    \*    \*

**(c)** "Hold request," "notification request," and "transfer request" have the same meanings as provided in Section 7283. Hold, notification, and transfer requests include requests issued by the United States Immigration and Customs Enforcement or the United States Customs and Border Protection as well as any other immigration authorities.

**(d)** "Law enforcement official" means any local agency or officer of a local agency authorized to enforce criminal statutes, regulations, or local ordinances or to operate jails or to maintain custody of individuals in jails, and any person or local agency authorized to operate juvenile detention facilities or to maintain custody of individuals in juvenile detention facilities.

**(e)** "Local agency" means any city, county, city and county, special district, or other political subdivision of the state.

**(f)** "Serious felony" means any of the offenses listed in subdivision (c) of Section 1192.7 of the Penal Code and any offense committed in another state which, if committed in California, would be punishable as a serious felony as defined by subdivision (c) of Section 1192.7 of the Penal Code.

**(g)** "Violent felony" means any of the offenses listed in subdivision (c) of Section 667.5 of the Penal Code and any offense committed in another state which, if committed in California, would be punishable as a violent felony as defined by subdivision (c) of Section 667.5 of the Penal Code.

ADD 7

## CAL. GOV. CODE § 7282.5

**(a)** A law enforcement official shall have discretion to cooperate with immigration authorities only if doing so would not violate any federal, state, or local law, or local policy, and where permitted by the California Values Act (Chapter 17.25 (commencing with Section 7284)). Additionally, the specific activities described in subparagraph (C) of paragraph (1) of subdivision (a) of, and in paragraph (4) of subdivision (a) of, Section 7284.6 shall only occur under the following circumstances:

**(1)** The individual has been convicted of a serious or violent felony identified in subdivision (c) of Section 1192.7 of, or subdivision (c) of Section 667.5 of, the Penal Code.

**(2)** The individual has been convicted of a felony punishable by imprisonment in the state prison.

**(3)** The individual has been convicted within the past five years of a misdemeanor for a crime that is punishable as either a misdemeanor or a felony for, or has been convicted within the last 15 years of a felony for, any of the following offenses:

**(A)** Assault ….

**(B)** Battery ….

**(C)** Use of threats ….

**(D)** Sexual abuse, sexual exploitation, or crimes endangering children ….

**(E)** Child abuse or endangerment ….

**(F)** Burglary, robbery, theft, fraud, forgery, or embezzlement….

**(G)** Driving under the influence of alcohol or drugs, but only for a conviction that is a felony.

**(H)** Obstruction of justice ….

**(I)** Bribery ….

**(J)** Escape ….

**(K)** Unlawful possession or use of a weapon, firearm, explosive device, or weapon of mass destruction ….

(L) Possession of an unlawful deadly weapon, under the Deadly Weapons Recodification Act of 2010 ….

(M) An offense involving the felony possession, sale, distribution, manufacture, or trafficking of controlled substances.

(N) Vandalism with prior convictions ….

(O) Gang-related offenses ….

(P) An attempt … or a conspiracy … to commit an offense specified in this section.

(Q) A crime resulting in death, or involving the personal infliction of great bodily injury ….

(R) Possession or use of a firearm in the commission of an offense.

(S) An offense that would require the individual to register as a sex offender pursuant to Section 290, 290.002, or 290.006 of the Penal Code.

(T) False imprisonment, slavery, and human trafficking ….

(U) Criminal profiteering and money laundering ….

(V) Torture and mayhem ….

(W) A crime threatening the public safety ….

(X) Elder and dependent adult abuse ….

(Y) A hate crime ….

(Z) Stalking ….

(AA) Soliciting the commission of a crime ….

(AB) An offense committed while on bail or released on his or her own recognizance ….

(AC) Rape, sodomy, oral copulation, or sexual penetration ….

(AD) Kidnapping ….

(AE) A violation of subdivision (c) of Section 20001 of the Vehicle Code.

(4) The individual is a current registrant on the California Sex and Arson Registry.

**(5)** The individual has been convicted of a federal crime that meets the definition of an aggravated felony as set forth in subparagraphs (A) to (P), inclusive, of paragraph (43) of subsection (a) of Section 101 of the federal Immigration and Nationality Act (8 U.S.C. Sec. 1101), or is identified by the United States Department of Homeland Security's Immigration and Customs Enforcement as the subject of an outstanding federal felony arrest warrant.

**(6)** In no case shall cooperation occur pursuant to this section for individuals arrested, detained, or convicted of misdemeanors that were previously felonies, or were previously crimes punishable as either misdemeanors or felonies, prior to passage of the Safe Neighborhoods and Schools Act of 2014 as it amended the Penal Code.

 **(b)** In cases in which the individual is arrested and taken before a magistrate on a charge involving a serious or violent felony, as identified in subdivision (c) of Section 1192.7 or subdivision (c) of Section 667.5 of the Penal Code, respectively, or a felony that is punishable by imprisonment in state prison, and the magistrate makes a finding of probable cause as to that charge pursuant to Section 872 of the Penal Code, a law enforcement official shall additionally have discretion to cooperate with immigration officials pursuant to subparagraph (C) of paragraph (1) of subdivision (a) of Section 7284.6.

## CAL. GOV. CODE § 7283

For purposes of this chapter, the following terms have the following meanings:

\*     \*     \*

 **(b)** "Hold request" means a federal Immigration and Customs Enforcement (ICE) request that a local law enforcement agency maintain custody of an individual currently in its custody beyond the time he or she would otherwise be eligible for release in order to facilitate transfer to ICE and includes, but is not limited to, Department of Homeland Security (DHS) Form I-247D.

\*     \*     \*

 **(d)** "ICE access" means, for the purposes of civil immigration enforcement, including when an individual is stopped with or without their consent, arrested, detained, or otherwise under the control of the local law enforcement agency, all of the following:

**(1)** Responding to an ICE hold, notification, or transfer request.

ADD 10

**(2)** Providing notification to ICE in advance of the public that an individual is being or will be released at a certain date and time through data sharing or otherwise.

**(3)** Providing ICE non-publicly available information regarding release dates, home addresses, or work addresses, whether through computer databases, jail logs, or otherwise.

**(4)** Allowing ICE to interview an individual.

**(5)** Providing ICE information regarding dates and times of probation or parole check-ins.

**(e)** "Local law enforcement agency" means any agency of a city, county, city and county, special district, or other political subdivision of the state that is authorized to enforce criminal statutes, regulations, or local ordinances; or to operate jails or to maintain custody of individuals in jails; or to operate juvenile detention facilities or to maintain custody of individuals in juvenile detention facilities; or to monitor compliance with probation or parole conditions.

**(f)** "Notification request" means an Immigration and Customs Enforcement request that a local law enforcement agency inform ICE of the release date and time in advance of the public of an individual in its custody….

**(g)** "Transfer request" means an Immigration and Customs Enforcement request that a local law enforcement agency facilitate the transfer of an individual in its custody to ICE ….

### CAL. GOV. CODE § 7283.1

**(a)** In advance of any interview between ICE and an individual in local law enforcement custody regarding civil immigration violations, the local law enforcement entity shall provide the individual with a written consent form that explains the purpose of the interview, that the interview is voluntary, and that he or she may decline to be interviewed or may choose to be interviewed only with his or her attorney present. * * *

**(b)** Upon receiving any ICE hold, notification, or transfer request, the local law enforcement agency shall provide a copy of the request to the individual and inform him or her whether the law enforcement agency intends to comply with the request. If a local law enforcement agency provides ICE with notification that an individual is being, or will be, released on a certain date, the local law

enforcement agency shall promptly provide the same notification in writing to the individual and to his or her attorney or to one additional person who the individual shall be permitted to designate.

**(c)** All records relating to ICE access provided by local law enforcement agencies, including all communication with ICE, shall be public records for purposes of the California Public Records Act (Chapter 3.5 (commencing with Section 6250)) * * *

**(d)** Beginning January 1, 2018, the local governing body of any county, city, or city and county in which a local law enforcement agency has provided ICE access to an individual during the last year shall hold at least one community forum during the following year, that is open to the public, in an accessible location, and with at least 30 days' notice to provide information to the public about ICE's access to individuals and to receive and consider public comment.

\*      \*      \*

## CAL. GOV. CODE § 7284.2

The Legislature finds and declares the following:

**(a)** Immigrants are valuable and essential members of the California community. Almost one in three Californians is foreign born and one in two children in California has at least one immigrant parent.

**(b)** A relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California.

**(c)** This trust is threatened when state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the detriment of public safety and the well-being of all Californians.

**(d)** Entangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments.

**(e)** State and local participation in federal immigration enforcement programs also raises constitutional concerns, including the prospect that California residents could be detained in violation of the Fourth Amendment to the United States Constitution, targeted on the basis of race or ethnicity in violation of the

Equal Protection Clause, or denied access to education based on immigration status. * * *

**(f)** This chapter seeks to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments.

**(g)** It is the intent of the Legislature that this chapter shall not be construed as providing, expanding, or ratifying any legal authority for any state or local law enforcement agency to participate in immigration enforcement.

## CAL. GOV. CODE § 7284.4

For purposes of this chapter, the following terms have the following meanings:

**(a)** "California law enforcement agency" means a state or local law enforcement agency, including school police or security departments. "California law enforcement agency" does not include the Department of Corrections and Rehabilitation.

\* \* \*

## CAL. GOV. CODE § 7284.6

**(a)** California law enforcement agencies shall not:

**(1)** Use agency or department moneys or personnel to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes, including any of the following:

**(A)** Inquiring into an individual's immigration status.

**(B)** Detaining an individual on the basis of a hold request.

**(C)** Providing information regarding a person's release date or responding to requests for notification by providing release dates or other information unless that information is available to the public, or is in response to a notification request from immigration authorities in accordance with Section 7282.5. Responses are never required, but are

permitted under this subdivision, provided that they do not violate any local law or policy.

(D) Providing personal information, as defined in Section 1798.3 of the Civil Code, about an individual, including, but not limited to, the individual's home address or work address unless that information is available to the public.

\*     \*     \*

(b) Notwithstanding the limitations in subdivision (a), this section does not prevent any California law enforcement agency from doing any of the following that does not violate any policy of the law enforcement agency or any local law or policy of the jurisdiction in which the agency is operating:

(1) Investigating, enforcing, or detaining upon reasonable suspicion of, or arresting for a violation of, Section 1326(a) of Title 8 of the United States Code that may be subject to the enhancement specified in Section 1326(b)(2) of Title 8 of the United States Code and that is detected during an unrelated law enforcement activity. Transfers to immigration authorities are permitted under this subsection only in accordance with paragraph (4) of subdivision (a).

(2) Responding to a request from immigration authorities for information about a specific person's criminal history, including previous criminal arrests, convictions, or similar criminal history information accessed through the California Law Enforcement Telecommunications System (CLETS), where otherwise permitted by state law.

(3) Conducting enforcement or investigative duties associated with a joint law enforcement task force, including the sharing of confidential information with other law enforcement agencies for purposes of task force investigations, so long as the following conditions are met:

(A) The primary purpose of the joint law enforcement task force is not immigration enforcement, as defined in subdivision (f) of Section 7284.4.

(B) The enforcement or investigative duties are primarily related to a violation of state or federal law unrelated to immigration enforcement.

(C) Participation in the task force by a California law enforcement agency does not violate any local law or policy to which it is otherwise subject.

ADD 14

**(4)** Making inquiries into information necessary to certify an individual who has been identified as a potential crime or trafficking victim for a T or U Visa pursuant to Section 1101(a)(15)(T) or 1101(a)(15)(U) of Title 8 of the United States Code or to comply with Section 922(d)(5) of Title 18 of the United States Code.

**(5)** Giving immigration authorities access to interview an individual in agency or department custody. All interview access shall comply with requirements of the TRUTH Act (Chapter 17.2 (commencing with Section 7283)).

\* \* \*

**(e)** This section does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual, or from requesting from federal immigration authorities immigration status information, lawful or unlawful, of any individual, or maintaining or exchanging that information with any other federal, state, or local government entity, pursuant to Sections 1373 and 1644 of Title 8 of the United States Code.

\* \* \*

## CAL. GOV. CODE § 7284.10

**(a)** The Department of Corrections and Rehabilitation shall:

**(1)** In advance of any interview between the United States Immigration and Customs Enforcement (ICE) and an individual in department custody regarding civil immigration violations, provide the individual with a written consent form that explains the purpose of the interview, that the interview is voluntary, and that he or she may decline to be interviewed or may choose to be interviewed only with his or her attorney present. The written consent form shall be available in English, Spanish, Chinese, Tagalog, Vietnamese, and Korean.

**(2)** Upon receiving any ICE hold, notification, or transfer request, provide a copy of the request to the individual and inform him or her whether the department intends to comply with the request.

\* \* \*

ADD 15

## CAL. PENAL CODE § 422.93

**(a)** It is the public policy of this state to protect the public from crime and violence by encouraging all persons who are victims of or witnesses to crimes, or who otherwise can give evidence in a criminal investigation, to cooperate with the criminal justice system and not to penalize these persons for being victims or for cooperating with the criminal justice system.

**(b)** Whenever an individual who is a victim of or witness to a hate crime, or who otherwise can give evidence in a hate crime investigation, is not charged with or convicted of committing any crime under state law, a peace officer may not detain the individual exclusively for any actual or suspected immigration violation or report or turn the individual over to federal immigration authorities.

## CAL. PENAL CODE § 679.10

\*   \*   \*

**(e)** Upon the request of the victim or victim's family member, a certifying official from a certifying entity shall certify victim helpfulness on the Form I-918 Supplement B certification, when the victim was a victim of a qualifying criminal activity and has been helpful, is being helpful, or is likely to be helpful to the detection or investigation or prosecution of that qualifying criminal activity.

\*   \*   \*

**(k)** A certifying entity is prohibited from disclosing the immigration status of a victim or person requesting the Form I-918 Supplement B certification, except to comply with federal law or legal process, or if authorized by the victim or person requesting the Form I-918 Supplement B certification.

\*   \*   \*

## CAL. PENAL CODE § 679.11

\*   \*   \*

**(e)** Upon the request of the victim or victim's family member, a certifying official from a certifying entity shall certify victim cooperation on the Form I-914 Supplement B declaration, when the victim was a victim of human

trafficking and has been cooperative, is being cooperative, or is likely to be cooperative to the investigation or prosecution of human trafficking.

\*　　\*　　\*

**(k)** A certifying entity is prohibited from disclosing the immigration status of a victim or person requesting the Form I-914 Supplement B declaration, except to comply with federal law or legal process, or if authorized by the victim or person requesting the Form I-914 Supplement B declaration.

\*　　\*　　\*

## CAL. WELF. & INST. CODE § 827

**(a) (1)** Except as provided in Section 828, a case file may be inspected only by the following:

\*　　\*　　\*

**(P)** The Department of Justice, to carry out its duties … as the repository for sex offender registration and notification in California.

\*　　\*　　\*

**(4)** A juvenile case file, any portion thereof, and information relating to the content of the juvenile case file, may not be disseminated by the receiving agencies to any persons or agencies, other than those persons or agencies authorized to receive documents pursuant to this section. Further, a juvenile case file, any portion thereof, and information relating to the content of the juvenile case file, may not be made as an attachment to any other documents without the prior approval of the presiding judge of the juvenile court, unless it is used in connection with and in the course of a criminal investigation or a proceeding brought to declare a person a dependent child or ward of the juvenile court.

\*　　\*　　\*

**(e)** For purposes of this section, a "juvenile case file" means a petition filed in any juvenile court proceeding, reports of the probation officer, and all other documents filed in that case or made available to the probation officer in making his or her report, or to the judge, referee, or other hearing officer, and thereafter retained by the probation officer, judge, referee, or other hearing officer.

\*　　\*　　\*

ADD 17

## CAL. WELF. & INST. CODE § 831

(a) It is the intent of the Legislature in enacting this section to clarify that juvenile court records should remain confidential regardless of the juvenile's immigration status. Confidentiality is integral to the operation of the juvenile justice system in order to avoid stigma and promote rehabilitation for all youth, regardless of immigration status.

(b) Nothing in this article authorizes the disclosure of juvenile information to federal officials absent a court order of the judge of the juvenile court upon filing a petition as provided by subparagraph (P) of paragraph (1) of subdivision (a) of Section 827.

(c) Nothing in this article authorizes the dissemination of juvenile information to, or by, federal officials absent a court order of the judge of the juvenile court upon filing a petition as provided by subparagraph (P) of paragraph (1) and paragraph (4) of subdivision (a) of Section 827.

(d) Nothing in this article authorizes the attachment of juvenile information to any other documents given to, or provided by, federal officials absent prior approval of the presiding judge of the juvenile court as provided by paragraph (4) of subdivision (a) of Section 827.

(e) For purposes of this section, "juvenile information" includes the "juvenile case file," as defined in subdivision (e) of Section 827, and information related to the juvenile, including, but not limited to, name, date or place of birth, and the immigration status of the juvenile that is obtained or created independent of, or in connection with, juvenile court proceedings about the juvenile and maintained by any government agency, including, but not limited to, a court, probation office, child welfare agency, or law enforcement agency.

\*      \*      \*

## CAL. CODE OF CIVIL PROCEDURE § 155

(a)(1) A superior court has jurisdiction under California law to make judicial determinations regarding the custody and care of children within the meaning of the federal Immigration and Nationality Act (8 U.S.C. Sec. 1101 et seq. and 8 C.F.R. Sec. 204.11), which includes, but is not limited to, the juvenile, probate, and family court divisions of the superior court. These courts have jurisdiction

to make the factual findings necessary to enable a child to petition the United States Citizenship and Immigration Services for classification as a special immigrant juvenile pursuant to Section 1101(a)(27)(J) of Title 8 of the United States Code.

\*     \*     \*

  **(c)** In any judicial proceedings in response to a request that the superior court make the findings necessary to support a petition for classification as a special immigrant juvenile, information regarding the child's immigration status that is not otherwise protected by state confidentiality laws shall remain confidential and shall be available for inspection only by the court, the child who is the subject of the proceeding, the parties, the attorneys for the parties, the child's counsel, and the child's guardian.

  **(d)** In any judicial proceedings in response to a request that the superior court make the findings necessary to support a petition for classification as a special immigrant juvenile, records of the proceedings that are not otherwise protected by state confidentiality laws may be sealed using the procedure set forth in California Rules of Court 2.550 and 2.551.

\*     \*     \*

## CERTIFICATE OF SERVICE

I certify that on May 22, 2019, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  May 22, 2019                    *s/ Joshua A. Klein*
                                        Joshua A. Klein